Zoë Brennan-Krohn*
Malhar Shah*
American Civil Liberties Union Foundation
425 California Street, Suite 700
San Francisco, CA 94104
Tel: (415) 343-0769
zbrennan-krohn@aclu.org
mshah@aclu.org

Brian Dimmick*
Aditi Fruitwala*
Jacob Abudaram*
American Civil Liberties Union Foundation
915 15th Street NW, 6th Floor
Washington, D.C. 20005
Tel: (202) 731-2395
bdimmick@aclu.org
afruitwala@aclu.org
jabudaram@aclu.org

Laura Henrie (Bar No.12449)
Nate Crippes (Bar No.14622)
Disability Law Center
960 South Main Street
Salt Lake City, Utah 84101
Tel: (801) 363-1347
lhenrie@disabilitylawcenter.org
ncrippes@disabilitylawcenter.org

Jason Groth (Bar No. 16683)
Tom Ford (Bar No. 19795)
ACLU of Utah
311 South State Street, Suite 310
Salt Lake City, UT 84111
Tel: (801) 5221-9862
jgroth@acluutah.org
tford@acluutah.org

John A. Freedman*
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ace., N.W.
Washinton, DC 20001
john.freedman@arnoldporter.com

Kristine Itliong*
Arnold & Porter Kaye Scholer LLP
250 W 55th St.
New York, NY 10019
Tel: (212) 836-7037
kristine.itliong@arnoldporter.com

*Application for admission pro hac vice
forthcoming

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| DISABILITY LAW CENTER,<br><br>        Plaintiff,<br><br>                v. | Case No. _____<br><br><br>**COMPLAINT** |

| STATE OF UTAH and SPENCER COX, GOVERNOR OF THE STATE OF UTAH, *in his official capacity*, | **FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |
|---|---|
| Defendants. | |

**INTRODUCTION**

1.      Guardianship is a civil death. A person under guardianship loses the right to make their own decisions and control their daily life. This usually includes losing the ability to decide where they live, whether and where they work, what medical care they will receive, and how they will spend their money. Guardianships are often permanent, meaning a person can be placed under guardianship at age 18 and *never* have the right to choose how to spend their days, what to eat, and who to spend time with. Imposition of guardianship is a momentous legal event. Even where a guardian is acting with the utmost good faith, guardianship carries practical, physical, and psychological consequences and risks, and should not be entered into lightly or established as a default.

2.      Not everyone with an intellectual disability, even a significant, or "severe"[1] intellectual disability, needs a guardian. Indeed, many people with significant support needs and complex disabilities can and do direct their lives with support, and without guardianships, through a range of formal and informal systems, including supported decision-making, powers of attorney, representative payees, and circles of support. These systems allow the disabled person to receive support without losing their rights. Many people with significant or severe intellectual disabilities avail themselves, successfully and safely, of these and other support systems.

3.      Utah's longstanding guardianship system—the only guardianship system in place in the state prior to July 2025—recognized the gravity of guardianship. This "standard guardianship" system, Utah Code §§ 75-5-301 *et seq.*, includes a system of procedural checks and

---

[1] As discussed below, *infra* ¶ 62, "severe" intellectual disability is not clearly defined in Utah Senate Bill 199, and is not a term with a clear, uniform understanding. Plaintiff uses the term here to refer to individuals who would likely be covered under the scope of Senate Bill 199 ("S.B. 199").

1

processes to avoid unnecessary or overbroad guardianships. This standard guardianship system instructs courts to prefer limited guardianships that allow people to retain some rights, even if they lose others. This system also enshrines a set of commonsense rights that people under guardianship retain. These protections are intended to preserve as much independence as possible and, absent a specific court order, allow the disabled person to associate with friends and family of their choosing. Under the pre-July 2025 standard guardianship system, Utah law provides legal counsel to guardianship respondents in most guardianship proceedings and, when counsel is not available, requires the court to appoint a court visitor. Each of these elements, and many of the others that make up the standard guardianship provisions of the Utah Probate Code, create protections against unnecessary and overbroad guardianships, while also allowing guardianship petitions to be considered, and guardians appointed, where the legal standards are met.

4.      But, since July 2025, Utah has implemented a separate, second-class guardianship system, created by Senate Bill 199 ("S.B. 199 guardianship"). Utah Code §§ 75-5-601 *et seq*. People categorized as having "severe intellectual disabilities" are now directed into S.B. 199 guardianships, where they are stripped of key rights and protections, funneled in many cases into a system where the opportunity to mount a defense to a guardianship petition all but vanishes, and, once under guardianship, subjected to more restrictive terms than are available in standard guardianships.

5.      The chasm between standard guardianships and S.B. 199 guardianships rests solely on a disability classification of "severe intellectual disability." Utah Code § 75-5-601(1)(a). This two-tier system—one which treats people differently based on their disability classification—is illegal.

6.      S.B. 199 violates the Americans with Disabilities Act ("ADA") by subjecting people classified as having "severe intellectual disabilities" to discrimination on the basis of their disability. S.B. 199 discriminates by creating a separate, harsher system on the basis of a classification of "severe intellectual disability," and it discriminates by denying people subject to S.B. 199 an equal opportunity to assert their rights and benefit from the safeguards in the standard guardianship system.

7.      Plaintiff Disability Law Center ("DLC") brings this action on behalf of itself and its constituents seeking injunctive and declaratory relief to protect the statutory rights violated by S.B. 199.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this case arises under the laws of the United States, namely the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*

9.      This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and (4) over this civil action commenced to (i) redress the deprivation of a right or privilege secured by an Act of Congress providing for equal rights of all citizens, and (ii) to secure equitable relief under an Act of Congress providing for the protection of civil rights.

10.      This Court has jurisdiction to issue declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

11.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2), because one or more Defendants reside in this district and because the events giving rise to the dispute occurred in this district.

3

## PARTIES

**Plaintiff**

12.    Founded in 1978, DLC is a private, non-profit organization dedicated to protecting the rights of Utahns with disabilities.

13.    DLC's vision is for a just society where Utahns with disabilities are free from stigma, discrimination, and abuse, and have the authority to make their own decisions and enjoy the same rights and opportunities as those without disabilities. In this society, the voices of Utahns with disabilities are heard, and these voices inspire discussion and motivate change. DLC envisions a world in which Utahns with disabilities have equitable access to supports and resources needed to be as independent as possible and to be full participants in their communities.

14.    DLC advocates on behalf of its constituents: the over 500,000 Utahns with disabilities. This advocacy includes working to protect and strengthen autonomy and self-determination, including through avoiding unnecessary or overbroad guardianship. DLC's advocacy also works to expand the availability of healthcare, increase access to education, and secure voting rights for Utahns with disabilities.

15.    DLC is designated as Utah's authorized protection and advocacy organization ("P&A"). Federal law requires DLC to affirmatively carry out the functions Congress identified in establishing the nationwide P&A system. These functions are laid out in statutes including the Developmental Disabilities Assistance and Bill of Rights Act. 42 U.S.C. §§ 15001, *et seq.* ("DD Act").

16.    All Utahns with intellectual disabilities are considered DLC constituents for purposes of the DD Act. 42 U.S.C. § 15043(a)(2)(A). DLC files this action to protect and

4

advocate for the rights and interests of itself and its constituents with intellectual disabilities. [2]

17.    The DD Act defines those with developmental disabilities as those with "a severe, chronic disability" due to a mental or physical impairment that occurs before the individual turns 22 that "results in substantial functional limitations in 3 or more" major life activities, and that "reflects the individual's need for a combination and sequence of special, inter-disciplinary, or generic services, individualized supports, or other forms of assistance that are of lifelong or extended duration." 42 U.S.C. § 15002(8)(A)(ii), (iv), (v).

18.    The DD Act authorizes DLC, as Utah's P&A, to bring legal and administrative actions to ensure protection of, and advocacy for, people with developmental disabilities and to provide information and referrals to programs and services addressing the needs of people with developmental disabilities. *Id.* § 15043(a)(2)(A)(i), (ii). The DD Act also authorizes DLC to investigate abuse and neglect allegations. *Id.* § 15043(a)(2)(B).

19.    The DD Act's express purpose is "to assure that individuals with developmental disabilities and their families participate in the design of and have access to needed community services, self-determination, independence, productivity, and integration and inclusion in all facets of community life, through culturally competent programs." *Id.* § 15001(b).

20.    DLC has frequently exercised its statutory authority to bring suit challenging laws and practices that harm Utahns with disabilities. *See, e.g.*, *Christensen v. Miner*, No. 2:18CV37DAK, 2019 WL 6970956 (D. Utah Dec. 19, 2019) (unpublished) (bringing class-action

---

[2] The terms "intellectual disability" and "developmental disability" are often discussed together collectively as "intellectual and developmental disabilities" or "IDD." Intellectual disabilities are a type of developmental disability, so a person with an intellectual disability is, by definition, also a person with a developmental disability. *See* Nat'l Ins. of Child Health and Human Dev., *About Intellectual and Developmental Disabilities* (2021), https://www.nichd.nih.gov/health/topics/idds.

suit to address the unnecessary segregation of people with intellectual disabilities in institutional settings in violation of the ADA); *Jacobs et al. v. Salt Lake City Sch. Dist.*, No. 2:21-cv-00706-JNP-CMR, 2023 WL 2742719 (D. Utah Mar. 31, 2023) (unpublished) (challenging school district policy for students with intellectual disabilities that required them to be sent to separate hub schools without regard for the needs or capabilities of individual students).

21.    DLC's 16-member elected governing board includes several Utahns with disabilities and their family members. The governing board is intimately familiar with the needs of those with developmental disabilities, as at least half of the board is a family member (sibling or parent) of a person with an intellectual or developmental disability or leads an organization that represents the population. This organizational structure ensures a close connection between DLC's activities and the interests of its constituents.

22.    The governing board also reviews and approves DLC's annual issue priorities each year after reviewing feedback from stakeholders, constituents, and other community members, including people with intellectual disabilities.

23.    In addition to the governing board, DLC also has an advisory council made up of individuals with mental health conditions, family members, and service providers, who provide feedback regarding DLC's services.

24.    DLC provides direct representation in guardianship proceedings to individuals who do not believe a guardianship is necessary and/or individuals who wish to modify a guardianship to be less restrictive.

25.    DLC has received over 350 calls related to guardianship over the last four years. DLC has provided direct legal services to dozens of guardianship respondents, as well as

6

information, referrals, and/or self-advocacy materials to those DLC could not directly represent. Over the past year, DLC has seen a 33% increase in calls related to guardianship.

26.    Some of these individuals are those who could be classified as having a severe intellectual disability by a doctor or psychologist.

**Defendants**

27.    Defendant State of Utah—including the Governor, the Utah State Legislature, and the Utah State Courts—is responsible for operating its programs, services, and activities in conformity with the ADA.

28.    Defendant State of Utah is a public entity subject to the requirements of Title II of the ADA. 42 U.S.C. § 12131.

29.    The ADA permits suits against states and authorizes injunctions and declaratory relief against them just as against any other entity. *Id.* § 12202 ("In any action against a State for a violation of the requirements of this chapter, remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in an action against any public or private entity other than a State.").

30.    If implementation and enforcement of S.B. 199 is enjoined by this Court, Defendant State of Utah is authorized to stop the law's implementation and enforcement.

31.    Defendant State of Utah has acknowledged this power by volunteering to cease both the enactment and enforcement of the law. Defendant State of Utah wielded this authority when it paused implementation and enforcement of S.B. 199 and prevented S.B. 199 guardianship petitions from being heard for nearly two months, during a stipulated stay of the law between May 7, 2025, when the law was initially set to take effect, and July 22, 2025.

7

32.    As an arm of the State of Utah, the Utah State Courts have made clear that a declaration from this Court that S.B. 199 violates the law would put a practical stop to implementation and enforcement.

33.    Defendant Spencer Cox is the Governor of Utah. The Governor is responsible for "supervis[ing] the official conduct of all executive and ministerial officers." Utah Code § 67-1-1(1). The Governor shall "see that all offices are filled and the duties thereof performed." *Id*. § 67-1-1(2). Defendant Cox is responsible for ensuring compliance with federal laws in state programs and activities. Defendant Cox is legally responsible for the unlawful policies, practices, and procedures challenged herein, and has the authority and legal obligation to eliminate and remedy these policies, practices, and procedures. Defendant Cox is sued in his official capacity.

## FACTUAL ALLEGATIONS

### I.    Utah's Adoption of a Two-Tier Guardianship System Based on Disability Classification

34.    Utah's longstanding "standard" guardianship system lays out a system of processes, protections, rights, and presumptions for guardianship proceedings. Utah Code §§ 75-5-301 *et seq*. Prior to the implementation of S.B. 199 in July 2025, the standard guardianship system was the only way that a Utahn could become subject to a guardianship.

35.    Now, following the implementation of S.B. 199, Utah has created a separate, second-class guardianship system via S.B. 199 guardianship, which eviscerates essential rights and protections relative to people in standard guardianships and does so solely on the basis of a disability classification.

36.    As outlined below, the S.B. 199 guardianship system is less protective and more restrictive of guardianship respondents than standard guardianship systems. At every turn, S.B.

8

199 distinguishes between people in standard guardianships and S.B. 199 guardianships on the basis of a disability classification, denies S.B. 199 guardianship respondents a meaningful opportunity to participate in the guardianship process, and increases the risk that S.B. 199 guardianship respondents' rights will be erroneously and permanently deprived. These distinctions, alone and in tandem, all but guarantee that people alleged to have and/or classified as having "severe intellectual disabilities" will lose rights through the S.B. 199 guardianship process, without a chance to be heard or an opportunity to participate in order to avoid an unnecessary or overly restrictive guardianship. This second-tier guardianship track is the result of an impermissible disability classification of "severe intellectual disability."

### A.  Limitations on Right to Counsel in S.B. 199 Guardianships

37.    Under standard guardianships, respondents enjoy the right to counsel. Specifically, the standard guardianship statute provides that, "[u]nless the allegedly incapacitated person has counsel of the person's own choice, the court shall appoint an attorney to represent the person in the proceeding." *Id*. § 75-5-303(2)(b).

38.    Standard guardianships provide a narrow exception to this right. Counsel is not required for standard guardianship proceedings if each of the following six conditions are met: no counsel is available for at least 60 days, *and* the court appoints and receives a report from a court visitor,[3] *and* the respondent is given an opportunity to communicate their acceptance of or objection to the guardianship; *and* the respondent appears in court for the hearing, *and* the

---

[3] A visitor is "an officer, employee, or special appointee of the court with no personal interest in the proceedings whose role is to investigate, observe, and report to the court," including "investigat[ing] the [guardianship] respondent's circumstances and well-being." Utah Code Jud. Admin. R. 6-507(1)(A), (2)(A) (2023).

petitioner is the parent of the respondent, *and* the value of the respondent's estate is less than $20,000. *Id.* § 75-5-303(6)(e)(i)–(vii).

39.    By contrast, S.B. 199 dramatically reduces the right to counsel for guardianship respondents by reversing the presumption of counsel, creating a default of non-representation. S.B. 199 effectuates this shift by eliminating or weakening five of the conditions that must be met to deny counsel in standard guardianships.

40.    First, while standard guardianships remove the right to counsel only if none of the attorneys on the court's list of volunteers can represent the respondent for at least 60 days, S.B. 199 eliminates the inquiry into counsel availability. This means that disabled respondents in S.B. 199 guardianships may lose their right without representation even if lawyers are ready and willing to represent them. *Compare* Utah Code § 75-5-303(2)(b) *with id.* § 75-5-606(2).

41.    Second, S.B. 199 eliminates the backstop protection of a court visitor. Under standard guardianships, where counsel is not appointed, the court must at least appoint and receive a written report from a court visitor, ensuring that the respondent is, at minimum, connected with a neutral third party who provides information to the court on behalf of the respondent. But in S.B. 199 guardianships, this protection is wholly eliminated: S.B. 199 guardianships can proceed without counsel or a visitor. *Compare* Utah Code § 75-5-303(6)(e)(vii) *with id.* § 75-5-606(2).

42.    Third, S.B. 199 eliminates the opportunity for a respondent to express objection to the appointment of the guardian. While under standard guardianships, respondents have a right to communicate their acceptance of *or objection to* the guardianship itself or the proposed guardians, S.B. 199 respondents are only entitled to communicate their "acceptance of" the guardianship. *Compare* Utah Code § 75-5-303(6)(e)(iv) *with id.* § 75-5-606(2)(d).

10

43.     Fourth, in standard guardianship proceedings, respondents can go without counsel only if, among other factors, the respondent appears in court in person at the hearing. In contrast, S.B. 199 proceedings remove this protections by directing the court to conduct the hearing remotely absent good cause and eliminating the requirement that remote appearance requires counsel. *Compare* Utah Code § 75-5-303(6)(e)(iii) *with id.* § 75-5-604(3)(b).

44.     Fifth, while standard guardianships can proceed without counsel only if the petitioner is a parent, S.B. 199 respondents can be denied counsel if the petitioner is a parent, a grandparent, or a sibling. *Compare* Utah Code § 75-5-303(6)(e)(i) *with id.* § 75-5-606(2)(a).

45.     Although under both standard and S.B. 199 guardianships the court must be "satisfied" that counsel is not necessary to protect the respondent's interests, *id.* §§ 75-5-303(6)(e)(vi), 75-5-606(2)(e), the changes enacted by S.B. 199 effectively prevent the court from obtaining the information needed to make that determination. The court receives no input from an attorney or a court visitor, the respondent has no right to express their objections directly, and the respondent is not even required to be present in court.

46.     The following table summarizes and compares the elements required to waive the right to counsel under standard and S.B. 199 guardianships (all elements must be met):

11

|  | Standard guardianships | S.B. 199 guardianships |
|---|---|---|
| **Availability of counsel** | No counsel is available within 60 days of the hearing date.[4] | No corresponding protection. |
| **Court visitor** | If counsel is not available, court visitor must be appointed, and must provide a written report.[5] | No corresponding protection. |
| **Respondent opportunity to participate** | Respondent must be given an opportunity to communicate *acceptance of or objection to* guardianship or guardian.[6] | Respondent is given opportunity *only* to communicate *acceptance of* guardianship.[7] |
| **Respondent presence at hearing** | Must be in person.[8] | Can be in person or remote.[9] |
| **Petitioner identity** | Petitioner must be parent.[10] | Petitioner is parent, or grandparent, or sibling.[11] |
| **Value of respondent's estate** | Under $20,000.[12] | Under $2,000.[13] |
| **Court assessment** | Court is satisfied that counsel is not necessary to protect the interests of respondent.[14] | Court is satisfied that counsel is not necessary to protect the interests of respondent.[15] |

47.     These changes mean that S.B. 199 respondents will virtually always proceed without counsel. The only change that would seem to add protections under S.B. 199 is the reduction in value of the respondent's estate from $20,000 to $2,000. *Compare* Utah Code § 75-5-303(6)(e)(ii) *with id.* § 75-5-606(2)(b). However, Medicaid and a range of other services relied

---

[4] Utah Code § 75-5-303(6)(e)(v).
[5] *Id.* § 75-5-303(6)(e)(vii).
[6] *Id.* § 75-5-303(6)(e)(iv).
[7] *Id.* § 75-5-606(2)(d).
[8] *Id.* § 75-5-303(6)(e)(iii).
[9] *Id.* § 75-5-606(2)(c).
[10] *Id.* § 75-5-303(6)(e)(i).
[11] *Id.* § 75-5-606(2)(a).
[12] *Id.* § 75-5-303(6)(e)(ii)
[13] *Id.* § 75-5-606(2)(b).
[14] *Id.* § 75-5-303(6)(e)(vi).
[15] *Id.* § 75-5-606(2)(e).

upon by virtually everyone with significant intellectual disabilities impose an asset limit of $2,000, ensuring that virtually everyone subject to an S.B. 199 guardianship will be below this asset limit.

48.     These changes are yielding the expected result: On information and belief, to date *no* S.B. 199 respondent in Utah has been appointed counsel.

### B.  Limited Discretion for Hearing Type in S.B. 199 Guardianships

49.     Under standard guardianships, courts enjoy discretion to hold hearings in person, remotely, or in a hybrid format, subject to considerations outlined in Utah Rule of Civil Procedure 87(b). S.B. 199 removes that discretion, stating that the court *shall* hold the hearing remotely unless it finds good cause to hold the hearing in person. The court is thus deprived of the discretion to assess what format is most appropriate for, and preferred by, the parties, including the respondent. *Compare* Utah Code  § 75-5-303(6)(a) *with id.* § 75-5-604(3)(b).

50.     On information and belief, all S.B. 199 hearings have been held remotely. Some have been conducted telephonically, with no determination of whether the respondent is even present on the phone line.

### C.  Denial of Right to Jury Trial in S.B. 199 Guardianships

51.     In standard guardianships, respondents are ensured a right to a trial by jury. Respondents in S.B. 199 guardianship proceedings are denied this right. *Compare* Utah Code § 75-5-303(6)(d) *with id.* § 75-5-604(4).

### D.  Presumption of Full Guardianship for S.B. 199 Guardianships

52.     In standard guardianship proceedings, courts can impose "full" or "limited" guardianships. The difference is significant. Under a full guardianship, a guardian has "the same powers, rights, and duties respecting the ward that a parent has respecting the parent's unemancipated minor," *id.* § 75-5-312(1)(c)(i), and may typically establish the disabled person's

13

place of residency, consent to their medical care or treatment, and arrange for their training and education. *Id*. § 75-5-312(2)(a)–(b). In a limited guardianship, by contrast, the guardian does not automatically receive this full panoply of decision-making rights, and the person under guardianship retains all rights not granted in the court's limited guardianship appointment. *Id.* §§ 75-5-304(2), 75-5-312(1)(a)(i). For example, the court could find that a person understands most decisions but struggles to evaluate housing or service contracts. In this scenario, the court could authorize the guardian to approve and terminate leases and contract for residential services, but the respondent could retain the right to determine their living arrangements, be employed, vote, and manage their personal relationships.

53. In standard guardianship proceedings, if the court finds that a respondent meets the criteria to impose a guardianship, the court must prefer a limited, rather than a full, guardianship. The court may only impose a full guardianship if "no other alternative exists," *id.* § 75-5-304(2)(a)(i), and after making a "specific finding" that "nothing less than a full guardianship is adequate," *id.* § 75-5-304(2)(a)(ii).

54. But in S.B. 199 guardianships, the standard is reversed. Courts are required to "prefer" *full* guardianships. *Id.* § 75-5-609(2)(b).

### E. Expanded Scope of "Full" Guardianship for S.B. 199 Guardianships

55. A "full" S.B. 199 guardianship is different, and more restrictive, than even a full standard guardianship in two ways.

56. First, a person under a standard full guardianship retains the right to "be granted the greatest degree of freedom possible that is consistent with the reasons for the guardianship," and to "remain as independent as possible." *Id.* § 75-5-301.5(3)(f), (5)(c). These rights are core to protect the dignity and respect of disabled people under guardianship, and to ensure that the person

14

under guardianship has the opportunity to learn and develop skills, and that their preferences are taken into consideration.

57.     But a person under an S.B. 199 "full" guardianship does not have these rights. *See id.* § 75-5-603. The S.B. 199 guardian need not support the person's independence, nor grant them the greatest degree of freedom possible.

58.     Second, under a standard full guardianship, the guardian's authority to restrict or limit the disabled person's contact with friends and family is expressly defined and subject to specific parameters. The standard guardian may not limit the disabled person's association with relatives or acquaintances absent a court order. To obtain such an order, the guardian must establish, by a preponderance of the evidence, that limiting contact with a particular person or group reflects the disabled person's expressed or presumed wishes, or is the least restrictive means necessary to protect the person's health or welfare. *Id.* § 75-5-312.5(2), (8). Ensuring court oversight before a guardian can take a disabled person away from family, friends, work, or day programs is an important protection against abuse and neglect by a guardian.

59.     But S.B. 199 "full" guardianships eliminate this system of safeguards and oversight as to association with friends and family. An S.B. 199 guardian may "restrict or prohibit" the disabled person's association with *any or all* friends or family "if the guardian deems that the association is harmful to the individual." *Id.* § 75-5-611(7)(b). The guardian may make this determination unilaterally, with no opportunity for input from the disabled person, no individualized determination, no oversight from the court, and no opportunity for the disabled person to challenge it. If an S.B. 199 guardian determines that a disabled person is better off isolated from *all* family, friends, support workers, and healthcare providers, neither the court nor the disabled person has any remedy to challenge this.

15

### F.  Diminished Opportunity to Change or End S.B. 199 Guardianships

60.    S.B. 199 limits the opportunities to modify or end S.B. 199 guardianships. A person under a standard guardianship who seeks to modify or end their guardianship, or to replace the guardian, is entitled to legal counsel, subject only to the narrow exceptions discussed above, *supra* § I(A). By contrast, a person under an S.B. 199 guardianship who wishes to end or change their guardianship remains subject to the default of no representation as discussed above, *supra* § I(A).

### II.    <u>Impact of the Two-Tier S.B. 199 Guardianship System on DLC Constituents</u>

61.    The two-tier guardianship system established by S.B. 199 creates a chasm between the rights of people in standard guardianship proceedings and those in S.B. 199 guardianship proceedings. This system is harming DLC's constituents who are or will be subject to S.B. 199 proceedings and S.B.199 guardianships. To summarize: S.B. 199 respondents, who are DLC's constituents, functionally lose the right to any kind of representation, and lose the right to object to a guardianship, the right to a jury trial, and the right to a preference of a limited guardianship. Once a guardianship is imposed, they also lose protections that would otherwise limit or oversee the guardian's authority.

62.    The only distinction between the S.B. 199 guardianship system and the standard guardianship system is a determination that the respondent has a "severe intellectual disability," a term ill-defined and a classification all but impossible to challenge. A respondent is directed into the S.B. 199 guardianship system if a petitioner presents "a signed letter or report from a physician or psychologist that indicates that the adult is an individual with a severe intellectual disability." Utah Code §§ 75-5-602(1), 75-5-604(1). Although the court must "find" that the respondent is a person with a "severe intellectual disability," *id.* § 75-5-609(1), the statute does not adequately

16

define this term or specify a standard of proof in making that finding. The lack of counsel or a court visitor in most cases further deprives courts of guidance to make this finding, because respondents have no opportunity to communicate with the court or to present any information to challenge such a determination. In many cases, the court will reach this "finding" based solely on information provided by the petitioner, with no interaction with the respondent.

63.    Some of DLC's constituents are already facing the harms of S.B. 199 guardianships, while others remain at risk of such harms. For those constituents already subject to S.B. 199, the dramatic difference between rights and protections in standard and S.B 199 guardianship proceedings is playing out as expected. Plaintiff is not aware of any S.B. 199 guardianship respondent who has been appointed counsel. Plaintiff is not aware of any S.B. 199 guardianship respondent who has been appointed a court visitor. And, pursuant to S.B. 199, each of these constituents who has been subjected to S.B. 199 proceedings without representation or support from a visitor, has also been deprived of the opportunity to object in the proceedings, deprived of the right to a jury trial, and deprived of the preference for a limited guardianship—all because of an ill-defined disability classification. In all of the S.B. 199 petitions that Plaintiff is aware of, the court has imposed an S.B. 199 full guardianship, meaning that these DLC constituents can be isolated from any and all family and friends by their guardian, with no court oversight or opportunity to challenge such isolation.[16]

64.    By virtue of S.B. 199's processes and presumptions, DLC constituents are suffering, and will continue to suffer, harm including: denial of the opportunity to participate in

---

[16] Petitions were filed in the Second District Court on August 14, August 18, August 26, and October 23, 2025. These S.B. 199 guardianships were granted on November 4, October 23, November 25, and November 19, 2025, respectively.

guardianship proceedings; and the harm of unnecessary or overbroad guardianship, which inflicts harm to independence, health, and well-being and increases the risk of abuse and neglect. Each of these harms is the result of S.B. 199 and would be mitigated or removed by relief from this Court.

### A. Denial of Opportunity to Participate in Guardianship Proceedings

65.     S.B. 199 denies people categorized has having "severe intellectual disabilities" an equal opportunity to participate in guardianship proceedings. By curtailing the rights and protections afforded to all other guardianship respondents as outlined above, *see supra* §§ I(A)– (D), (F), S.B. 199 excludes people, based on a disability classification, from an opportunity to mount a defense, have their voices heard to the court, and express their preferences, in guardianship proceedings. Lawyers, court visitors, and other procedural protections are even more important when a guardianship respondent has a significant disability.

66.     This harm impacts all S.B. 199 guardianship respondents, even those with significant or "severe" intellectual disabilities. Even people with significant and complex disabilities have preferences and ways to communicate them. These may include words, signs, gestures, or facial expressions. Those preferences should be taken seriously in guardianship proceedings, even if a guardianship is ultimately established.

67.     People with intellectual disabilities face particularly significant challenges navigating guardianship processes because court processes and documents can be complex, dense, and overwhelming for anyone. Counsel and court visitors can and do make the process accessible to people with a wide range of disabilities, including significant intellectual disabilities. Counsel and court visitors can and do ensure that people with significant disabilities understand, as much as possible, the proceedings that are occurring; have their questions answered by counsel or the court; and have an opportunity to express their preferences with respect to their rights and future.

68.     Some of the ways that lawyers and others can make guardianship processes accessible are: explaining information in plain language; meeting in comfortable, familiar settings where the person is best equipped to receive and process information; observing and learning about the person's preferences through verbal and nonverbal communication; and requesting accommodations in the court proceedings to help the person understand and track what is happening. Without the support of an attorney or a visitor, an S.B. 199 guardianship respondent has almost no chance of having their voice or preferences heard or considered.

69.     The harm from this denial of an equal opportunity to participate fully in proceedings is extensive. For some people, this denial of procedural protections in S.B. 199 proceedings may mean the difference between retaining rights and losing them through a guardianship. Disabled people who ostensibly "consented" to guardianship have, upon meeting with counsel, understood for the first time the nature and consequences of guardianship and have subsequently withdrawn that consent and regained their rights. For other respondents, these protections may make the difference between a full and a limited guardianship. But even if a full guardianship is ultimately imposed, procedural protections remain important, and the denial of an opportunity to participate causes harm.

70.     The harms from the loss of counsel and the loss of an opportunity to express opposition to a guardianship will be even further exacerbated if the guardianship respondent is not even present in the courtroom.

### B.  Imposition of Overbroad or Unnecessary Guardianships

71.     S.B. 199 subjects people with disabilities to S.B. 199 full guardianships, when a limited guardianship, no guardianship at all, or a standard full guardianship, would be appropriate.

19

This unnecessary or overbroad deprivation of rights means that the independence, health, and well-being of S.B. 199 guardianship respondents will suffer.

72.    The denial of an equal opportunity to participate in the process, *see supra* § II(A), all but guarantees that the result of an S.B. 199 petition will be the imposition of an S.B. 199 guardianship, and forecloses opportunities for the respondent to mount a defense or engage with important questions of support, capacity, and alternatives to guardianship.

73.    Matters of support, capacity, and alternatives to guardianship can make the difference between retaining and losing rights. Many people with significant intellectual disabilities who require support to manage their daily lives also retain capacity to direct aspects of their lives and to make some or all of their own decisions with or without support. They may use powers of attorney, representative payees, supported decision making, and formal and informal circles of support to get support in some or all aspects of their lives, without guardianship.

74.    For example, Margaret "Jenny" Hatch, a woman with a measured IQ of 49, was able to get out of guardianship in Virginia after a bench trial, in a first-of-its-kind case in 2013.[17] The court found that Ms. Hatch was able to live and direct her life with support, and found that she therefore did not meet the criteria for guardianship.

75.    But not all family members or courts are aware of these options and alternatives and may believe that guardianship is the only option. Under S.B. 199, there is virtually no way for a disabled respondent or an advocate to introduce these ideas and limit or avoid guardianship.

---

[17] *See The Justice for Jenny Trial,* Nat'l Res. Ctr. for Supported Decision-Making, https://jennyhatchjusticeproject.org/justice-project/about-the-jenny-hatch-justice-project/the-justice-for-jenny-trial/.

76.     Instead, without participation from the respondent or the presence of an advocate, courts will impose guardianships relying solely on a letter from a physician or a psychologist and the statements of the petitioner. Utah Code §§ 75-5-602(1), 75-5-604(1). But the assessments of physicians and psychologists often do not accurately reflect a person's ability to make decisions, learn, and receive information. These assessments often ignore the support systems disabled people have, viewing such support as evidence of incapacity, rather than strength. And even loving guardianship petitioners acting in complete good faith often underestimate the abilities, capacity, and growth potential of their loved ones with intellectual disabilities.

### a.   Harm to Respondents' Independence, Health, and Well-Being

77.     The loss of rights through an unnecessary or overbroad guardianship causes harm, even when the guardian is acting in good faith and with love. Loving parents and family members often underestimate the abilities, capacity, and growth potential of their loved ones with intellectual disabilities, and may inadvertently limit their opportunities to learn, grow, and develop.

78.     Even when guardianship petitioners are acting in good faith, there is still often tension between what a guardian perceives as the disabled person's abilities and support needs, and the person's actual abilities and support needs. A guardianship, especially an S.B. 199 full guardianship, allows the guardian to impose their understanding, every time.

79.     Research consistently shows that people with intellectual and developmental disabilities who exercise more self-determination in their lives are more likely to be independent, employed, and active in their communities. While guardians may override the choices or preferences of a person with disabilities out of concern for the person's best interests, the decision to ignore the person's wishes can harm their well-being. The loss of self-determination is

21

associated with a decreased quality of life. This is true when comparing people with similar types of disabilities and includes people with significant intellectual disabilities.

### b. **Risk of Isolation and Abuse**

80. S.B. 199 guardianships put DLC's constituents at risk of abuse and isolation and eliminate key safeguards to identify and stop abuse.

81. Of course, most family members and others who seek guardianship do so with good and kind intentions. But sadly, there are abusive guardians, and some of these are family guardians. Just because a petitioner is a family member does not guarantee that the person is acting in good faith.

82. DLC has represented multiple individuals under guardianships who have alleged abuse and/or exploitation by a family member who is their guardian.

83. Abuse or neglect can also happen when courts change a guardianship without the respondent's consent. For example, a loving family member may serve as a good faith guardian. But if the guardian is no longer able to serve, or if the court determines that someone else should be a guardian, the disabled person may find themselves in a situation far different from what the original guardian intended.

84. No system offers absolute protection against abuse and neglect. But isolation dramatically increases risk. Ongoing relationships with friends, family, and community supports serve as a critical protective factor, enabling those closest to the individual to identify neglect and intervene before harm escalates. Family, friends, service providers, and support workers can be critical in identifying and taking action in cases of neglect.

85. Under S.B. 199 guardianships, the guardian can permanently isolate a disabled person—cutting off all contact with any or all family, friends, and support workers. S.B. 199

22

guardians can exclude the disabled person them from work, volunteering, or day programs, and force them to live in a remote or segregated settings, without transportation or access to communications. These decisions occur without notice to the court, without oversight, and without any recourse to contest them.

86. This unrestricted and unchecked power can be easily exploited by a guardian who wishes to abuse or neglect a disabled person. Even within standard guardianships, abuse and neglect are difficult to detect and address; those challenges are magnified here. S.B. 199 eliminates key checks against abuse and neglect in guardianships and will harm DLC's constituents.

### III.    S.B. 199's Harm to DLC and Impact on its Core Business Activities

87. DLC is harmed as an organization by S.B. 199.

88. Working to protect the legal rights, choices, and opportunities of Utahns with disabilities is a core part of DLC's mission, and addressing guardianship is a critical part of that work. The services that DLC provides related to guardianship include: self-advocacy education; a legal clinic that works with individuals subject to guardianship and provides information about their rights and choices and how best to protect their autonomy; general information for individuals; referrals; and legal representation to adults under or at risk of abusive or unnecessary guardianships.

89. Approximately 1,000 guardianship petitions for adults with disabilities are filed every year in Utah, and DLC regularly receives calls for assistance from people with disabilities who are facing these petitions, or who are already under guardianship. Most of the calls DLC receives about guardianship concern adults with intellectual or developmental disabilities. DLC provides guidance, advocacy, and individual representation to some of these people, including some who might be classified under S.B. 199 as having a severe intellectual disability.

90. In the vast majority of the cases where DLC's assistance is requested for a guardianship matter, a parent is the guardian or petitioner, and a sibling is often in the role of co-guardian or "successor" guardian.

91. There is often significant disagreement between what a parent-guardian perceives as the disabled person's functional limitations and abilities and what the disabled person's actual functional abilities are.

92. In many cases, DLC has seen full guardianships granted over individuals who already have supports in place, can communicate their wishes, and are able to live independently, with support. DLC has been able to modify and terminate some unnecessary or overbroad guardianships through direct representation.

93. Since S.B. 199 took effect in July 2025, DLC's core business activities have been harmed in multiple ways, and they will continue to be harmed so long as S.B. 199 is in effect.

94. First, S.B. 199 has curtailed DLC's ability to monitor and participate in guardianship proceedings to protect the interests of DLC's constituents. Because S.B. 199 created a new type of guardianship proceeding, the State has elected to hold these hearings separate from the standard guardianship process. Previously, DLC staff could attend a probate calendar where many initial guardianship hearings were scheduled. DLC staff were able to freely join these public hearings and could see the guardianship respondent. DLC staff could also voice objections or concerns to any of the proposed guardianships and could ask to be added to the case as an interested party. This allowed one DLC staff member to observe many guardianship proceedings at one time.

95. Following these hearings, if any objection occurred, including by DLC, the case would be sent to the assigned judge for further evidentiary review.

96.    But S.B. 199 guardianships are not included on these probate calendars; they go directly to the assigned judge.

97.    This means that DLC staff cannot attend regularly scheduled probate calendars. In order to observe hearings, DLC staff must monitor all guardianship filings in the state to determine which may be S.B. 199 filings.

98.    Because there is no current court code for these filings, DLC staff must spend a significant amount of time reviewing dockets to see where there has been an assertion that a guardianship respondent has a "severe intellectual disability," determine when the hearing will occur, and determine how they can attend that specific remote hearing.

99.    This is much more onerous than attending a general probate calendar. It requires DLC staff to register to attend the remote hearing and wait to be approved and sent a link.

100.    In standard guardianship hearings, anyone can attend the probate calendar. But in S.B. 199 proceedings, DLC staff has frequently been required to announce their presence at that specific case in order to be allowed to observe. Given these challenging circumstances, DLC staff cannot be certain on the true number of SB 199 guardianship petitions that have been filed in the State.

101.    To date, DLC staff has identified multiple S.B. 199 guardianships that were filed, and all of the hearings have occurred remotely.

102.    DLC staff has tried to attend all of the identified hearings, but was not permitted to observe one of them.

103.    In each observed instance when the Court held an S.B. 199 hearing, the respondent did not have an attorney, was not asked any questions by the Judge, and was not provided with any opportunity to object to the guardianship.

104. In one of the observed hearings, neither the petitioners nor the respondent appeared on video. The petitioners communicated with the court by audio. The respondent did not communicate with the court at all, visually or by audio.

105. Because the respondent was not asked any questions and did not appear, DLC staff could not interact with them directly or gather any information about their preferences or experiences.

106. To overcome these obstacles posed by S.B. 199 and ensure it can provide the requisite resources to assess and support S.B. 199 guardianship respondents, DLC has had to revise its annual goals to account for a significant increase in staff time. This staff time is devoted to identifying potential S.B. 199 petitions, tracking docket entries and hearings dates, and attending S.B. 199 hearings in an effort to understand and mitigate the impact of the new law on the rights of DLC constituents.

107. Further, because DLC staff have continued to observe general probate calendars in addition to the additional tracking and observation of S.B. 199 cases, DLC has tasked additional personnel with attending the general probate calendars. This requires additional training and supervision. In addition, attending to these additional responsibilities has left DLC personnel with less time to devote to other duties.

108. Second, S.B. 199 has harmed DLC's core business activities, including its guardianship work and its broader activities. Specifically, S.B. 199 diminishes DLC's ability to identify people under guardianship who are experiencing abuse or neglect and investigate reports of abuse or neglect, as required by the DD Act. These reports come primarily from a family member, friend, or service provider who has identified a concern related to the guardian's care and

26

typically relate to misuse of the individual's limited funds, provision of daily necessities, or physical safety. Sadly, it is often a combination of all three.

109. But S.B. 199 guardianships severely curtail DLC's ability to receive information from interested family, friends, medical providers, or staff because S.B. 199 guardians have virtually unchecked power to isolate disabled people from family and friends. *See* Utah Code § 75-5-611(7)(b). Being placed in an S.B. 199 guardianship cuts disabled people off from supporters who could previously maintain relationships with them, and who were well positioned to recognize problems that may arise and report these to DLC.

110. Without these reports, DLC's ability to investigate abuse and neglect among people under guardianship has been significantly curtailed, and as a result, DLC faces significant barriers in meeting its obligations under the DD Act to identify and investigate such incidents. In response to S.B. 199, DLC is expending more resources to identify individuals experiencing abuse or neglect. This includes educating medical providers, legal services providers, educators, and providers of services to people with intellectual disabilities about DLC's services and the impact of the new law on people with "severe intellectual disabilities."

111. S.B. 199 has also harmed several other programs that DLC provides to people with disabilities, including intellectual disabilities, unrelated to guardianship. These programs include providing representation and advice in employment, housing, education, and access to public accommodations matters. As with abuse and neglect reports, DLC often learns of individuals who need assistance with these matters through their family members and friends. But, as discussed above, S.B. 199 prevents DLC from receiving such reports by allowing S.B. 199 guardians to isolate disabled people from their family and friends. Without these reports, DLC has less

27

opportunity and ability to represent and assist people with intellectual disabilities on their individual employment, housing, and public accommodation discrimination issues.

112.    Third, S.B. 199 has forced DLC to prepare to expend more resources providing representation to more individuals involved in guardianship proceedings.[18] This is because individuals subject to S.B. 199 guardianships will not have other counsel representing them, and will not be entitled to interaction with, or a report from, a court visitor. *See id.* §§ 75-5-606(2), 75-5-607(2). The same increased need will also arise in guardianship termination proceedings, where the right to counsel will also be curtailed.

113.    Each of these harms to DLC's core business activities has forced and continues to force DLC to divert resources away from other activities core to its mission. For example, as noted above, DLC will be able to represent fewer individuals in other types of proceedings because it will need to devote more resources to representing people subject to S.B. 199 petitions and guardianships. DLC will have to expend more effort to identify and support people who are experiencing abuse and neglect, because of the ease with which S.B. 199 guardians can now isolate people. As a result, DLC staff have less time to attend to other urgent requests for assistance from its constituents.

114.    DLC has a specific, finite grant under the DD Act that it must use specifically to serve people with intellectual and developmental disabilities. Many of the other funding sources on which DLC relies are designated to serve other disabled populations and cannot be used on work to serve this population. Therefore, DLC has limited resources available to represent and

---

[18] A declaratory judgment from this Court would also allow the DLC to better inform individuals and judges about their rights under S.B.199 and could prohibit it from taking effect.

otherwise serve people with intellectual disabilities. S.B. 199 has required and will force DLC to stretch these already limited resources to prevent additional harms to people with intellectual disabilities, leaving less funding from the DD Act grant to support people with intellectual disabilities in other areas such as abuse and neglect investigations, employment discrimination, and housing discrimination.

## CLAIM FOR RELIEF
Violation of Title II of the Americans with Disabilities Act

115.    Plaintiffs incorporate paragraphs 1 to 114, *supra*, by reference.

116.    The ADA provides a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities. 42 U.S.C. § 12101(b)(1) & (2).

117.    Enactment of the ADA reflected deeply held American ideals that value the contributions that individuals can make when free from arbitrary, unjust, or outmoded societal attitudes and practices that prevent the realization of their full potential. The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1).

118.    The ADA defines "[q]ualified individual with a disability" as an "individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of . . . communication . . . barriers, or the provision of auxiliary aids or services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

29

119.    DLC's constituents are qualified individuals under the ADA in that they meet the essential eligibility requirements for access to the courts and for participation in the guardianship process implemented by S.B. 199.

120.    DLC has constituents with intellectual disabilities who will be subject to the guardianship process implemented by S.B. 199. These constituents are individuals with disabilities within the meaning of the ADA. They have mental impairments that substantially limit one or more major life activities, such as thinking, speaking, caring for themselves, and interacting with others. They are also regarded as having intellectual disabilities based on representations regarding their medical conditions in guardianship petitions.

121.    Any individual who would be subject to an S.B. 199 guardianship would necessarily be alleged to have a mental impairment that substantially limits a major life activity by virtue of the requisite doctor's note identifying them as a person with a "severe intellectual disability."

122.    The ADA defines "[p]ublic entity" as "A) any State or local government; [and] (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government . . . ." 42 U.S.C. § 12131(1).

123.    The State of Utah is a state government entity and thus a public entity subject to Title II. 42 U.S.C. § 12131(1). The ADA permits suits against states and authorizes injunctions and declaratory relief against them just as against any other entity.  42 U.S.C. § 12202 ("In any action against a State for a violation of the requirements of this chapter, remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in an action against any public or private entity other than a State.")

124.    Title II prohibits public entities from discriminating against a qualified individual with a disability by treating them more harshly than others. 42 U.S.C. § 12132. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id.*

125.    Title II prohibits public entities from providing aids, benefits, or services in such a way that qualified individuals are denied the opportunity to participate in or benefit from those aids, benefits or services. 28 C.F.R. § 35.130(b)(1)(i). Public entities may not provide aids, benefits, or services in such a way that qualified individuals are not afforded "equal opportunity to obtain the same result . . . as that provided to others." *Id.* § 35.130(b)(1)(iii). Title II also provides that a public entity may not, "directly or through contractual or other arrangements, utilize criteria or methods of administration . . . [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability" or that "have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." *Id.* § 35.130(b)(3)(i), (ii). And "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." *Id.* § 35.130(b)(7)(i). Title II also provides that a public entity may not "impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered." *Id.* § 35.130(b)(8).

126. S.B. 199, and Defendants' implementation of it, violate the ADA by enacting a facially discriminatory scheme that grants different and fewer rights in the S.B. 199 guardianship process, compared to a standard guardianship process, to DLC's constituents based on classifying them as having a "severe intellectual disability."

127. S.B. 199, and Defendants' implementation of it, violates the ADA by using a vague definition of "severe intellectual disability" without requiring petitions to include sufficient information for a court to make an informed determination as to whether the individual meets that definition. The statute further presumes remote hearings and the imposition of a full guardianship, subjects individuals to a form of "full" guardianship more restrictive than any authorized elsewhere in Utah law, and provides little meaningful opportunity to contest the petition. As a result, S.B. 199: (1) denies DLC's constituents an equal opportunity to participate in or benefit from guardianship proceedings and the guardianship system; (2) provides DLC's constituents with benefits and rights in guardianship proceedings and the guardianship system that are not equal to those provided to others; (3) utilizes methods of administration that have the effect of defeating or substantially impairing the objectives of the guardianship procedure and guardianship system for people with disabilities; (4) fails to make reasonable modifications necessary to avoid disability discrimination against people categorized as having "severe intellectual disability"; and (5) imposes eligibility criteria that tend to screen out people categorized as having "severe intellectual disabilities" from the protections of a standard guardianship.

128. Further, S.B. 199 denies people with "severe intellectual disabilities" the opportunity for an individualized assessment that is required for the imposition of any guardianship under the standard process. The medical letter required by S.B. 199 presupposes that the

respondent is "incapacitated" without evaluating this question based on proper legal standards that would include an individualized evaluation.

129.    This discrimination occurs by reason of DLC's constituents' disabilities: DLC's constituents are subjected to the S.B. 199 guardianship proceedings solely due to the disability-based classification of "severe intellectual disability."

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court to:

A. Declare that S.B. 199, and Defendants' implementation of it, violates the ADA;

B. Permanently enjoin Defendants from enforcing S.B. 199;

C. Award Plaintiffs' attorneys' fees, costs, and expenses incurred in this matter pursuant to 42 U.S.C. § 12205 and 42 U.S.C. § 1988; and

D. Provide any such further relief the Court deems just and equitable.

Dated: December 22, 2025

Respectfully submitted,
/s/ Jason Groth

Jason Groth (Bar No. 16683)
Tom Ford (Bar No. 19795)
ACLU of Utah
311 South State Street, Suite 310
Salt Lake City, UT 84111
Tel: (801) 5221-9862
jgroth@acluutah.org
tford@acluutah.org

Zoë Brennan-Krohn*
Malhar Shah*
American Civil Liberties Union Foundation
425 California Street, Suite 700
San Francisco, CA 94104
Tel: (415) 343-0769
zbrennan-krohn@aclu.org
mshah@aclu.org

Laura Henrie (Bar No.12449)
Nate Crippes (Bar No.14622)
Disability Law Center
960 South Main Street
Salt Lake City, Utah 84101
Tel: (801) 363-1347
lhenrie@disabilitylawcenter.org
ncrippes@disabilitylawcenter.org

Brian Dimmick*
Aditi Fruitwala*
Jacob Abudaram*
American Civil Liberties Union Foundation
915 15th Street NW, 6th Floor
Washington, D.C. 20005
Tel: (202) 731-2395

33

bdimmick@aclu.org
afruitwala@aclu.org
jabudaram@aclu.org

Kristine Itliong*
Arnold & Porter Kaye Scholer LLP
250 W 55th St.
New York, NY 10019
Tel: (212) 836-7037
kristine.itliong@arnoldporter.com

John A. Freedman*
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ace., N.W.
Washinton, DC 20001
john.freedman@arnoldporter.com

*Application for admission pro hac vice forthcoming

*Attorneys for Plaintiff*