Zoë Brennan-Krohn*
Malhar Shah*
American Civil Liberties Union Foundation
425 California Street, Suite 700
San Francisco, CA 94104
Tel: (415) 343-0769
zbrennan-krohn@aclu.org
mshah@aclu.org

Brian Dimmick*
Aditi Fruitwala*
Jacob Abudaram*
American Civil Liberties Union Foundation
915 15th Street NW, 6th Floor
Washington, D.C. 20005
Tel: (202) 731-2395
bdimmick@aclu.org
afruitwala@aclu.org
jabudaram@aclu.org

Laura Henrie (Bar No.12449)
Nate Crippes (Bar No.14622)
Disability Law Center
960 South Main Street
Salt Lake City, Utah 84101
Tel: (801) 363-1347
lhenrie@disabilitylawcenter.org
ncrippes@disabilitylawcenter.org

Jason Groth (Bar No. 16683)
Tom Ford (Bar No. 19795)
ACLU of Utah
311 South State Street, Suite 310
Salt Lake City, UT 84111
Tel: (801) 5221-9862
jgroth@acluutah.org
tford@acluutah.org

John A. Freedman*
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ace., N.W.
Washinton, DC 20001
john.freedman@arnoldporter.com

Kristine Itliong*
Arnold & Porter Kaye Scholer LLP
250 W 55th St.
New York, NY 10019
Tel: (212) 836-7037
kristine.itliong@arnoldporter.com

*Admitted pro hac vice

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| DISABILITY LAW CENTER,<br><br>    Plaintiff,<br><br>    v.<br><br>STATE OF UTAH and SPENCER COX, GOVERNOR OF THE STATE OF UTAH, *in his official capacity*<br>    Defendants. | Case No. 2:25-cv-01154-DBP<br><br>**PLAINTIFF'S MOTION AND MEMORANDUM IN SUPPORT OF A PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................................. iii

INTRODUCTION ............................................................................................................................. 1

STATEMENT OF FACTS ................................................................................................................. 3

    I.    Utah's Two-Tier Guardianship System Based on Disability Classification ...................... 3

        A.  No Appointment of Legal Counsel or Court Visitor ....................................................... 3

        B.  No Opportunity to Object to Guardianship or Guardian ................................................ 4

        C.  Presumption of Remote Hearings ................................................................................... 5

        D.  Denial of Right to Jury Trial .......................................................................................... 5

        E.  Presumption of Full Guardianship ................................................................................. 5

        F.  More Restrictive "Full" Guardianship ........................................................................... 6

        G.  Diminished Opportunity to Modify or Terminate a Guardianship .............................. 7

        H.  The Harms of S.B. 199 to DLC and Its Constituents .................................................... 7

ARGUMENT .................................................................................................................................. 11

    I.    DLC has Organizational and Associational Standing ........................................................ 11

        A.  DLC Suffers and Will Continue to Suffer Organizational and Associational Injuries 11

        B.  A Causal Nexus Exists Between DLC's Injuries and S.B. 199 That is Fairly Traceable to and Redressable by Defendants ......................................................................................... 13

    II.    Plaintiff DLC Has a Likelihood of Success on the Merits ................................................ 16

        A.  S.B. 199 Facially Discriminates on the Basis of Disability ......................................... 18

        B.  S.B. 199 Denies Individuals with Disabilities an Equal Opportunity to Participate in and Benefit from Guardianship Proceedings .................................................................... 19

    III.  Plaintiff DLC and Its Constituents Face Immediate and Irreparable Harm ..................... 23

    IV.  The Balance of Equities Decisively Weighs in Plaintiff's Favor ...................................... 24

    V.   The Public Interest Requires a Preliminary Injunction ..................................................... 24

    VI.  No Bond Should be Required ............................................................................................ 25

CONCLUSION ............................................................................................................................... 26

CERTIFICATE OF SERVICE ......................................................................................................... 28

CERTIFICATE OF COMPLIANCE ................................................................................................. 29

## TABLE OF AUTHORITIES

**Cases**

*Amundson ex rel. Amundson v. Wisconsin Dep't of Health Servs.*, 721 F.3d 871 (7th Cir. 2013) ............ 19

*Bay Area Addiction Rsch. & Treatment, Inc. v. City of Antioch*, 179 F.3d 725 (9th Cir. 1999) ................ 18

*Consumer Data Indus. Ass'n v. King*, 678 F.3d 898 (10th Cir. 2012) ........................................................ 15

*Cota v. Maxwell-Jolly*, 688 F. Supp. 2d 980 (N.D. Cal. 2010) ................................................................. 19

*Courage to Change Ranches Holding Co. v. El Paso Cnty.*, 73 F.4th 1175 (10th Cir. 2023) ............. 18, 19

*Crowder v. Kitagawa*, 81 F.3d 1480 (9th Cir. 1996) ................................................................................. 19

*Diamond House of SE Idaho, LLC v. City of Ammon*, 381 F. Supp. 3d 1262 (D. Idaho 2019) ................ 14

*DiCocco v. Garland*, 52 F.4th 588 (4th Cir. 2022) .................................................................................... 14

*Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276 (10th Cir. 2016) ............................... 25

*Doran v. 7-Eleven, Inc.*, 524 F.3d 1034 (9th Cir. 2008) .............................................................................. 11

*Elrod v. Burns*, 427 U.S. 347 (1976) ........................................................................................................ 24

*Enyart v. Nat'l Conf. of Bar Examiners, Inc.*, 630 F.3d 1153 (9th Cir. 2011) .......................................... 25

*Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91 (4th Cir. 2011). .................................................. 16

*Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016) ......................................................................................... 23

*Franco-Gonzales v. Holder*, 767 F. Supp. 2d 1034 (C.D. Cal. 2010) ...................................................... 22

*Free Speech Coal., Inc. v. Anderson*, 119 F.4th 732 (10th Cir. 2024) ...................................................... 14

*Gutierrez v. Saenz*, 606 U.S. 305 (2025) ................................................................................................... 16

*Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082 (10th Cir. 2006) ................................................ 13

*Isaac A. v. Carlson*, 775 F. Supp. 3d 1296 (N.D. Ga. 2025) .................................................................... 22

*Jacobs v. Salt Lake City Sch. Dist.*, 154 F.4th 790 (10th Cir. 2025) .......................................................... 11

*Jud. Watch, Inc. v. Griswold*, 554 F. Supp. 3d 1092 (D. Colo. 2021) ........................................................ 11

*Larson v. Valente*, 456 U.S. 228 (1982) .................................................................................................... 16

*Lovell v. Chandler*, 303 F.3d 1039 (9th Cir. 2002) ............................................................................ 18, 21

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ................................................................................ 13

*Mathis v. United States Parole Comm'n*, 749 F. Supp. 3d 8 (D.D.C. 2024) .............................................. 22

*Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 498 (4th Cir. 2016) .................................................... 22

*New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293 (3d. Cir. 2007) ................................. 21

*Nova Health Sys. v. Gandy*, 416 F.3d 1149 (10th Cir. 2005) ............................................................... 13, 16

*OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017) ................................................................. 14

*Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999) ........................................................................ 1, 19

*Or. Advoc. Ctr. v. Mink*, 322 F.3d 1101 (9th Cir. 2003) ........................................................................... 12

*Peck v. McCann*, 43 F.4th 1116 (10th Cir. 2022) ..................................................................................... 14

*Petrella v. Brownback*, 697 F.3d 1285 (10th Cir. 2012) ........................................................................... 14

*Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234 (10th Cir. 2001) ............................... 23, 24

*Redd v. Guerrero*, 84 F.4th 874 (9th Cir. 2023) ....................................................................................... 16

*Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*, 120 F.4th 390 (4th Cir. 2024) ............... 11

*Rio Grande Found. v. Oliver*, 57 F.4th 1147 (10th Cir. 2023) .................................................... 13

*Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185 (10th Cir. 2007) ................................ 17, 21

*RoDa Drilling Co. v. Siegal*, 552 F.3d 1203 (10th Cir. 2009) ........................................................ 23, 25

*Shotz v. Cates*, 256 F.3d 1077 (11th Cir. 2001) ...................................................................... 17

*Smith-Berch, Inc. v. Baltimore Cnty., Md.*, 68 F. Supp. 2d 602 (D. Md. 1999) ......................................... 21

*Speech First, Inc. v. Shrum*, 92 F.4th 947 (10th Cir. 2024) ........................................................... 12

*T.R. v. Cnty. of Delaware*, No. 13-2931, 2013 WL 6210477 (E.D. Pa. Nov. 26, 2013) ................................... 22

*T.R. v. Havens*, 612 F. App'x 83 (3d Cir. 2015) ....................................................................... 23

*Tennessee v. Lane*, 541 U.S. 509 (2004) .......................................................................... 17, 18

*Trafficante v. Metro. Life Ins. Co.,* 409 U.S. 205 (1972) ............................................................. 11

*United States v. Missouri*, 114 F.4th 980 (8th Cir. 2024) .............................................................. 14

*Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*, 21 F.4th 1229 (10th Cir. 2021) .......... 12

*Utah v. Evans*, 536 U.S. 452 (2002) ................................................................................. 16

*Yeskey v. Pennsylvania Dep't of Corr.*, 118 F.3d 168 (3d Cir. 1997) ................................................... 17

*Yeskey v. Pennsylvania Dep't of Corr.,* 524 U.S. 206 (1998) ........................................................... 17

**Statutes**

28 C.F.R. § 35.108 ............................................................................................... 12, 17

28 C.F.R. § 35.130 .................................................................................................. 19

42 U.S.C. § 12101 ................................................................................................... 1

42 U.S.C. § 12102 ............................................................................................... 12, 17

42 U.S.C. § 12132 .................................................................................................. 1, 19

42 U.S.C. § 15043 ................................................................................................... 7

Utah Code Ann. § 75-5-301 ............................................................................................ 2

Utah Code Ann. § 75-5-301.5 .......................................................................................... 6

Utah Code Ann. § 75-5-303 ...................................................................................... 4, 5, 7

Utah Code Ann. § 75-5-304 ..................................................................................... 5, 6, 20

Utah Code Ann. § 75-5-306 ........................................................................................... 7

Utah Code Ann. § 75-5-312 ......................................................................................... 5, 6

Utah Code Ann. § 75-5-312.5 ......................................................................................... 6

Utah Code Ann. § 75-5-601 ........................................................................................... 3

Utah Code Ann. § 75-5-603 ........................................................................................... 6

Utah Code Ann. § 75-5-604 ........................................................................................... 5

Utah Code Ann. § 75-5-606 ...................................................................................... 4, 5, 7

Utah Code Ann. § 75-5-609 ........................................................................................... 6

Utah Code Ann. § 75-5-611 ....................................................................................... 7, 20

Utah Code Ann. § 75-5-613 ........................................................................................... 7

Plaintiff Disability Law Center ("DLC"), on behalf of itself and its constituents, by and through its counsel, submits this Motion for a Preliminary Injunction ("Motion") and Memorandum of Law in Support, along with the declarations of Robert Bebout, Katie Cox, Dr. Clarissa Kripke, Jonathan Martinis, and Adina Zahradnikova, and accompanying exhibits. Plaintiff seeks to enjoin Defendants State of Utah and Governor Spencer Cox from enforcing Utah Senate Bill 199 ("S.B. 199"), which went into effect in July 2025.

Injunctive relief is necessary to protect DLC and its constituents' rights under Title II of the Americans with Disabilities Act ("ADA"). DLC is likely to succeed on the merits of its ADA claim, both on behalf of itself and its constituents. S.B. 199 classifies and facially discriminates against people on the basis of their disability and, as such, constitutes a per se violation of the ADA. DLC has organizational standing based on direct injuries to itself and associational standing based on injuries to its member constituents. Both injuries are traceable to Defendants' implementation of S.B. 199 and are redressable by injunctive or declaratory relief against the State of Utah and Governor Cox. DLC and its constituents have suffered, and will continue to suffer, irreparable harm in the absence of preliminary relief, the balance of equities favors an injunction, and an injunction is in the public interest. Accordingly, DLC respectfully requests that the Court grant this Motion.

**INTRODUCTION**

One of the primary purposes of the Americans with Disabilities Act ("ADA") is to provide a "national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C § 12101(b)(1). Among the ADA's hallmark protections is its clear prohibition on classifying people based on disability and relegating them to separate, discriminatory programs. *See* 42 U.S.C. § 12132; *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597–99 (1999).

1

Utah is violating these prohibitions by creating a discriminatory classification within its guardianship system. Since July 2025, when Utah Senate Bill 199 ("S.B. 199") took effect, Utah has implemented a disability classification on the basis of a "severe intellectual disability" and directed this class of disabled people into a separate guardianship system where their rights are materially and substantially curtailed compared to other guardianships.

The stakes could not be higher. In 2009, Judge George M. Harmond lamented that courts imposed guardianships "terminat[ing] fundamental and basic right[s] with all the procedural rigor of processing a traffic ticket." Ad hoc Comm. on Probate Law & Procedure, *Final Report to the Utah Judicial Council* 3 (Utah Admin. Office of the Courts, Feb. 23, 2009). Judge Harmond identified significant procedural failures, including the denial of legal representation, reliance on "cursory" evidence, a lack of planning "to help the respondent live life as independently as possible," and the routine imposition of full guardianships "with little evidence[.]" *Id.* at 3–4.

Following Judge Hammond's report, Utah took important steps to remedy the identified problems. Utah established a system of processes and protections that courts must follow before instituting a guardianship (the "standard guardianship" process). Utah Code Ann. §§ 75-5-301 *et seq.* In the standard guardianship process, courts must provide legal counsel for respondents or, at a minimum, appoint a court visitor. Courts must favor limited guardianships over full guardianships. Individuals subject to guardianship retain the right to maximize their independence. These elements, along with other protections, guard against unnecessary and overbroad guardianships, while ensuring guardianship petitions may be considered and guardians appointed when legally justified. Prior to S.B. 199, this system provided the exclusive legal pathway by which a Utahn could be subject to guardianship.

Since July 2025, Utah has operated a separate and second-class guardianship system under S.B. 199. *Id.* §§ 75-5-601 *et seq.* S.B. 199 violates the ADA by creating a separate and more onerous guardianship regime based solely on the "severe intellectual disability"[1] classification and denying affected individuals an equal opportunity to exercise their rights and access the safeguards available in the standard guardianship system. Commenting on the S.B. 199 system, Judge Keith A. Kelly recently warned that "a full guardianship is the greatest restriction on individual liberty imposed by a Utah State District Court, other than capital punishment, incarceration, or civil commitment." *Issues Raised by the 2025 Severe Intellectual Disability Guardianship Statute*, 39 Utah B.J. 12, 15 (2026).

Plaintiff requests that this Court declare that S.B. 199 violates federal law and enjoin Defendants from further implementing S.B. 199 while this Court resolves the merits.

## STATEMENT OF FACTS

### I. Utah's Two-Tier Guardianship System Based on Disability Classification

The S.B. 199 guardianship system discriminates on the basis of disability by creating a separate, more restrictive guardianship system based on a classification of "severe intellectual disability". A summary of key differences between standard and S.B. 199 guardianships is attached as Exhibit A.

### A. No Appointment of Legal Counsel or Court Visitor

---

[1] Guardianship petitions are placed in the S.B. 199 process upon receipt of a statement from a doctor or psychologist that a person has severe intellectual disabilities. Utah Code Ann. §§ 75-5-601(1)(a), 75-5-604(1). The provider need not explain their reasoning or even meet the disabled person. And many clinicians have little or no training on assessing people with complex disabilities. Ex. B, Declaration of Clarissa C. Kripke, MD, FAAFP ("Kripke Decl.") ¶¶ 15–18.

3

In standard guardianship proceedings, respondents have a statutory right to counsel: "Unless the allegedly incapacitated person has counsel of the person's own choice, the court shall appoint an attorney to represent the person in the proceeding." Utah Code Ann. § 75-5-303(2)(b). The statute provides only a narrow exception under which counsel may be waived if enumerated conditions are met. By contrast, S.B. 199 sharply curtails the right to counsel, reversing the presumption of representation and establishing non-representation as the default, and eliminating safeguards that must be established before counsel may be denied in standard guardianships. *Compare id.* § 75-5-303(2)(b) with *id.* § 75-5-606(2); *compare id.* § 75-5-303(6)(e)(vii) with *id.* § 75-5-606(2); *compare id.* § 75-5-303(6)(e)(i) with *id.* § 75-5-606(2)(a); *compare id.* § 75-5-303(6)(e)(iii) with *id.* § 75-5-606(2)(c). For example, under standard guardianships, if representation by counsel is waived, the court must appoint and receive a written report from a court visitor, ensuring that the court receive, at minimum, information from a neutral third party. S.B. 199 eliminates this provision, subjecting respondents to guardianship without counsel or a court visitor. *Compare id.* § 75-5-303(6)(e)(vii) with *id.* § 75-5-606(2); *see also* Ex. A (comparing conditions for waiver of right to counsel between S.B. 199 and standard guardianships). Although both the standard guardianship statute and S.B. 199 nominally require the court to be "satisfied" that counsel is not necessary to protect the respondent's interests, Utah Code Ann. §§ 75-5-303(6)(e)(vi), 75-5-606(2)(e), the denial of input from an attorney or a court visitor under S.B. 199 prevents courts from receiving information needed to make that determination.

### B. No Opportunity to Object to Guardianship or Guardian

S.B. 199 strips respondents of the right to object to the guardianship or guardian. In standard guardianship proceedings, respondents are expressly permitted to communicate acceptance of or objection to the guardianship or proposed guardian. S.B. 199, however, allows

respondents to communicate only their "acceptance," thereby extinguishing any opportunity to oppose the deprivation of their rights. *Compare id.* § 75-5-303(6)(e)(iv) with *id*. § 75-5-606(2)(d).

### C. Presumption of Remote Hearings

Under standard guardianships, courts retain discretion to conduct hearings in person, remotely, or in a hybrid format. S.B. 199 eliminates that discretion by mandating that hearings be held remotely unless the court finds good cause to proceed in person. As a result, courts are deprived of the ability to determine the format most appropriate for—and preferred by—the parties, including the respondent. *Compare id.* § 75-5-303(6)(a) with *id*. § 75-5-604(3)(b).

Based on a review of dockets statewide since July 2025, DLC has not identified any S.B. 199 hearings conducted in person; all have been held remotely, including some conducted telephonically. Ex. D, Declaration of Katie Cox ("Cox Decl.") ¶ 26. In the hearings that DLC has monitored, there has been no determination that the respondent is even present. *Id*. ¶ 25.

### D. Denial of Right to Jury Trial

Whereas respondents in standard guardianship proceedings are guaranteed the right to a jury trial, S.B. 199 denies that protection. *Compare* Utah Code Ann. § 75-5-303(6)(d) with *id*. § 75-5-604(4). Based on its review of the dockets, DLC has found no jury seated in any S.B. 199 proceedings conducted to date. Cox Decl. ¶ 27.

### E. Presumption of Full Guardianship

In standard guardianship proceedings, courts may impose either a "limited" or a "full" guardianship, a distinction of substantial consequence. In a limited guardianship, the court enumerates the specific rights the respondent loses. Utah Code Ann. §§ 75-5-304(2), 75-5-312(1)(a)(i). Under a full guardianship, the guardian possesses broad power over all aspects of the

individual's life, including authority to determine the individual's place of residence, consent to medical care or treatment, and arrange for training and education, *id*. § 75-5-312(2)(a)–(c).

The standard guardianship framework requires that courts prefer limited guardianships over full guardianships, and impose full guardianship only if "no other alternative exists," *id*. § 75-5-304(2)(a)(i), and only after the court makes a specific finding that "nothing less than a full guardianship is adequate," *id*. § 75-5-304(2)(a)(ii).

By contrast, S.B. 199 reverses this presumption, requiring courts to "prefer" full guardianships. *Id*. § 75-5-609(2)(b).

### F.  More Restrictive "Full" Guardianship

A "full" S.B. 199 guardianship is significantly more restrictive than full guardianship under the standard guardianship framework.

Individuals subject to a standard full guardianship retain core statutory rights to "be granted the greatest degree of freedom possible that is consistent with the reasons for the guardianship" and to "remain as independent as possible." *Id*. § 75-5-301.5(3)(f), (5)(c). These protections ensure that individuals under guardianship can develop skills, exercise choice, and have their preferences respected. By contrast, individuals subject to an S.B. 199 "full" guardianship are not entitled to the greatest degree of freedom or support for independence, and the guardian is under no obligation to promote autonomy. *See id.* § 75-5-603.

Further, under a standard guardianship, a guardian may not restrict an individual's contact with family or friends without a court order supported by a preponderance of the evidence showing that the restriction either reflects the individual's expressed or presumed wishes, or is the least restrictive means necessary to protect the individual's health or welfare. *Id*. § 75-5-312.5(2), (8). This oversight is a critical safeguard against abuse, neglect, and isolation.

6

S.B. 199 eliminates these protections. Under an S.B. 199 "full" guardianship, a guardian may unilaterally "restrict or prohibit" the individual's association with any or all friends or family whenever the guardian deems such association "harmful." *Id*. § 75-5-611(7)(b). S.B. 199 provides for no court oversight, avenue to challenge, or opportunity to be heard, and requires no individualized findings to prohibit contact, granting the guardian unfettered discretion to isolate an individual.

### G.  Diminished Opportunity to Modify or Terminate a Guardianship

S.B. 199 significantly curtails the ability of individuals to modify or terminate their guardianships. While individuals under standard guardianships are entitled to counsel when seeking to change or end a guardianship, those subject to S.B. 199 have no such right. *Compare id.* § 75-5-303(2)(b), (6)(e) and 75-5-306 *with id.* §§ 75-5-606(1), (2) and 75-5-613.

### H.  The Harms of S.B. 199 to DLC and Its Constituents

DLC is Utah's designated Protection and Advocacy ("P&A") organization under federal law—the Developmental Disabilities Assistance and Bill of Rights Act of 2000 ("DD Act"), 42 U.S.C. § 15043—charged with protecting and advancing the rights of individuals with disabilities, including approximately 500,000 Utahns. Ex. E, Declaration of Adina Zahradnikova ("Zahradnikova Decl.") ¶¶ 5–7. Pursuant to this federal mandate, DLC is empowered to pursue legal, administrative, and other remedies to protect individuals with developmental disabilities[2] including investigating and monitoring programs that affect their rights. Cox Decl. ¶ 36.

---

[2] The terms "intellectual disability" and "developmental disability" are often discussed collectively as "intellectual and developmental disabilities" or "IDD." Intellectual disabilities are a type of developmental disability, so a person with an intellectual disability is, by definition, also a person with a developmental disability. *See* Nat'l Ins. of Child Health and Human Dev., *About Intellectual and Developmental Disabilities* (2021), https://www.nichd.nih.gov/health/topics/idds.

A significant portion of DLC's work involves addressing guardianship practices that threaten the rights, dignity, and autonomy of individuals with intellectual and developmental disabilities. *See* Zahradnikova Decl. ¶¶ 9, 17. DLC offers a broad range of services, including legal advice, representation, education on self-advocacy, and a guardianship clinic. *Id*. ¶ 16. Each year, approximately 1,000 guardianship petitions involving adults with disabilities are filed in Utah, and DLC routinely receives requests for assistance from individuals subject to or at risk of unnecessary or overbroad guardianships. *Id*. ¶¶ 2–24.

S.B. 199 has significantly impaired DLC's ability to carry out its federal mandate of tracking guardianship proceedings statewide and supporting guardianship respondents, both formally and informally. *See id*. ¶¶ 27–28; Cox Decl. ¶ 13. Prior to S.B. 199, DLC staff could observe and participate in guardianship matters by attending public probate calendars where such cases were scheduled, and could intervene as appropriate. Cox Decl. ¶ 23. This efficient structure allowed a single staff member to monitor multiple cases at once. *Id*. Through direct representation, DLC has been able to modify and terminate some unnecessary or overbroad guardianships. *Id*. ¶ 7.

S.B. 199 fundamentally changed this process in three key ways.

First, S.B. 199 curtails DLC's ability to observe and track guardianship proceedings in the state. S.B. 199 petitions bypass public probate calendars and proceed directly to individual judges, without notice to DLC or other interested stakeholders. *Id*. ¶ 24. There is no dedicated court code or docket label for these cases, requiring DLC staff to monitor filings statewide, review docket entries manually to identify references to "severe intellectual disability," and track down remote hearing access on a case-by-case basis. *Id*. These burdensome steps have made it significantly

more difficult for DLC to identify and attend hearings and to offer legal assistance to individuals affected. *Id*. ¶ 28. And staff have been denied access to some hearings. *Id*. ¶ 24.

Second, because S.B. 199 limits or altogether prohibits the respondent from participating in the proceedings, DLC is prevented from gathering information to identify and attend S.B. 199 hearings. When DLC has been able to attend hearings, DLC has observed respondents unrepresented by counsel, not being questioned by the judge, and not being afforded an opportunity to object. *Id*. ¶ 25. In one case, the respondent was entirely absent from the hearing, appearing neither by video nor audio. *Id*. These practices prevent DLC from assessing the individual's wishes, needs, or circumstances and identifying opportunities to intervene and support. *Id*.

Third, by permitting complete isolation by guardians, S.B. 199 limits DLC's access to information about instances of abuse and neglect and other support needs by people under guardianship. DLC often receives reports of abuse and neglect and need for representation from family members, service providers, or others in the individual's support network. *Id*. ¶¶ 35–39. However, by allowing guardians to isolate individuals from those outside their household, S.B. 199 has sharply curtailed DLC's ability to identify those at risk. *Id*. This isolation not only impairs abuse investigations but also reduces access to information about individuals who may need other essential services. *Id*.

As a result of S.B. 199, DLC has been forced to divert significant resources—both personnel and financial—away from other statutorily mandated activities. *See id*. ¶ 36.  Staff must now spend substantially more time reviewing court dockets, monitoring proceedings, requesting hearing access, and preparing to intervene where necessary. *Id*. ¶ 29. To maintain a presence at both general probate calendars and S.B. 199 proceedings, DLC has had to assign and train additional personnel, thereby reducing capacity for other core activities. *Id*. ¶ 30. As the scale of

S.B. 199 guardianships increases, DLC will need to divert greater resources to determining the best course of action to identify instances of abuse and neglect and the need for services for those individuals subject to SB 199 guardianships. *Id*. ¶ 35.

The additional burdens imposed by S.B. 199 have strained DLC's limited DD Act funds, reducing its capacity to assist individuals in other critical areas, such as abuse and neglect investigations, housing and employment discrimination, and access to public accommodations. These resource diversions are especially harmful because DLC's funding under the DD Act is finite and must be used exclusively for services to individuals with developmental disabilities. Zahradnikova Decl. ¶ 21. Many of the other funding sources on which DLC relies are designated to serve other disability populations and cannot be used to support this work. *Id*. Therefore, the more resources dedicated to serving people subject to or at risk of S.B. 199 guardianship, the less funding is available to support people with intellectual disabilities in other areas. *Id*.

At the same time, DLC's constituents are at risk of being subjected to guardianship proceedings under S.B. 199, which could result in the overbroad or unnecessary loss of their civil personhood and fundamental human dignity. *See id*. ¶¶ 22–26. Many individuals with significant intellectual disabilities are able to retain their rights and live full lives with appropriate supports and without guardianship. Ex. C, Declaration of Jonathan Gerald Martinis, Esq. ("Martinis Decl.") ¶ 29; Kripke Decl. ¶¶ 27, 36–40; *see* Ex. F, Declaration of Robert Bebout ("Bebout Decl.") ¶¶ 6-8. Nevertheless, because of S.B. 199, DLC's constituents face unnecessary and overexpansive civil death without a meaningful opportunity to participate in the process. They are at risk of the well-documented harms to well-being, self-esteem, and meaningful participation in society that accompany the loss of self-determination. Martinis Decl. ¶¶ 30-44. They also face heightened risks of abuse and neglect, *id.* ¶ 24; *see* Cox Decl. ¶¶ 15, 36, as well as isolation from family, friends,

supporters, and advocates such as DLC. The harm to DLC's constituents will be immeasurable and irreversible.

## ARGUMENT

### I.    DLC has Organizational and Associational Standing

To establish standing, Plaintiff must show that it has suffered an actual injury that is fairly traceable to the challenged action and that it can be redressed by a favorable ruling. *Jacobs v. Salt Lake City Sch. Dist.*, 154 F.4th 790, 799 (10th Cir. 2025). Courts "take a broad view of constitutional standing in civil rights cases, especially where, as under the ADA, private enforcement suits 'are the primary method of obtaining compliance with the Act.'" *Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1039 (9th Cir. 2008) (quoting *Trafficante v. Metro. Life Ins. Co.,* 409 U.S. 205, 209 (1972)).

### A. DLC Suffers and Will Continue to Suffer Organizational and Associational Injuries

DLC has both organizational and associational standing to bring this action. An organization has standing where it suffers a direct injury to its mission or operations. *See Jud. Watch, Inc. v. Griswold*, 554 F. Supp. 3d 1092, 1104 (D. Colo. 2021). Since the enactment of S.B. 199 in July 2025, DLC has been forced to divert significant time, staff, and financial resources away from its federally designated mandate to investigate abuse and neglect of individuals with developmental disabilities, and instead toward addressing the harmful consequences and systemic confusion created by S.B. 199. *See Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*, 120 F.4th 390, 395–96 (4th Cir. 2024) (recognizing organizational standing where entity diverted resources to counteract effects of challenged law); *see also* Cox Decl. ¶¶ 10–13, 16, 20, 23–30,

11

33–35; Zahradnikova Decl. ¶ 28. The resource drain caused by S.B. 199 has already impacted DLC's ability to fulfill its congressionally assigned role under the DD Act. These harms are both particularized and ongoing, satisfying the requirements for organizational standing.

DLC also has associational standing because its constituents possess the indicia of membership in an organization[3] and face imminent, concrete injuries as a direct result of S.B. 199. Utahns with disabilities are essential participants in DLC's functioning because they and their families comprise DLC's elected governing board and advisory committee and regularly provide input and recommendations about DLC's priorities. Zahradnikova Decl. ¶¶ 11–13; *see Or. Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1111–12 (9th Cir. 2003). And these individuals are at serious risk of being presumptively subjected to full, highly restrictive guardianships without the procedural safeguards historically provided under Utah law. Such injuries are sufficiently particularized and imminent to confer standing to those individuals in their own right. *See Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*, 21 F.4th 1229, 1241 (10th Cir. 2021); *Speech First, Inc. v. Shrum*, 92 F.4th 947, 949 (10th Cir. 2024).

Ensuring that individuals with disabilities are not discriminatorily denied legal protections in guardianship proceedings lies at the heart of DLC's statutory purpose and federal mandate as Utah's P&A agency. Because DLC's constituents have standing to sue in their own right, DLC may properly assert associational standing on their behalf.

---

[3] These constituents are individuals with disabilities as defined under the ADA. They have intellectual disabilities that substantially limit major life activities such as communication, learning, and decision-making. *See* 42 U.S.C. § 12102(1); 28 C.F.R. § 35.108(d)(2)(iii)(C). Any individual subjected to a guardianship under S.B. 199 is, by definition, being treated as having a mental impairment that substantially limits one or more major life activities—squarely meeting the ADA's coverage.

12

Furthermore, Plaintiff is aware of at least four DLC constituents who have already been subjected to guardianship proceedings under S.B. 199 and are currently subjected to its extreme curtailment of rights. Cox Decl. ¶ 32. In each instance, the court imposed a S.B. 199 full guardianship without appointing an attorney, assigning a court visitor, allowing the respondent to object, or offering any opportunity to advocate for a less restrictive alternative. *Id*. These examples illustrate not only the statute's discriminatory effects, but also the urgency and legitimacy of DLC's representative interest in preventing further harm.

**B. A Causal Nexus Exists Between DLC's Injuries and S.B. 199 That is Fairly Traceable to and Redressable by Defendants**

To establish Article III standing, a plaintiff must show that "a causal connection between the injury and the conduct complained of" so that the injury is "fairly . . . trace[able] to the challenged action of the defendant." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Causation demands something less than proximate cause and at least requires "proof of a substantial likelihood that the defendant's conduct caused plaintiff's injury in fact." *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 (10th Cir. 2005). Additionally, the plaintiff must show that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Id*. at 1159.

**a. DLC's Organizational and Associational Injuries Are Directly Caused by the State's Implementation of S.B. 199**

S.B. 199 itself is the direct cause of Plaintiff's injuries because it alters the legal rights or obligations of a plaintiff. *See Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1090–94 (10th Cir. 2006) (en banc); *Rio Grande Found. v. Oliver*, 57 F.4th 1147, 1165 (10th Cir. 2023). On its face, the statute classifies some of DLC's constituents as having a "severe intellectual disability" and on that basis denies rights afforded to all other guardianship respondents. As a result, DLC's

13

constituents face a substantially increased risk of being placed under full guardianship without the safeguards long required under Utah law. These injuries to DLC's constituents flow directly from the statute's legal mandates, not from independent third-party actions.

S.B. 199 has also directly injured DLC as an organization. As explained above, in response to the statute's implementation, DLC has been compelled to divert substantial staff and financial resources away from its core statutory mission to address and mitigate the discriminatory effects of S.B. 199.

### b. DLC's Injuries Are Traceable to Defendants

A plaintiff's injury is traceable to the state itself where a state's law is the source of the injury. *Peck v. McCann*, 43 F.4th 1116, 1129 (10th Cir. 2022); *OCA-Greater Houston v. Texas*, 867 F.3d 604, 613 (5th Cir. 2017). This is true where an injury is traceable to a defendant's laws or policies that facially discriminate or contravene anti-discrimination laws. *See DiCocco v. Garland*, 52 F.4th 588, 592 (4th Cir. 2022); *Diamond House of SE Idaho, LLC v. City of Ammon*, 381 F. Supp. 3d 1262, 1271–72 (D. Idaho 2019). A state law is also traceable to the state officials, such as the governor, who have "responsibility for the enforcement of the laws of the state." *Petrella v. Brownback*, 697 F.3d 1285, 1294 (10th Cir. 2012) (*cited with approval in Free Speech Coal., Inc. v. Anderson*, 119 F.4th 732, 740 (10th Cir. 2024) (noting that "the statute at issue in *Petrella* did not include any particular enforcement provisions" but the ability to enforce was "necessarily encompassed by the attorney general's overall enforcement authority.")). An action to enjoin a state official from implementing a statute that injures a plaintiff by violating their rights is appropriate even if the statute is "enforced only by private-citizen suits." *United States v. Missouri*, 114 F.4th 980, 985 (8th Cir. 2024), *cert. denied*, 146 S. Ct. 90 (2025).

14

Here, DLC and its members' injuries are traceable to Defendants because S.B. 199 is the direct cause of those injuries. As discussed above, if the State had not passed S.B. 199, DLC would not be forced to divert its resources, and its members would not be subject to a discriminatory classification or face discriminatory guardianship petitions or proceedings.

### c.   DLC's Injuries Are Redressable by Injunctive or Declaratory Relief

DLC's injuries, as well as those of its constituents, are redressable through both injunctive and declaratory relief against Defendants. Injunctive relief would directly prevent the future implementation of S.B. 199, thereby averting the injuries that the statute is actively causing. The State of Utah has already demonstrated that it possesses the authority to halt S.B. 199. In response to the district court's temporary stay order in the Plaintiff's previous pre-enforcement challenge, *Disability Law Ctr. v. Cox*, No. 2:25-cv-00307-RJS (D. Utah July 22, 2025), senior State officials "halted all efforts to prepare for S.B. 199 to go into effect" and "directed judges and clerks across the State of Utah to exclude S.B. 199's provisions when processing guardianship petitions." *See id.,* Mot. to Dismiss Am. Compl. & Mem. in Supp. 4 (D. Utah May 8, 2025) (ECF No. 28). This proposal led to a full stay of the law's effect until this Court issued its dismissal order on July 22, 2025, a period of approximately two and a half months. During that time, no guardianship petitions were filed under S.B. 199, and DLC was not forced to divert resources in response to its discriminatory procedures. This record confirms that the Defendants have the capacity to meaningfully redress the harms identified.

Declaratory relief would also redress Plaintiff's injuries. The Tenth Circuit has made clear that where injunctive relief would remedy a plaintiff's harm, declaratory relief will likewise suffice. *Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 906 (10th Cir. 2012). A declaratory

15

judgment that S.B. 199 violates Title II of the ADA would carry significant legal and practical consequences. If this Court declares that S.B. 199 violates the ADA, Defendants (as well as other state actors) have indicated, through statements and actions, that S.B. 199 will not be given effect, thus redressing Plaintiff's injuries.

Importantly, redressability under Article III does not require that the relief sought eliminate every trace of injury. *Nova Health Sys.*, 416 F.3d at 1158 (quoting *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (Redressability "need not relieve [a plaintiff's] every injury.")). Relief is sufficient where "the practical consequence of [a declaratory judgment] would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." *Utah v. Evans*, 536 U.S. 452, 464 (2002); *see also Gutierrez v. Saenz*, 606 U.S. 305, 318–21 (2025); *Redd v. Guerrero*, 84 F.4th 874, 884 (9th Cir. 2023); *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 100–01 (4th Cir. 2011).

Here, even partial relief would substantially mitigate DLC's organizational injuries. Absent declaratory or injunctive relief, DLC must continue to devote disproportionate resources to identifying, tracking, and intervening in guardianship proceedings under S.B. 199—tasks that require intensive individualized support. *See* Cox Decl. ¶ 24. A declaration that S.B. 199 violates the ADA would streamline DLC's work, reduce duplication of efforts, and enable DLC to preserve capacity for its other statutorily mandated programs. *See id.* ¶¶ 35–39. Thus, both injunctive and declaratory relief satisfy the redressability requirement.

## II.    Plaintiff DLC Has a Likelihood of Success on the Merits

Plaintiff has a likelihood of succeeding on the merits of its ADA claim for two independent reasons. First, S.B. 199 facially discriminates against guardianship respondents based on their

disability—this facial classification is a *per se* violation of the ADA. Second, S.B. 199 denies such persons an equal opportunity to participate in and benefit from guardianship proceedings.

The State of Utah is a public entity subject to the restrictions of Title II of the ADA. *See* 42 U.S.C. § 12131(1)(A). Judicial proceedings, including guardianship proceedings conducted by state courts, constitute "services, programs, or activities" of a public entity and are subject to the requirements of Title II. *See Tennessee v. Lane*, 541 U.S. 509, 531 (2004) ("[T]he unequal treatment of disabled persons in the administration of judicial services has a long history…"); *Shotz v. Cates*, 256 F.3d 1077, 1080 (11th Cir. 2001) (concluding that court proceedings are covered under Title II); *Yeskey v. Pennsylvania Dep't of Corr.*, 118 F.3d 168, 171 (3d Cir. 1997), *aff'd*, 524 U.S. 206 (1998) (Title II covers "anything a public entity does."). Accordingly, the guardianship process under S.B. 199 is subject to the protections of Title II of the ADA.

To establish a violation of Title II of the ADA, a plaintiff must show that: (1) they are a qualified individual with a disability; (2) they were excluded from participation in or denied the benefits of a public entity's services, programs, or activities; and (3) such exclusion, denial of benefits, or discrimination was by reason of their disability. *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1193 (10th Cir. 2007).

Plaintiff has established the first element because its constituents, who will be subject to the guardianship process implemented by S.B. 199, are qualified individuals under the ADA. These individuals have intellectual disabilities that substantially limit one or more major life activities, as defined by statute and regulation. *See* 42 U.S.C. § 12102(1); 28 C.F.R. § 35.108(d)(2)(iii)(C).

The State of Utah is a public entity within the meaning of Title II of the ADA. *See* 42 U.S.C. § 12131(1)(A). Judicial proceedings, including guardianship proceedings conducted by

17

state courts, constitute "services, programs, or activities" of a public entity and are subject to the requirements of Title II.

Accordingly, the guardianship process under S.B. 199 is subject to the protections of Title II of the ADA.

### A.  S.B. 199 Facially Discriminates on the Basis of Disability

Plaintiff has established the second and third elements of its ADA claim because S.B. 199 facially discriminates on the basis of disability by categorically assigning individuals labeled with a "severe intellectual disability" to a separate and unequal guardianship process. This reliance on a disability-based classification denies affected individuals equal access to legal rights and procedural protections because of their disability status and therefore constitutes a "per se violation" of the ADA. *Bay Area Addiction Rsch. & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 735 (9th Cir. 1999); *Lane*, 541 U.S. at 522–23 (recognizing that Title II prohibits categorical exclusion of individuals with disabilities from public services).

A statutory scheme facially discriminates when it expressly imposes burdens or limitations on individuals with disabilities that do not apply to others, based on the existence of a disability. *See Courage to Change Ranches Holding Co. v. El Paso Cnty.*, 73 F.4th 1175, 1193 (10th Cir. 2023) (holding that a municipal ordinance was facially discriminatory where it imposed more restrictive occupancy limits on group homes for individuals with disabilities than on comparable residences); *Lovell v. Chandler*, 303 F.3d 1039, 1056–57 (9th Cir. 2002) (finding facial discrimination where a state health insurance program explicitly excluded blind and disabled individuals from eligibility).

Here, S.B. 199 facially classifies individuals based on their disability—a designation of "severe intellectual disability"—and subjects those individuals to a distinct guardianship regime

18

with fewer procedural protections and diminished respect for individual autonomy compared to the standard guardianship process. *See Courage to Change Ranches Holding Co.*, 73 F.4th at 1197–98 (explaining that a law is facially discriminatory where its text explicitly classifies individuals by disability). While individuals subject to standard guardianship proceedings may also have disabilities, S.B. 199 explicitly singles out a subclass and imposes upon them a more restrictive and less protective system but based on a categorical disability classification.[4]

### B. S.B. 199 Denies Individuals with Disabilities an Equal Opportunity to Participate in and Benefit from Guardianship Proceedings

S.B. 199 further discriminates on the basis of disability by denying individuals labeled as having a "severe intellectual disability" an equal opportunity to access, participate in, and benefit from guardianship proceedings. *See* 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a). The ADA defines discrimination broadly to prohibit policies that impose "different and greater" burdens on disabled people's access to services or benefits, even if some nominal access remains. *Crowder v. Kitagawa*, 81 F.3d 1480, 1484 (9th Cir. 1996); *Cota v. Maxwell-Jolly*, 688 F. Supp. 2d 980, 996 (N.D. Cal. 2010) (the ADA prohibits policies and practices that "while not creating a direct bar to individuals with disabilities, *indirectly prevent or limit their ability to participate.*") (quoting 28 C.F.R. Pt. 35, App. A).

---

[4] The ADA recognizes claims based on this form of intra-class discrimination—disparate treatment among individuals with disabilities based on the nature or severity of their disability. *See, e.g., Amundson ex rel. Amundson v. Wisconsin Dep't of Health Servs.*, 721 F.3d 871, 874 (7th Cir. 2013). *See generally Olmstead*, 527 U.S. at 598 n.10 (recognizing Title II prohibits discrimination among individuals with disabilities themselves, noting that requiring comparison to a nondisabled comparator is "incorrect as a matter of precedent and logic").

S.B. 199 violates these core protections in at least two independent ways. First, it categorically places individuals labeled with a "severe intellectual disability" into a more restrictive system based on their disability classification. Second, S.B. 199 denies these respondents meaningful access to guardianship proceedings by stripping away basic procedural safeguards—such as the right to counsel, the opportunity to object, and access to neutral oversight—that are available to others. Together, these provisions violate the ADA's mandate of equal access and non-discrimination in public services.

### a.    S.B. 199 Creates a Discriminatory, Two-Tier Guardianship System That Deprives Respondents of Fundamental Liberties

S.B. 199 discriminates against individuals labeled with a "severe intellectual disability" by excluding them from the standard guardianship process and subjecting them to a separate, more restrictive regime based on their disability classification. The guardian may restrict the respondent's communication with family and friends or prohibit any conduct the guardian deems "harmful," *see* Utah Code Ann. § 75-5-611(7)(b)–(c), without clear standards or a mechanism for respondents to challenge restrictions. S.B. 199 thus abandons the principles of standard guardianship favoring limited and narrowly tailored restrictions. *See id*. §§ 75-5-611(7)(b)–(c), 75-5-304(2)(a). Indeed, S.B. 199 also departs from guardianship frameworks nationwide in which individuals with intellectual disabilities often retain legal authority over key aspects of their lives. *See* Martinis Decl. ¶¶ 25–30; Kripke Decl. ¶¶ 36–40. S.B. 199's default of full guardianship eliminates these rights, stripping individuals of autonomy and isolating them from meaningful relationships. *See* Kripke Decl. ¶¶ 29–34. The ability to maintain personal connections is a fundamental human need, no less vital for people with disabilities. *Id*.

20

Courts have repeatedly invalidated such two-tiered systems that afford disabled people fewer rights and protections. *See, e.g.*, *Lovell*, 303 F.3d at 1053–54 (holding that state policy discriminated on the basis of disability by excluding disabled people from state insurance program); *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 305 (3d. Cir. 2007) (holding state law discriminated against people with opioid use disorder by allowing cities to deny zoning permits only to methadone clinics); *Smith-Berch, Inc. v. Baltimore Cnty., Md.*, 68 F. Supp. 2d 602, 622 (D. Md. 1999) (holding that county discriminated against disabled people by subjecting only methadone clinics to additional zoning requirements).

S.B. 199 similarly violates the ADA by categorically denying individuals labeled with a "severe intellectual disability" access to the less-restrictive, rights-preserving features of the standard guardianship system. These exclusions, based on disability, are incompatible with the ADA's guarantee of equal treatment.

### b.   S.B. 199 Denies Meaningful Access to Guardianship Proceedings by Eliminating Core Procedural Protections

S.B. 199 denies disabled people meaningful access to judicial proceedings by establishing a separate guardianship system for individuals labeled with a "severe intellectual disability" without the procedural protections they need to meaningfully participate, including the right to counsel, neutral court oversight, the opportunity to object, and presumptions of in-person hearings and limited guardianship. S.B. 199 thus renders the imposition of a full guardianship effectively inevitable.

The ADA requires public entities to provide meaningful access to judicial proceedings. *Robertson*, 500 F.3d at 1195. When people with disabilities are denied counsel, barred from objecting, isolated from neutral fact-finding, subjected to remote-only proceedings, and

21

presumptively stripped of rights, meaningful access is impossible. In high-stakes guardianship proceedings—where fundamental liberty interests are at stake—the denial of procedural supports constitutes unlawful discrimination.

Courts have recognized that individuals with significant intellectual disabilities cannot meaningfully participate without accommodations. In *Franco-Gonzales v. Holder*, 767 F. Supp. 2d 1034, 1053–55 (C.D. Cal. 2010), for example, the court held that the government was required to provide appointed counsel to detainees found to be mentally incompetent and facing removal proceedings because their cognitive impairments and the complexity and consequences of the proceedings made it "difficult to conceive of any paradigm in which [the plaintiffs] could proceed *pro se*." *Id*. at 1054; *see generally People First of Alabama v. Merrill*, 491 F. Supp. 3d 1076 (N.D. Ala. 2020); *Isaac A. v. Carlson*, 775 F. Supp. 3d 1296 (N.D. Ga. 2025); *see also Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 498, 506 (4th Cir. 2016) (holding that voting policies preventing blind voters from casting ballots privately and independently violated the ADA); *Mathis v. United States Parole Comm'n*, 749 F. Supp. 3d 8 (D.D.C. 2024) (holding that parole commission denied disabled parolees equal access to supervision by forcing them to navigate supervision without reasonable accommodations).

That reasoning applies with equal force here. Guardianship proceedings under S.B. 199 involve the permanent or long-term deprivation of core rights, including autonomy and freedom of association. When respondents are denied counsel, court visitors, or other meaningful supports, the proceedings become inaccessible in any practical sense. *See also T.R. v. Cnty. of Delaware*, No. 13-2931, 2013 WL 6210477, at *6 (E.D. Pa. Nov. 26, 2013) (unpublished) (holding that allegations of procedures failing to secure the right to counsel stated a claim that individuals with mental

22

illness were denied an equal opportunity to benefit from commitment proceedings), *aff'd sub nom.*

*T.R. v. Havens*, 612 F. App'x 83 (3d Cir. 2015).

### III.    Plaintiff DLC and Its Constituents Face Immediate and Irreparable Harm

DLC and the individuals it serves face ongoing, immediate and irreparable harm without preliminary injunctive relief. As detailed above, in direct response to S.B. 199, DLC has been forced to divert substantial resources away from its core programs, advocacy initiatives, and statutory mandates to respond to the sudden and increased need for education, advocacy, and legal support from individuals at risk under the S.B. 199 guardianship regime. This diversion of resources has caused concrete and non-compensable injuries, severely restricting DLC's ability to fulfill its broader mandate, including protecting its constituents from abuse and neglect, employment discrimination, and housing discrimination. The harm to DLC's organizational capacity and mission is ongoing and cannot be remedied through monetary damages. *See RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (A plaintiff suffers irreparable harm when there is "a significant risk that [they] will experience harm that cannot be compensated after the fact by money damages."); *Fish v. Kobach*, 840 F.3d 710, 753 (10th Cir. 2016); *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001).

S.B. 199 also places DLC's constituents at imminent and severe risk of unnecessary and overbroad deprivation of their legal rights and civil personhood. Once subjected to S.B. 199's guardianship framework, individuals are presumptively placed under full guardianship, denied meaningful participation in proceedings, and stripped of means to challenge or exit the system. Absent injunctive relief, these individuals face an unnecessary and avoidable loss of their civil personhood—along with their most basic rights and inherent human dignity—based a

23

discriminatory and deeply flawed process that denies an opportunity to retain those rights. The resulting harms are profound: damage to well-being and self-esteem, loss of self-determination, Martinis Decl. ¶¶ 30–44, and harmful isolation from family, friends, and advocates, including DLC, Kripke Decl. ¶¶ 29–34, all of which increase vulnerability to abuse and neglect, *id*. ¶ 41. These injuries are not compensable through monetary relief. *See Prairie Band of Potawatomi Indians*, 253 F.3d at 1250. As courts have consistently recognized, the deprivation of constitutional or civil rights, even temporarily, constitutes irreparable injury. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976).

In short, both DLC as an organization and the individuals subject to S.B. 199 are currently suffering and will continue to suffer irreparable harm in the absence of a preliminary injunction.

### IV.     The Balance of Equities Decisively Weighs in Plaintiff's Favor

An injunction halting the implementation of S.B. 199 would merely restore the status quo that existed prior to July 2025, under which the State of Utah administered its guardianship system prior to S.B. 199. The State stands to suffer little, if any, harm from reinstating the baseline procedural protections that all guardianship respondents previously received.

Any inconvenience the State may face in reverting to the prior regime is far outweighed by the harm to individuals stripped of core civil liberties under S.B. 199. DLC's constituents face immediate, ongoing, and irreversible deprivations of their fundamental rights. This state-sanctioned civil death, imposed without adequate process or individualized assessment, constitutes irreparable harm of the highest order.

### V.     The Public Interest Requires a Preliminary Injunction

24

Enjoining S.B. 199 serves the public's interest in the lawful, nondiscriminatory administration of justice, protection of civil rights, and prevention of harm to vulnerable populations. At its core, the public has a compelling interest in ensuring accurate and fair determinations in guardianship proceedings because they implicate rights to autonomy and access to legal process. The legitimacy of the judicial system depends on proceedings that are procedurally sound and substantively just. That interest is thwarted when individuals are subjected to presumptive full guardianship without due process, meaningful participation, or access to counsel.

The public has an equally compelling interest in preventing disability discrimination. "In enacting the ADA, Congress demonstrated its view that the public has an interest in ensuring the eradication of discrimination on the basis of disabilities." *Enyart v. Nat'l Conf. of Bar Examiners, Inc.*, 630 F.3d 1153, 1167 (9th Cir. 2011). The discriminatory impact of S.B. 199 undermines federal law and the public's stake in equality before the law.

A preliminary injunction unquestionably aligns with the public interest.

### VI.    <u>No Bond Should be Required</u>

The Court should waive the bond requirement under Rule 65(c) of the Federal Rules of Civil Procedure. Courts have broad discretion to determine whether security is necessary when granting a preliminary injunction. *See RoDa Drilling Co.*, 552 F.3d at 1215. Courts regularly waive the bond requirement in public interest cases brought to enforce federal civil rights statutes, including the ADA. *See, e.g., Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1282 (10th Cir. 2016) (affirming district court's discretion to set nominal bond in a public interest case).

Plaintiff is a nonprofit public interest organization asserting rights on behalf of individuals with disabilities who face imminent and irreparable harm under a state law that conflicts with federal antidiscrimination protections. Requiring a bond in these circumstances would frustrate the enforcement of congressional mandates and erect a barrier to the vindication of rights under the ADA.

Given the nature of the claim, the strong public interest in enforcement of the ADA, and the absence of any evidence that Defendants will suffer monetary damages if erroneously enjoined, waiving the bond requirement is appropriate.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that this Court issue injunctive relief barring Defendants from implementing S.B. 199.

Dated: January 28, 2026

Respectfully submitted,

 /s/ Jason M. Groth
Jason M. Groth (Bar No. 16683)

Zoë Brennan-Krohn*
Malhar Shah*
American Civil Liberties Union Foundation
425 California Street, Suite 700
San Francisco, CA 94104
Tel: (415) 343-0769
zbrennan-krohn@aclu.org
mshah@aclu.org

Tom Ford (Bar No. 19795)
ACLU of Utah
311 South State Street, Suite 310
Salt Lake City, UT 84111
Tel: (801) 5221-9862
jgroth@acluutah.org
tford@acluutah.org

John A. Freedman*
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ace., N.W.
Washinton, DC 20001
john.freedman@arnoldporter.com

Brian Dimmick*
Aditi Fruitwala*
Jacob Abudaram*
American Civil Liberties Union Foundation
915 15th Street NW, 6th Floor
Washington, D.C. 20005
Tel: (202) 731-2395
bdimmick@aclu.org
afruitwala@aclu.org

Kristine Itliong*
Arnold & Porter Kaye Scholer LLP
250 W 55th St.
New York, NY 10019

26

jabudaram@aclu.org

Laura Henrie (Bar No.12449)
Nate Crippes (Bar No.14622)
Disability Law Center
960 South Main Street
Salt Lake City, Utah 84101
Tel: (801) 363-1347
lhenrie@disabilitylawcenter.org
ncrippes@disabilitylawcenter.org

*Admitted pro hac vice*

Tel: (212) 836-7037
kristine.itliong@arnoldporter.com

*Attorneys for Plaintiff*

27

## CERTIFICATE OF SERVICE

I hereby certify that on January 28, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which sent notification of such filing to all attorneys of record.

/s/ Jason M. Groth
Jason M. Groth (Bar No. 16683)

*Attorney for Plaintiff*

## CERTIFICATE OF COMPLIANCE

I, Jason Groth, certify that this Motion and Memorandum in support of a Preliminary Injunction contains 7,747 words and complies with DUCivR 7-1(a)(4).

  /s/ Jason M. Groth
Jason M. Groth (Bar No. 16683)

*Attorney for Plaintiff*