DAVID N. WOLF (6688)
KEITH W. BARLOW (15532)
JASON DUPREE (17509)
Assistant Utah Attorneys General
Utah Attorney General's Office
160 East 300 South, 6th Floor
PO Box 140856
Salt Lake City, UT 84114-0856
Telephone: (801) 366-0100
dnwolf@agutah.gov
kwbarlow@agutah.gov
jndupree@agutah.gov

*Counsel for Defendants*
*Governor Cox and State of Utah*

## IN THE UNITED STATES DISTRICT COURT

## IN AND FOR THE DISTRICT OF UTAH

| | |
|---|---|
| DISABILITY LAW CENTER,<br><br>    *Plaintiff*,<br><br>v.<br><br>STATE OF UTAH and SPENCER COX, GOVERNOR OF THE STATE OF UTAH, *in his official capacity*,<br><br>    *Defendants*. | **DEFENDANTS'**<br>**MOTION TO DISMISS PLAINTIFF'S**<br>**COMPLAINT PURSUANT TO FED.**<br>**R. CIV. P. 12(b)(1)**<br><br>Case No. 2:25-cv-01154-DBP<br><br>Judge Howard C. Nielson, Jr. |

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

BACKGROUND AND ALLEGATIONS ........................................................................ 3

LEGAL STANDARD ...................................................................................................... 5

ARGUMENT ................................................................................................................... 6

    I.   THIS COURT LACKS SUBJECT MATTER JURISDICTION OVER DLC'S
       CLAIM BECAUSE DLC LACKS STANDING ............................................... 6

      A.  DLC Lacks Standing. ...................................................................................... 7

      B.  DLC Has Not Alleged Injury in Fact. ........................................................... 7

          1. DLC does not have associational standing. .......................................... 8

              i. DLC members would not "otherwise have standing" because DLC
              is not a traditional membership organization. ............................................ 8
              ii. Because seeking guardianships are not germane to DLC's purpose,
              DLC cannot allege associational representation of the
              severely intellectually disabled population. ............................................... 9
              iii. DLC fails to identify or name a specific, individual member
              harmed by SB199. ..................................................................................... 10

          2. DLC lacks organizational standing. .................................................... 12

              i. DLC has not suffered an organizational injury. ................................... 13
              ii. DLC's alleged organizational injuries are not fairly traceable to
              Defendants ............................................................................................... 17

      C.  DLC's Claim Lacks Causation and Cannot be Redressed. ........................... 18

          1. The State did not cause and cannot redress DLC's alleged injuries. ............... 18

          2. Governor Cox did not cause and cannot redress DLC's alleged injuries. ........ 18

      D.  This Court Lacks Subject Matter Jurisdiction Due to Sovereign Immunity ......... 19

i

*1.* The State has not consented to suit. .................................................................. 20

*2.* The Ex Parte Young exception does not apply. ................................................... 20

    i. DLC fails to allege specific enforcement authority. ...................................... 21

    ii. DLC must allege more than a "general duty" to enforce a statute. .............. 22

    iii. Ex Parte Young is inapplicable where the subject statute places enforcement ability with a private party. ........................................................... 23

    iv. Even if Defendants possessed enforcement power, DLC fails to explain how this justifies an injunction against those petitioning for guardianship. ............. 24

*3.* The abrogation of immunity exception does not apply. .................................... 26

CONCLUSION ................................................................................................................... 27

# TABLE OF AUTHORITIES

Page(s)

Cases

*Access 4 All v. Commons at Sugarhouse, LLC,*
  2016 WL 6779430 (D. Utah Nov. 15, 2016)................................................................. 12

*Am. Chem. Council v. Dep't of Transp.,*
  468 F.3d 810 (D.C. Cir. 2006)..................................................................................... 11

*Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't,*
  659 F.3d 13 (D.C. Cir. 2011)....................................................................................... 13

*Arcia v. Fla. Sec'y of State,*
  772 F.3d 1335 (11th Cir. 2014).................................................................................... 15

*Ash Creek Min. v. Lujan,*
  969 F.2d 868 (10th Cir. 1992)..................................................................................... 19

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ....................................................................................................... 6

*Ass'n for Retarded Citizens of Dallas v. Dallas County Mental Health & Mental Retardation Ctr.,*
  19 F.3d 241 (5th Cir. 1994).......................................................................................... 9

*Chamber of Commerce of the United States v. Edmondson,*
  594 F.3d 742 (10th Cir. 2010)............................................................................... 23, 24

*Clapper v. Amnesty Intern. USA,*
  568 U.S. 398 (2013) .................................................................................................. 7, 8

*Consumer Data Industry Ass'n v. King,*
  678 F.3d 898 (10th Cir. 2012)...................................................................................... 7

*Cox v. Phelps Dodge,*
  43 F.3d 1345 (10th Cir. 1994)..................................................................................... 19

*Disability L. Ctr. v. Cox,*
  No. 2:25-CV-00307-RJS, 2025 WL 2050235 (D. Utah July 22, 2025) ................... 2, 5

*Doe v. Stincer,*
  175 F.3d 879 (11th Cir. 1999)..................................................................................... 12

*Edelman v. Jordan,*
  415 U.S. 651 (1974) ................................................................................................ 20

*Faith Action for Cmty. Equity v. Hawai'i Dep't of Transp.,*
  No. 13-00450 SOM, 2014 WL 1691622 (D. Haw. Apr. 28, 2014) ........................... 15

*Foremaster v. St. George,*
  882 F.2d 1485 (10th Cir.1989) ............................................................................... 13

*Free Speech Coal. v. Anderson,*
  119 F.4th 732 (10th Cir. 2024) ........................................................... 21, 22, 23, 24

*Gorka v. Sullivan,*
  82 F.3d 772 (7th Cir. 1996) .................................................................................... 20

*Guttman v. Khalsa,*
  669 F.3d 1101 (10th Cir. 2012) .............................................................................. 26

*Havens Realty v. Coleman,*
  455 U.S. 363 (1982) ........................................................................................ 13, 15

*Hendrickson v. AFSCME Council 18,*
  992 F.3d 950 (10th Cir. 2021) ............................................................................... 24

*Hunt v. Wash. State Apple Adver. Comm'n,*
  432 U.S. 333 (1977) ................................................................................................. 8

*In re Justices of Supreme Court of Puerto Rico,*
  695 F.2d 17 (1st Cir. 1982) ..................................................................................... 7

*Khalik v. United Air Lines,*
  671 F.3d 1188 (10th Cir. 2012) ............................................................................... 6

*King v. King,*
  174 P.3d 659 (Wash. 2007) ............................................................................. 26, 27

*La Asociacion de Trabajadores de Lake Forest v. Lake Forest,*
  624 F.3d 1083 (9th Cir. 2010) ............................................................................... 15

*Lujun v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ................................................................................................. 7

iv

*Massey v. Utah Department of Corrections,*
   2017 WL 1476138 (D. Utah April 24, 2017) ........................................................... 20

*Michael R. v. Comm'r of Soc. Sec.,*
   No. C19-5001 TSZ, 2019 WL 3941127 (W.D. Wash. Aug. 21, 2019) ................... 17

*Missouri Prot. & Advoc. Servs., Inc. v. Carnahan,*
   499 F.3d 803 (8th Cir. 2007) ...................................................................................... 9

*Mitchell v. King,*
   537 F.2d 385 (10th Cir. 1976) .................................................................................... 6

*Muscogee (Creek) Nation v. Pruitt,*
   669 F.3d 1159 (10th Cir. 2012) .......................................................................... 20, 21

*N. New Mexicans Protecting Land Water & Rts. v. United States,*
   161 F. Supp. 3d 1020 (D.N.M. 2016) ...................................................................... 11

*Pennhurst State Sch. & Hosp. v. Halderman,*
   465 U.S. 89 (1984) .................................................................................................... 20

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.,*
   797 F.3d 1087 (D.C. Cir. 2015) ................................................................................ 13

*Postsecondary Sch. v. DeVos,*
   344 F. Supp. 3d 158 (D.D.C. 2018) ............................................................................ 8

*Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy,*
   506 U.S. 139 (1993) .................................................................................................. 21

*Ratto v. Sec'y, Dep't of Health & Hum. Servs.,*
   839 F. Supp. 1415 (D. Or. 1993) .............................................................................. 17

*Shotz v. Cates,*
   256 F.3d 1077 (11th Cir. 2001) ................................................................................ 12

*Spokeo, Inc. v. Robins,*
   578 U.S. 366 (2016) .................................................................................................... 7

*State of Connecticut Off. of Prot. & Advoc. for Persons with Disabilities v. Connecticut,*
   706 F. Supp. 2d 266 (D. Conn. 2010) ...................................................................... 11

*Steadfast Ins. v. Agricultural Ins.,*
   507 F.3d 1250 (10th Cir. 2007) ............................................................. 20

*Summers v. Earth Island Inst.,*
   555 U.S. 488 (2009) ................................................................................ 11

*Sutton v. Utah State School for Deaf and Blind,*
   173 F.3d 1226 (10th Cir. 1999) ............................................................. 20

*Tennessee v. Lane,*
   541 U.S. 509 (2004) ................................................................................ 26

*Tenn. Prot. & Advocacy, Inc. v. Bd. of Educ.,*
   24 F.Supp.2d 808 (M.D. Tenn. 1998) ...................................................... 9

*United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.,*
   517 U.S. 544 (1996) .................................................................................. 8

*United States v. AVX Corp.,*
   962 F.2d 108 (1st Cir. 1992) ................................................................... 18

*United States v. Georgia,*
   546 U.S. 151 (2006) ................................................................................ 26

*United States v. Rodriguez–Aguirre,*
   264 F.3d 1195 (10th Cir. 2001) ............................................................... 6

*V-1 Oil Co. v. Utah State Dept. of Pub. Safety,*
   131 F.3d 1415 (10th Cir. 1997) ............................................................. 20

*Valdez v. National Security Agency,*
   228 F.Supp.3d 1271 (D. Utah 2017) ........................................................ 6

*Warth v. Seldin,*
   422 U.S. 490 (1975) .................................................................................. 8

*Weingarten v. Devos,*
   468 F. Supp. 3d 322 (D.D.C. 2020)........................................................ 15

*Whitmore v. Arkansas,*
   495 U.S. 149 (1990) ................................................................................ 12

vi

*Whole Woman's Health v. Jackson,*
  595 U.S. 30 (2021) ............................................................... 19, 21, 24, 25

*Wood v. Milyard,*
  414 Fed. Appx. 103 (10th Cir. 2011) ..................................................... 20

*Yvonne M. v. Comm'r of Soc. Sec.,*
  No. C20-5447 RSM, 2021 WL 735482 (W.D. Wash. Feb. 25, 2021) ...................................... 17

<u>Statutes</u>
42 U.S.C. §15043(2)(A) ............................................................................. 3

Utah Code § 63G-7-501(1) ...................................................................... 20

Utah Code § 75-5-604(1) ...................................................... 19, 22, 24

Utah Code § 75-5-309(1) ...................................................... 25, 26

<u>Rules</u>
FED. R. CIV. P. 12(b)(1) ...................................................... 1, 6, 7, 28

Utah Code of Judicial Administration Rule 4-202.02 ............................. 16

<u>Other Authorities</u>
Senate Bill 199 .......................................................................... Passim

Pursuant to Federal Rules of Civil Procedure 12(b)(1), and the Eleventh Amendment to the Constitution, Defendants Spencer Cox, Governor of the State of Utah ("Governor Cox"), and the State of Utah (the "State") (collectively "Defendants") hereby submit this Motion to Dismiss Plaintiff Disability Law Center's ("Plaintiff" or "DLC") Complaint.

## <u>INTRODUCTION</u>

For families caring for loved ones with severe intellectual disabilities, every day is filled with immense responsibility, constant vigilance, and unrelenting fear of what happens when support systems fail. These families are not asking for convenience, they seek survival tools. Parents devote their lives and sacrifice self-interests to support loved ones who cannot safely navigate the world on their own. Severely intellectually disabled individuals cannot understand danger, communicate basic needs, or make informed decisions. Sadly, this is a lifelong, permanent disability. Their parents advocate tirelessly only to face new and confusing legal barriers, delaying critical decisions and benefits. In Utah, guardianship for these families has become a confusing, expensive, and unworkable barrier, leaving their vulnerable children open to harm. Utah Senate Bill 199 ("SB199") provides desperately needed remedies.

On March 27, 2025, Governor Spencer Cox signed SB199 into law, amending statutes related to guardianship proceedings for individuals with severe intellectual disabilities. Previously, Utah had a single process for adult guardianship petitions initiated when an individual ("petitioner") files a petition asking the court to impose guardianship on an adult alleged to be "incapacitated" ("respondent" or "ward").[1] Utah's inflexible, one-size-fits all

---

[1] ECF No. 1 ("Compl.") ¶¶ 34-35.

1

approach to guardianship petitions applied to adult guardianship cases regardless of a respondent's disability level and was specifically tailored to the elderly and those who once had legal capacity, may regain capacity, and/or have somewhat limited capacity. This created a significant need for additional protection of those with severe functional and cognitive impairments. SB199 corrects this issue and addresses this need for those with severe intellectual disabilities, requiring common-sense protection and authority. It creates carefully refined processes for those for whom communication and comprehension are so limited that meaningful participation in legal proceedings is simply not possible.

Notwithstanding, DLC wants to stop familial care and protection of severe intellectually disabled individuals by seeking declaratory and injunctive relief based on a claim that SB199 violates the Americans with Disabilities Act ("ADA"). We have already traveled this road. DLC sought to derail SB199 in prior litigation. However, DLC's claims were dismissed for lack of subject matter jurisdiction.[2] As before, DLC gets it wrong. SB199 does not restrict the rights of those with severe intellectual disabilities. It protects them from harm in a system that treats every disabled person as equally able to self-advocate. SB199 streamlines processes, reduces unnecessary trauma, and ensures those who cannot speak for themselves are not left unprotected because of guardianship law too rigid to recognize their reality.

Regardless of the wisdom behind policies advanced by SB199, this Court still lacks subject matter jurisdiction to address DLC's claim. First, DLC lacks organizational and representative standing. DLC has not identified specific individuals impacted by SB199 and fails

---

[2] *See Disability L. Ctr. v. Cox*, No. 2:25-CV-00307-RJS, 2025 WL 2050235, at *1 (D. Utah July 22, 2025), *reconsideration denied*, No. 2:25-CV-00307-RJS, 2025 WL 3187347 (D. Utah Nov. 14, 2025).

to allege harm beyond hypothetical conjecture and speculation. Second, any injunction prohibiting Defendants from implementing or enforcing SB199 will not redress DLC's alleged injuries. And, third, Defendants are immune under the Eleventh Amendment and doctrine of sovereign immunity. Accordingly, DLC's claim should, once again, be dismissed.

## BACKGROUND AND ALLEGATIONS

1. DLC is a private, non-profit organization charged with advocating on behalf of disabled individuals in Utah. (Compl. ¶ 12.) DLC is designated as "Utah's authorized protection and advocacy organization," required to "protect and advocate for the rights and interests of itself and its constituents with intellectual disabilities." (*Id*. ¶¶ 15-16.) DLC claims, "[a]ll Utahns with intellectual disabilities are considered DLC constituents" for purposes of 42 U.S.C. §15043(2)(A). (*Id*. ¶ 16.)

2. DLC alleges a "core part" of its mission is "[w]orking to protect the legal rights, choices, and opportunities of Utahns with disabilities," and that "addressing guardianship is a critical part of that work." (*Id*. ¶ 88.)

3. DLC alleges that it responds to requests for assistance from people with disabilities facing guardianship petitions or already under guardianship, including adults with intellectual or developmental disabilities. DLC alleges providing "guidance, advocacy, and individual representation to some of these people, including some who might be classified by a physician or psychologist as having a severe intellectual disability." (*Id*. ¶ 89.)

4. On March 27, 2025, Governor Cox signed SB199, amending statutes governing guardianship proceedings involving individuals with severe intellectual disabilities. (*Id*. ¶¶ 4-5, 34-35.)

5. DLC alleges that the process for establishing guardianships under SB199 alters "standard"

3

guardianship process by: (1) being "less protective of the respondent" and more expansive than standard guardianships (*id.* ¶ 36); (2) limiting a respondent's right to counsel and not requiring appointment of a court visitor (*id.* ¶¶ 37-48); (3) creating a presumption for remote hearings instead of in-person hearings absent good cause (*id.* ¶¶ 49-50); (4) removing a guardianship respondent's right to trial by jury (*id.* ¶ 51); (5) creating a presumption of "full guardianship," which includes possible limitations of the "disabled person's association with relatives and acquaintances" (*id.* ¶¶ 52-59); and (6) alleged "diminished opportunity to change or end the guardianship (*id.* ¶ 60.)

6. DLC alleges that deviation from "standard" guardianship procedures to the process created by SB199 is triggered upon a court finding that a guardianship respondent is "incapacitated" and has received a "severe intellectual disability "diagnosis. (*Id*. ¶ 62.) SB199's processes only apply if this finding is established, following which courts must prefer "full guardianships." (*Id*. ¶¶ 53-54.)

7. DLC alleges that since SB199 took effect, its "core business activities have been harmed in multiple ways," including: (1) curtailing its "ability to monitor and participate in guardianship proceedings" by holding SB199 "hearings separate from the standard guardianship process;" allegedly meaning that "DLC staff must monitor all guardianship filings to determine" SB199 filings and "review dockets" for assertions of a "sever intellectual disability" and then determine hearing time and location (*id.* ¶¶ 94-99); (2) harm to DLC's "guardianship work [and] broader activities" by preventing reports from family and friends of those within guardianships, which allegedly inhibits DLC's "ability to investigate abuse and neglect" (*id.* ¶ 108); this allegedly requires DLC to expend "more resources to

identify individuals experiencing abuse or neglect," including "educating medical providers, legal service providers, educators, and providers of services to people with intellectual disabilities" (*id.* ¶¶ 109-110); harm DLC's "other programs that provide services unrelated to guardianship" (*id.* ¶ 111); force DLC to "prepare to expend more resources providing representation to more individuals" (*id.* ¶ 112); and, requiring DLC to divert "resources away from other activities core to its mission" (*id.* ¶ 113).

8. DLC also alleges that SB199's "two-tier guardianship system" harms "DLC constituents who are or will be subject to SB199" proceedings and guardianships. (*Id.* ¶¶ 61-62). DLC alleges that "[s]ome of [its] constituents are already facing harms of SB199 guardianships, while others remain at risk of such harms." (*Id.* ¶ 63.) These alleged harms include: "denial of opportunity to participate in guardianship proceedings" (*id.* ¶¶ 65-70); subjecting "people with disabilities" to SB199 "full guardianships," when limited or no guardianship "would be appropriate" (*id.* ¶ 71); harm to independence, health, and well-being (*id.* ¶¶ 77-79); and placing DLC's "constituents at risk of abuse and isolation" (*id.* ¶¶ 80-86).

9. On December 22, 2025, DLC filed this Complaint for Declaratory Judgment and Injunctive Relief (*see* ECF. No. 1) asserting the same ADA claim dismissed for lack of subject matter jurisdiction last year (*see Disability L. Ctr.*, 2025 WL 2050235, *reconsideration denied*, 2025 WL 3187347).

## LEGAL STANDARD

To withstand a motion to dismiss, a complaint must include sufficient factual allegations to state a plausible, not merely conceivable, claim. *Khalik v. United Air Lines,* 671 F.3d 1188, 1190 (10th Cir. 2012) (cleaned up). In determining whether the complaint validly states a claim,

5

courts disregard mere labels and conclusions, and "formulaic recitation[s] of the elements of a cause of action." *Id.* 1190-91.

In considering a motion to dismiss, the complaint's factual allegations are taken as true and reasonable inferences must be indulged in favor of the complainant. *Mitchell v. King*, 537 F.2d 385, 386 (10th Cir. 1976). A 12(b)(1) motion to dismiss permits a defendant to challenge a court's subject matter jurisdiction both facially and factually. *United States v. Rodriguez–Aguirre*, 264 F.3d 1195, 1203 (10th Cir. 2001). Facial challenges target the adequacy of the complaint's allegations. *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When presented with facial challenges, courts (1) identify allegations entitled to an assumption of truth and (2) evaluate whether these allegations plausibly support entitlement to relief. *Iqbal, 556 U.S. at 680*; *Valdez v. National Security Agency*, 228 F.Supp.3d 1271, 1279, & n.24 (D. Utah 2017).

To be entitled to assumption of truth, allegations must be "well-pleaded," meaning, at minimum, they cannot be legal conclusions, bare assertions, or "formulaic recitations" of claim elements. *Valdez,* 228 F.Supp.3d at 1279. In resolving factual challenges to subject matter jurisdiction, the court "does not presume the truthfulness of the complaint's factual allegations, but has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)." *Id.* at 1279, n.24.

## **ARGUMENT**

### *I.* **THIS COURT LACKS SUBJECT MATTER JURISDICTION OVER DLC'S CLAIM BECAUSE DLC LACKS STANDING**

This Court lacks jurisdiction because there is no case or controversy. "It is fundamental that to be heard in a federal court, a 'controversy' between litigants must be 'definite and concrete, touching the legal relationships of the parties having adverse legal interests.'" *In re*

6

*Justices of Supreme Court of Puerto Rico*, 695 F.2d 17, 21 (1st Cir. 1982) (cleaned up). The case or controversy requirement applies to actions seeking declaratory judgments and injunctive relief. *Consumer Data Industry Ass'n v. King*, 678 F.3d 898 (10th Cir. 2012). DLC's Complaint does not withstand Rule 12(b)(1) scrutiny and should be dismissed.

### A.    DLC Lacks Standing.

This Court lacks subject matter jurisdiction because DLC lacks standing. Standing is an "irreducible constitutional minimum" requirement for a justiciable case or controversy under Article III. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). A party has standing only when it has: (1) suffered an injury in fact, (2) fairly traceable to the alleged conduct, and (3) likely to be redressed by a favorable decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). DLC has the burden of establishing standing. *Id.* To satisfy this burden at the pleadings stage, a party's complaint must include well-pleaded allegations of fact demonstrating each element. *Id.* Here, DLC fails to meet its burden.

### B.    DLC Has Not Alleged Injury in Fact.

DLC fails to allege facts demonstrating "injury in fact." To demonstrate injury in fact, DLC must show it suffered an invasion of a legally protected interest that is concrete, particularized, and actual or imminent, not conjectural or hypothetical. *Spokeo*, 136 S. Ct. at 1548. Allegations of possible future injury fail to satisfy this element. *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013). A plaintiff "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Id. at* 416.

1. **DLC does not have associational standing.**

DLC asserts associational standing because its constituents allegedly possess standing to sue in their own right by suffering concrete injuries from SB199 traceable to Defendants and redressable by them. (Compl. ¶¶ 7, 14, 61-86.) However, DLC's quest for associational standing falls short. To possess associational standing, a plaintiff must allege facts showing "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

*Hunt* requires organizations "suing as representative to include at least one member with standing to present, in his or her own right, the claim (or type of claim) pleaded by the association." *United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 555 (1996). Associational standing permits traditional membership organizations "to invoke the court's remedial powers on behalf of its members." *Warth v. Seldin*, 422 U.S. 490, 515 (1975)). In short, "[a]ssociational standing is premised on the theory that the plaintiff is not seeking a remedy on its own behalf but, rather, is proceeding 'as the representative of its members.'" *California Ass'n of Priv. Postsecondary Sch. v. DeVos*, 344 F. Supp. 3d 158, 168–69 (D.D.C. 2018) (cleaned up).

   i. **DLC members would not "otherwise have standing" because DLC is not a traditional membership organization.**

*Hunt* precludes DLC from relying on associational standing, in part, because DLC is not a "traditional membership organization." DLC does not have "members," let alone a member possessing standing to present their own claim as currently pleaded by DLC. Specifically, DLC

8

alleges that it advocates on behalf of "its constituents" to avoid "unnecessary or overbroad guardianship." (Compl. ¶ 14 (DLC alleged its constituents are "over 500,000 Utahns with disabilities").) DLC alleges that all *"Utahns with intellectual disabilities"* are its constituents. (*Id.* ¶ 16.) DLC alleges being designated as "Utah's authorized protection and advocacy organization ("P&A")." (*Id.* ¶ 15.)

However, P&A groups do not have traditional members, and thus, courts have held that P&A organizations, such as DLC, do not possess associational standing. *Ass'n for Retarded Citizens of Dallas v. Dallas County Mental Health & Mental Retardation Ctr.,* 19 F.3d 241, 244 (5th Cir. 1994) (the subject association with a "statutory mandate [] to protect and advocate the rights of disabled individuals," failed to meet *Hunt*'s first prong because "[t]he organization bears no relationship to traditional membership groups because most of its 'clients'— handicapped and disabled people—are unable to participate in and guide the organization's efforts"); *Missouri Prot. & Advoc. Servs., Inc. v. Carnahan,* 499 F.3d 803 (8th Cir. 2007) (agreeing with *Ass'n for Retarded Citizens*); *Tenn. Prot. & Advocacy, Inc. v. Bd. of Educ.,* 24 F.Supp.2d 808, 815–16 (M.D. Tenn. 1998) (federally funded advocacy organization lacked associational standing because it did not sue "on behalf of specific individuals who themselves have allegedly suffered concrete harm as a result of the defendant's actions").

ii.    **Because seeking guardianships are not germane to DLC's purpose, DLC cannot allege associational representation of the severely intellectually disabled population.**

DLC has not shown that the interests it seeks to protect are germane to its purposes. DLC alleges that "[a]ll individuals with intellectual disabilities are considered" its constituents, and that it desires to "protect and advocate for the rights and interests of itself and its constituents

with intellectual disabilities." (Compl. ¶ 16.) DLC further alleges that it "provides direct representation in guardianship proceedings to individuals who do not believe a guardianship is necessary. . . ." (*Id.* ¶ 24.) In doing so, DLC infers that some of its alleged constituents believe that guardianship *is* necessary in certain circumstances. (*Id.* ¶ 2 (alleging "[n]ot everyone, [and therefore some individuals,] with a "significant or severe intellectual disability, need[] a guardian").) Therefore, individuals encompassed within the definition of severe intellectual disability are likely to seek protection and benefits resulting from SB199 guardianships.

DLC unabashedly alleges that "[g]uardianship is a civil death." (*Id.* ¶ 1.) DLC does not assist those seeking to secure protection of guardianships, even if necessary and appropriate. In short, despite recognizing guardianship is appropriate in certain cases, being the P&A agency "protecting the disabled," and purporting to represent every disabled Utahn, DLC will not assist necessary and appropriate cases seeking guardianship under SB199. By doing so, DLC chooses to ignore a population of the disabled where guardianships *are* necessary and appropriate. Thus, because seeking guardianships is not germane to DLC's purpose, DLC does not represent the severely intellectually disabled population for whom full guardianship is necessary and appropriate.

### iii. DLC fails to identify or name a specific, individual member harmed by SB199.

Even if it had "members," DLC did not include any members in this lawsuit, let alone someone with standing to individually bring the claims advanced by DLC. Inherent in *Hunt*'s associational standing requirements is the requirement that DLC show how an "identifiable group of individuals" was harmed by the challenged conduct. *State of Connecticut Off. of Prot. & Advoc. for Persons with Disabilities v. Connecticut*, 706 F. Supp. 2d 266, 284 (D. Conn.

10

2010). Plaintiffs claiming organizational standing, such as DLC, must specifically "identify members who have suffered the requisite harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009); *see also N. New Mexicans Protecting Land Water & Rts. v. United States*, 161 F. Supp. 3d 1020, 1041 (D.N.M. 2016), *aff'd*, 704 F. App'x 723 (10th Cir. 2017) (such members must be "specifically identified"). For associational standing, DLC "must show that at least one specifically-identified member has suffered an injury in fact." *N. New Mexicans*, 161 F. Supp. 3d at 1041 (quoting *Am. Chem. Council v. Dep't of Transp.,* 468 F.3d 810, 820 (D.C. Cir. 2006)). "At the very least, the identity of the party suffering an injury in fact must be firmly established." *Id*.

Here, DLC has not identified any specific individuals, let alone those classified as having a severe intellectual disability, impacted by SB199 or encompassed in the broad range of individuals it alleges are subject to, and being harmed by, SB199. Nor has DLC alleged facts showing that specific individuals it could represent have suffered or will suffer an injury from SB199. DLC has not alleged facts plausibly showing any rights have been or will be violated. DLC's alleged associational injuries are hypothetical and speculative. In short, DLC alleges that "[t]his system is harming DLC's constituents," but fails to name one person that has been, or is likely to be, injured. (Compl. ¶ 61.)  DLC alleges its "constituents are suffering," but cannot find one individual example, let alone provide a named plaintiff for this lawsuit. (*Id*. ¶ 64.) Therefore, even a post-enforcement challenge, with SB199 in full effect, DLC still cannot identify a specific individual harmed by SB199.

*Access 4 All v. Commons at Sugarhouse, LLC*, 2016 WL 6779430, * 9 (D. Utah Nov. 15, 2016) (cleaned up) further reinforces DLC's lack of standing. *Access* addressed whether an

11

organization had standing to bring an ADA claim on behalf of a member for purposes of assessing Rule 11 sanctions. Concluding that such representative standing requires at least one member with standing be included in the lawsuit, the court noted that, under *Shotz v. Cates*, 256 F.3d 1077 (11th Cir. 2001), to "state a valid claim under Title II of the ADA, an *individual* plaintiff must establish, at an irreducible minimum, an injury in fact caused by the challenged act of the defendant." *Id.* *11 (cleaned up). Further, to obtain injunctive relief, the individual "also had to establish a real and immediate—as opposed to a merely conjectural or hypothetical— threat of future injury." *Id.*

DLC fails to plead sufficient facts showing that an individual "constituent" suffered an injury or is facing a real or certain threat of future injury. *Cf. Doe v. Stincer,* 175 F.3d 879, 884-85 (11th Cir. 1999) (requiring allegations of injury of fact showing individual). DLC has not alleged facts demonstrating that any specific individual faces a "certainly impending" injury. *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (cleaned up) (a "threatened injury must be 'certainly impending' to constitute an injury in fact").

## 2. DLC lacks organizational standing.

DLC alleges organizational standing on the basis SB199 harms DLC's core business activities. (Compl. ¶¶ 88, 113.) However, DLC's allegations are legally and factually insufficient to confer standing. To assert standing on its own behalf, DLC must, "like an individual plaintiff," demonstrate injury in fact, fairly traceable to the alleged action that can be redressed by the court. *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) (cleaned up); *Foremaster v. St. George*, 882 F.2d 1485, 1487 (10th Cir.1989); *Havens Realty v. Coleman,* 455 U.S. 363, 378-79 (1982) (plaintiff must allege "such a personal

stake" in a controversy's outcome as to warrant invocation of federal-court jurisdiction).

Further, DLC, as an organization, must allege a "concrete and demonstrable injury to [its] activities," along with "consequent drain on the organization's resources [which must] constitute[] *far more* than simply a setback to the organization's abstract social interests." *Havens,* 455 U.S. at 379 (emphasis added). Moreover, "an organization's diversion of resources to litigation or to investigation in anticipation of litigation is considered a 'self-inflicted' budgetary choice that cannot qualify as an injury in fact for purposes of standing." *Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't,* 659 F.3d 13, 25 (D.C. Cir. 2011).

> i. **DLC has not suffered an organizational injury.**

DLC fails to show it has suffered an injury. DLC's claimed injuries are, at best, speculative future harm. Specifically, DLC alleges that SB199 may impact its "guardianship work" and "broader activities." (Compl. ¶ 108). DLC further claims SB199 curtails its "ability to investigate abuse and neglect" because SB199 inhibits "DLC's ability to receive information" and creates an alleged need to "expend more resources to identify individuals experiencing abuse or neglect." (*Id*. ¶¶ 108-110.) This includes alleged harm to DLC's ability to provide "other programs . . . unrelated to guardianship" to individuals with disabilities. (*Id*. ¶ 111.) In addition, DLC asserts that SB199 forced it "to prepare to expend more resources providing representation to more individuals involved in guardianship proceedings." (*Id*. ¶ 112). And DLC also contends SB199 has caused, or may yet cause, a diversion of "resources away from other activities core to its mission." (*Id.* ¶ 113.)

DLC's allegations contain layers of hypothetical conjecture and are insufficient to confer standing. For example, DLC alleges that it has been, or may be, forced to expend more resources

in providing legal assistance to those without counsel or to identify "individuals experiencing abuse and neglect." (*Id.* ¶ 110.) First, DLC only alleges that it must "*prepare* to expend more resources," not that it actually *has* expended more resources. Second, to meet the test for an organizational injury, any alleged drain on DLC's resources must constitute more than a setback to its abstract social interests. Third, DLC's alleged diversion of resources to investigate in anticipation of litigation is a 'self-inflicted' budgetary choice that cannot qualify as injury in fact.

Fourth, claims of "denial of opportunity to participate in guardianship proceedings" (*id.* ¶¶ 65-70) connotes wrongfulness or illegality, which makes these improper legal conclusions, not factual allegations. Fifth, these bare assertions are unsupported by foundational factual allegations. SB199 has gone into effect, yet DLC fails to allege that anyone has actually been denied counsel when counsel was necessary or denied the benefits of services under SB199. Although DLC alleges having "identified multiple SB199 guardianships that were filed"), it has not set forth facts plausibly showing that in those instances: (1) any unnamed constituent's constitutional or statutory rights were violated, and (2) that DLC has been injured consequently. Indeed, DLC alleges that when it observed SB199 hearings, respondents "did not have an attorney," were "not asked questions," and were not provided objection opportunities. (*Id.* ¶¶ 101-103.) Yet DLC doesn't allege harm of constitutional or statutory rights violation. Rather, DLC alleges that its "staff could not interact with [respondents] directly or gather any information about their preferences and experiences." (*Id.* ¶ 105.)

Moreover, this Court should not assume the truth of DLC's allegations regarding a diversion of resources or funds because, not only are such allegations conclusory in nature, they also formulaically track the "diversion of funds" theory of standing rejected in *La Asociacion de*

*Trabajadores de Lake Forest v. Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010). DLC must show "it would have suffered some other injury if it had not diverted resources to counteracting." *Id; Havens,* 455 U.S. at 379 ("[C]oncrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests."); *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014). Here, DLC fails to allege having suffered some other concrete injury but for its alleged diversion of funds or expenditure of resources. DLC simply offers conclusory statements that "SB199 has harmed several other programs that DLC provides to people with disabilities, including intellectual disabilities, unrelated to guardianship." (Compl. ¶ 111.) This is not enough.

Expending resources to advocate against a law or policy does not constitute injury sufficient to confer standing, even with "highly permissive" standing requirements. *Faith Action for Cmty. Equity v. Hawai'i Dep't of Transp.*, No. 13-00450 SOM, 2014 WL 1691622, *6-7 (D. Haw. Apr. 28, 2014); *Weingarten v. Devos*, 468 F. Supp. 3d 322, 334 (D.D.C. 2020) (an organization must show "harm to its activities distinct from diversion of resources"). If this was not the case, expending time to purchase a postage stamp and send a "letter to the editor" could manufacture standing, regardless of concrete and particularized injury.

Moreover, DLC alleges a possible need to expend more operational budget to sit in hearings and monitor every guardianship proceeding, which may result in additional funds and time. (Compl. ¶¶ 94-100.) DLC's allegation is unfounded. Even if attending guardianship hearings, in most situations, without being a party to guardianship proceedings, DLC could not

access relevant, private documentation anyway.[3] Thus, DLC lacks a factual basis for objecting.

Even then, DLC stops short of alleging actual harm. Instead, DLC merely alleges speculative harm, despite SB199 being in effect since July 2025. First, DLC alleges harm to core business activities because of diminished ability to identify and investigate "people under guardianship who are experiencing abuse or neglect." (*Id.* ¶ 108.) DLC's alleged harm derives from SB199 curtailing "DLC's ability to receive information" because of guardians "unchecked power to isolate disabled people. . . ." (*Id.* ¶ 109.) And, according to DLC, because this "isolation" creates a lack of "reports," it must expend "more resources to identify individuals experiencing abuse or neglect." (*Id.* ¶ 110.) However, DLC never alleges *actual* instances or examples of an "SB199 guardian" isolating a severely disabled individual to the point of requiring DLC to expend more resources. DLC also never alleges what resources it expended because of SB199.

Second, DLC's allegations regarding expending more resources to provide representation to more individuals do not include allegations that DLC has done so. Specifically, DLC alleges that it "*will need* to devote more resources," not that it *has* devoted more resources because of SB199. (*Id.* ¶ 113.) DLC alleges that it "*will have* to expend more effort," not that it *has* expended more effort because of SB199. (*Id.*) Speculative harm is not enough.

---

[3] https://www.utcourts.gov/en/legal-help/legal-help/procedures/filing/non-public.html; *see also* Utah Code of Judicial Administration Rule 4-202.02 (designating "medical, psychiatric, or psychological records" for guardianships as private); *id.* 4-202.03 (listing who may access private court records in guardianship proceedings); *id.* 4-202.03(K) (allowing government entities to access records). DLC, a private, non-profit organization, is not a governmental organization for purposes of the rule.

ii. **DLC's alleged organizational injuries are not fairly traceable to Defendants.**

DLC's alleged injury is not concrete or traceable to Defendants. Rather, DLC's alleged injury is built on questionable assumptions that the judicial branch and health care professionals will act unethically, incompetently, and not correctly follow SB199. DLC's allegations reveal an underlying distrust of medical professionals' ability to create accurate reports based on testing, assessments, and treatment. DLC cannot rest claims of medical professional incompetence on the assumption that doctors will erroneously diagnose an individual with a "severe intellectual disability." *Ratto v. Sec'y, Dep't of Health & Hum. Servs.,* 839 F. Supp. 1415, 1426 (D. Or. 1993) (agency may not assume doctors routinely lie to help patients collect disability benefits); *Yvonne M. v. Comm'r of Soc. Sec.,* No. C20-5447 RSM, 2021 WL 735482, at *5 (W.D. Wash. Feb. 25, 2021) (court will not assume doctors routinely lie to deny a claimants disability); *Michael R. v. Comm'r of Soc. Sec.,* No. C19-5001 TSZ, 2019 WL 3941127, at *2 (W.D. Wash. Aug. 21, 2019) (may not assume, without evidence, doctors routinely lie or are incompetent).

DLC's allegations also exhibit distrust of a court's ability to make correct determinations based on available evidence regarding: (1) lifelong functional limitations, (2) incapacity, and (3) an individual having a severe intellectual disability. DLC's allegations are unavailing. There is no unlawful conduct where, as here, a statute provides necessary protection of the health, safety and welfare of the most vulnerable population, and healthcare professionals assess the individual and provide relevant information to the court, which then determines whether statutory definitions have been met.

In short, this Court is not obliged "to credit bald assertions, periphrastic circumlocutions, unsubstantiated conclusions, or outright vituperation, nor to honor subjective characterizations . .

. or problematic suppositions." *United States v. AVX Corp.*, 962 F.2d 108, 115 (1st Cir. 1992) (cleaned up). And, here, DLC's "empirically unverifiable conclusions, not logically compelled, or at least supported, by the stated facts, deserve no deference." *Id.* (cleaned up).

### C.    DLC's Claim Lacks Causation and Cannot be Redressed.

Even if DLC sufficiently plead an injury, it must demonstrate that the alleged injury is fairly traceable to Defendants' conduct and can be redressed by this Court. Here, DLC fails to properly allege either causation or redressability.

#### 1.    The State did not cause and cannot redress DLC's alleged injuries.

The Court should dismiss DLC's claim against the State because an injunction prohibiting it from "enforcing" SB199 will not redress any alleged injuries. DLC alleges that the State "is authorized to stop the law's implementation and enforcement," pointing only to the example of the State "volunteering to cease both the enactment and enforcement of the law" during a "stipulated stay of the law [during DLC' prior challenge] between May 7, 2025, when the law was initially set to take effect, and July 22, 2025." (Compl. ¶¶ 30-31.) DLC never alleges the State bears actual responsibility for implementing and enforcing SB199, only that it is "authorized to stop" the same.

#### 2.    Governor Cox did not cause and cannot redress DLC's alleged injuries.

The Court should dismiss DLC's claim against Governor Cox because an injunction prohibiting him from enforcing SB199 will not redress DLC's alleged injuries. DLC alleges that Governor Cox "is responsible for supervis[ing] the official conduct of all executive and ministerial officers." (Compl. ¶ 33.) DLC also alleges that Governor Cox ensures "compliance with federal laws," is "legally responsible for unlawful policies, practices, and procedures," and

possesses "authority and legal obligation to eliminate and remedy" such actions. (*Id.*) However, DLC does not allege that Governor Cox bears responsibility for implementing and enforcing SB199. DLC's minimal allegations against Governor Cox cannot establish that he caused DLC's alleged injury or that an injunction against him could redress that injury.

A court's judgment must have an effect on the defendant that redresses the plaintiff's injury. *Ash Creek Min. v. Lujan*, 969 F.2d 868, 875 (10th Cir. 1992) (redressability requires "the relief requested will redress the injury claimed"); *Cox v. Phelps Dodge*, 43 F.3d 1345,1348 (10th Cir. 1994) ("what makes a declaratory judgment action 'a proper judicial resolution of a 'case or controversy' rather than an advisory opinion is the settling of some dispute which affects the behavior of the defendant toward the plaintiff'") (cleaned up).

Here, Governor Cox can do nothing to redress DLC's claimed injury. DLC's Complaint contains one paragraph referencing Governor Cox's general duties and directs its claim primarily against the State. (Compl. ¶ 33.) Even if the Court found merit in DLC's claim, the Court could order no relief against Governor Cox that would redress DLC's alleged harm or assist its request for an order enjoining enforcement of SB199. Governor Cox plays no role in implementation, enforcement, or the guardianship petition process of SB199, which notably is not applied until a private, third-party files a petition seeking guardianship. *See* Utah Code § 75-5-604(1). Governor Cox has neither caused DLC's alleged injury nor can he redress that injury. Thus, DLC's claim should be dismissed.

### D.    This Court Lacks Subject Matter Jurisdiction Due to Sovereign Immunity.

Defendants are immune from suits in federal court, under "the Eleventh Amendment and the doctrine of sovereign immunity." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021).

19

The Eleventh Amendment provides sovereign immunity to states from being sued in federal court. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984). This includes suits seeking injunctive and declaratory relief. *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974); *Steadfast Ins. v. Agricultural Ins.*, 507 F.3d 1250, 1252 (10th Cir. 2007); *Massey v. Utah Department of Corrections*, 2017 WL 1476138, *1 (D. Utah April 24, 2017). Here, due to Defendants' sovereign immunity, this Court lacks subject matter jurisdiction. *Wood v. Milyard*, 414 Fed. Appx. 103, 105 (10th Cir. 2011) (unpublished) (cleaned up); *Gorka v. Sullivan*, 82 F.3d 772, 775 (7th Cir. 1996). Although three primary exceptions to sovereign immunity exist: (1) State consent to suit; (2) *Ex Parte Young* doctrine; and (3) abrogation of immunity by appropriate congressional legislation, *see Muscogee (Creek) Nation v. Pruitt,* 669 F.3d 1159, 1166 (10th Cir. 2012), none of these exceptions apply.

### 1. The State has not consented to suit.

The consent to suit exception is inapplicable. Under this exception, a plaintiff must demonstrate that a state expressly and unequivocally consented to suit in federal court. *V-1 Oil Co. v. Utah State Dept. of Pub. Safety*, 131 F.3d 1415, 1421 (10th Cir. 1997). There are no allegations that Defendants consented. Regardless, the State manifests unequivocal intent to retain sovereign immunity. *Sutton v. Utah State School for Deaf and Blind*, 173 F.3d 1226, 1233-34 (10th Cir. 1999) (10th Cir. 1999) (because Utah gives its courts exclusive jurisdiction over suits brought against the state, Utah "clearly intended" to retain sovereign immunity from suits in federal court); Utah Code § 63G-7-501(1).

### 2. The Ex Parte Young exception does not apply.

The *Ex Parte Young* exception to sovereign immunity "allows certain private parties to

20

seek judicial orders in federal court preventing state executive officials from enforcing state laws that are contrary to federal law." *Whole Woman's Health*, 595 U.S. at 39. "To come within this exception the 'state official must have some connection with the enforcement of the challenged statute.'" *Free Speech Coal. v. Anderson*, 119 F.4th 732, 736 (10th Cir. 2024) (cleaned up). This exception applies only to state officials. *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy*, 506 U.S. 139, 146 (1993); *Muscogee*, 669 F.3d at 1167 (plaintiffs must show they are "suing state officials rather than the state itself" for *Ex parte Young* to apply).

DLC seeks a declaration that SB199 violates the ADA and an order enjoining Defendants from "enforcement." This Court should deny DLC's request because *Ex Parte Young* does not apply to (1) the State as it is not an "official," or (2) Governor Cox because he lacks any connection to SB199's enforcement.

### i.    DLC fails to allege specific enforcement authority.

Although *Ex parte Young* "authorizes federal courts to enjoin certain state officials from enforcing state laws," DLC does not direct this Court to any enforcement authority Defendants possess in connection with SB199 "that a federal court might enjoin [them] from exercising." *Whole Woman's Health*, 595 U.S. at 43. The closest DLC comes is alleging that the "State of Utah—including the Governor, the Utah State Legislature, and the Utah State Courts—is responsible for operating its programs, services, and activities in conformity with the ADA." (Compl. ¶¶ 27.) DLC does not allege that the State is specifically responsible for operating and enforcing SB199 or explain how being "responsible for operating programs, services, and activities" creates an enforcement connection with SB199.

DLC's allegations regarding Governor Cox's enforcement connection to SB199 are even

more sparse. Plaintiff simply alleges a "supervisory responsibility" to fill offices, ensure

compliance with federal law, and use gubernatorial authority to "eliminate and remedy" unlawful

policies, practices, and procedures. (*Id.* ¶ 33.) DLC's Complaint says nothing to connect

Governor Cox to SB199, let alone specific enforcement responsibly or oversight. These frail

assertions are insufficient to justify stripping Defendants' Eleventh Amendment immunity.

      The Tenth Circuit's decision in *Free Speech Coalition* is instructive. There, the court held

that the Utah Attorney General and Commissioner of the Utah Department of Public Safety were

immune under the Eleventh Amendment from a suit seeking declaratory and injunctive relief.

*Free Speech Coalition*, 119 F.4th at 735. The plaintiff argued that the defendants fell within the

*Ex parte Young* exception based on a "responsibility for enforcing Utah state laws." *Id.* at 740.

The Tenth Circuit rejected this argument, holding instead that state officials must possess "a

particular duty to 'enforce' the statute in question and a demonstrated willingness to exercise that

duty." *Free Speech Coal.*, 119 F.4th at 736 (cleaned up). Here, Defendants have no particular

duty to enforce SB199, nor do they possess power to do so. SB199's enforcement mechanism is

initiated by an individual petitioning for guardianship, not by state action. *See* Utah Code § 75-5-

604(1).

      **ii.**    **DLC must allege more than a "general duty" to enforce a statute.**

      Defendants' "general duty" to enforce SB199 by way of an alleged responsibility for

"operating [the State's] programs, services, and activities" does not create an exception to

sovereign immunity. "*Ex parte Young* requires something 'more than a mere general duty to

enforce the law.'" *Free Speech Coal.*, 119 F.4th at 739 (cleaned up). "[I]f a general duty to

enforce the law were sufficient to avoid immunity, 'then the constitutionality of every act passed

by the legislature could be tested by a suit against the governor[,] because the governor is, 'in a general sense, charged with the execution of all [a state's] laws'. . . .'" *Id.* (cleaned up). Accordingly, allegations of a "general duty" to enforce SB199 or oversee its enforcement by virtue of supposedly being a state "program or service" is not enough for DLC to maintain claims against Defendants.

### iii. Ex Parte Young is inapplicable where the subject statute places enforcement ability with a private party.

DLC misportrays the law by placing the entire onus of SB199 enforcement on Defendants. Instead, private parties, none of whom are parties to this litigation, enforce SB199's provisions. A crucial distinction consists of whether the law at issue places "enforcement ability specifically with private individuals," not state officials. Looking to *Whole Women's Health*, the Tenth Circuit reasoned that if a "state attorney general could not be sued in a pre-enforcement challenge to an abortion regulation that placed enforcement authority in the hands of private parties," state officials in *Free Speech Coalition* were similarly immune. *Id.* Enforcement inquiry under *Ex parte Young* only asks, "whether a defendant enforces or gives effect to the law." *Id.* (cleaned up). And because the plaintiffs in *Free Speech Coalition* could not point to any "enforcement authority the attorney general possesses in connection with [the challenged statute] that a federal court might enjoin him from exercising," the Court held the *Ex parte Young* exception could not apply. *Id.* (cleaned up).

The Tenth Circuit elsewhere concluded a "governor and attorney general did not fall within the *Ex parte Young* exception because their only connection to the challenged statute—*which placed enforcement authority in an independent board*—was 'their general enforcement power.'" *Id.* (cleaned up); *Chamber of Commerce of the United States v. Edmondson*, 594 F.3d

742, 754, 760 (10th Cir. 2010) (holding a state official was not a proper defendant because it lacked prosecutorial authority and the subject law specifically placed enforcement authority elsewhere). Moreover, *Whole Woman's Health* found sovereign immunity applied where the subject law at issue "does not allow state officials to bring criminal prosecutions or civil enforcement actions, [but instead] directs enforcement 'through . . . private civil actions culminating in injunctions and statutory damages awards." 595 U.S. at 35-36.

Likewise, SB199's enforcement authority resides with a private petitioner seeking guardianship. Utah Code § 75-5-604(1). Just as the Tenth Circuit found the *Ex parte Young* exception inapplicable where the statute "vested enforcement authority in an independent board," SB199 places enforcement authority with private individuals—those petitioning for guardianship. *Free Speech Coal.*, 119 F.4th at 739; *Hendrickson v. AFSCME Council 18*, 992 F.3d 950, 960 (10th Cir. 2021); *cf. Edmondson*, 594 F.3d at 754. Further, "just as the governor in [that same case] lacked authority to remove members of that independent board at will," Defendants here lack power to direct the actions of private actors petitioning for guardianship or prevent them from seeking SB199 enforcement. *Id.*; *Hendrickson*, 992 F.3d at 966. In short, DLC cannot point to any SB199 enforcement authority that Defendants possess, which this Court might enjoin them from exercising.

### iv.   Even if Defendants possessed enforcement power, DLC fails to explain how this justifies an injunction against those petitioning for guardianship.

Even if Defendants possessed enforcement authority, DLC has not identified anything "that might allow a federal court to parlay that authority . . . into an injunction against any and all unnamed private persons who might seek to bring their own [SB199] suits." *Whole Woman's Health*, 595 U.S. at 44. Indeed, "[c]onsistent with historical practice, a federal court exercising

24

its equitable authority may enjoin named defendants from taking specified unlawful actions. But under traditional equitable principles, no court may lawfully enjoin the world at large. . . ." *Id.* (cleaned up). Thus, without a plausible enforcement connection to SB199, *Ex parte Young* does not apply, and DLC's suit is barred by the Eleventh Amendment.

DLC may argue that dismissing Defendants leave it without an avenue to challenge SB199. This is incorrect. "[M]any paths exist to vindicate the supremacy of federal law in this area." *Id.* 48-49. Any respondent brought into a petition for guardianship under SB199 "may pursue state and federal constitutional arguments in his or her defense." *Id.* For example, consider a scenario where a parent of a severely intellectually disabled individual seeks guardianship. The potential ward may be appointed counsel if the court deems it appropriate pursuant to statute. If aware of the proceeding, DLC could seek to intervene or represent the ward. In doing so, DLC or the potential ward, through counsel, could object to guardianship, challenge SB199, and raise any applicable defenses in a *state court* guardianship action. Even if DLC was unaware of the proceeding, a respondent could subsequently approach DLC and assert they were improperly placed under an SB199 guardianship.[4] DLC could take that case to *state court* and argue an ADA violation while seeking to remove guardianship.

In either scenario, the *state court* could assess an alleged ADA violation by SB199. However, regardless of any future path for challenging SB199, what remains clear is that DLC does not possess an unqualified right for review of an ADA claim in federal court when it cannot identify a plaintiff whose rights under the ADA have been violated. Thus, Defendants are not

---

[4] A close relative, physician, another person aware of initial proceedings could contact DLC regarding potential involvement. Utah Code § 75-5-309(1). The doctor providing the report under § 75-5-601(1)(a)(ii) would likely know about the proceeding, as they provided the report, and could alert DLC.

25

proper defendants here. *Id.*

### 3. The abrogation of immunity exception does not apply.

Title II of the ADA does not abrogate the State's sovereign immunity because DLC failed to allege facts showing Title II applies. *United States v. Georgia* established a three-step analysis for determining whether Title II validly abrogates a states' sovereign immunity on specific claims in individual cases. 546 U.S. 151, 159 (2006). Courts must determine, on a claim-by-claim basis: (1) whether the state's alleged conduct violated Title II; (2) whether any conduct violating Title II also violates the Fourteenth Amendment; and; (3) "insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid" as a congruent and proportional exercise of its authority under § 5 of the Fourteenth Amendment. *Id.*; *Guttman v. Khalsa*, 669 F.3d 1101, 1113 (10th Cir. 2012).

Because DLC failed to allege facts satisfying this test, the State retains sovereign immunity. Although DLC brought a Title II claim, in *Tennessee v. Lane*, the third prong for evaluating abrogation could only be met where Title II is "unquestionably valid legislation" given Title II's requirement of program accessibility as applied to cases implicating "access to the courts" and "accessibility of judicial services" in terms of "physical inaccessibility of local courthouses." 541 U.S. 509, 527, 531 (2004) (Congress' abrogation power under § 5 of the Fourteenth Amendment "is not unlimited"). Indeed, *Lane* dealt with "physical barriers" to access and services. *King v. King*, 174 P.3d 659, 665–66 (Wash. 2007). "'[M]eaningful' access in *Lane* should be read in that light: the incongruity of a right of access that is all but denied by physical obstacles." *Id.* Here, SB199 does not implicate, diminish, or eliminate "physical access to the

26

courts" for severe intellectually disabled individuals. Nor does DLC allege Defendants deny a litigant's ability to get into court and receive a judgment.

Further, because DLC's ADA claim has not ripened into an actual case or controversy— no specific individuals allege concrete harm deriving from SB199—DLC has not alleged facts showing a Title II violation, as required by all prongs of the test. The State therefore retains sovereign immunity.

## **CONCLUSION**

For these reasons, Defendants respectfully request this Court grant their Motion and dismiss DLC's claim.

DATED: February 6, 2026

OFFICE OF THE UTAH ATTORNEY GENERAL

*Keith W. Barlow*
DAVID WOLF
KEITH W. BARLOW
JASON DUPREE
Assistant Utah Attorneys General
*Counsel for Defendants*

I, Keith W. Barlow, certify that this Motion to Dismiss contains 7719 words (excluding the caption, table of contents, table of authorities, and signature block) and complies with DUCivR7-1(a)(4).

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2026, I electronically filed the foregoing, **STATE DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(1)** by using the Court's electronic filing system which will send a notice of electronic filing to the following:

Aditi Fruitwala
ACLU
915 15TH ST NW 6TH FL
WASHINGTON, DC 20005
212-549-2100
Email: afruitwala@aclu.org

Brian Lawrence Dimmick
ACLU
915 15TH ST NW
WASHINGTON, DC 20005
202-731-2395
Email: bdimmick@aclu.org

Jacob Abudaram
ACLU
915 15TH ST. NW
WASHINGTON, DC 2005
(202) 548-6601

John A. Freedman
ARNOLD & PORTER KAYE SCHOLER
LLP
601 MASSACHUSETTS AVE NW
WASHINGTON, DC 20001
202-942-5316
Email: john.freedman@arnoldporter.com

Kristine Rose Itliong
ARNOLD & PORTER KAYE SCHOLER
LLP
250 W 55TH ST
NEW YORK, NY 10019
212-836-7037
Email: kristine.itliong@arnoldporter.com

Malhar Shah
AMERICAN CIVIL LIBERTIES UNION
425 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CA 94104
(212) 549-2500

Zoe Brennan-Krohn
ACLU
39 DRUMM ST
SAN FRANCISCO, CA 94111
415-343-0769
Email: zbrennan-krohn@aclu.org

Laura K. Henrie
DISABILITY LAW CENTER
960 S MAIN ST
SALT LAKE CITY, UT 84101
801-363-1347
Email: lhenrie@disabilitylawcenter.org

Nathaniel J. Crippes
DISABILITY LAW CENTER
960 S MAIN ST
SALT LAKE CITY, UT 84101
Email: ncrippes@disabilitylawcenter.org

28

Thomas Ford , Jr
ACLU
311 S STATE ST STE 310
SALT LAKE CITY, UT 84111
801-521-9862
Email: tford@acluutah.org

Jason Michael Groth
311 S STATE ST STE 310
SALT LAKE CITY, UT 84111
563-419-4261
Fax: 801-532-2850
Email: jgroth@acluutah.org

/s/ Asia Reid
ASIA REID
Paralegal