Zoë Brennan-Krohn*
Malhar Shah*
American Civil Liberties Union Foundation
425 California Street, Suite 700
San Francisco, CA 94104
Tel: (415) 343-0769
zbrennan-krohn@aclu.org
mshah@aclu.org

Brian Dimmick*
Aditi Fruitwala*
Jacob Abudaram*
American Civil Liberties Union Foundation
915 15th Street NW, 6th Floor
Washington, D.C. 20005
Tel: (202) 731-2395
bdimmick@aclu.org
afruitwala@aclu.org
jabudaram@aclu.org

Laura Henrie (Bar No.12449)
Nate Crippes (Bar No.14622)
Disability Law Center
960 South Main Street
Salt Lake City, Utah 84101
Tel: (801) 363-1347
lhenrie@disabilitylawcenter.org
ncrippes@disabilitylawcenter.org

Jason M. Groth (Bar No. 16683)
Tom Ford (Bar No. 19795)
ACLU of Utah
311 South State Street, Suite 310
Salt Lake City, UT 84111
Tel: (801) 5221-9862
jgroth@acluutah.org
tford@acluutah.org

John A. Freedman*
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ace., N.W.
Washinton, DC 20001
john.freedman@arnoldporter.com

Kristine Itliong*
Arnold & Porter Kaye Scholer LLP
250 W 55th St.
New York, NY 10019
Tel: (212) 836-7037
kristine.itliong@arnoldporter.com

*Admitted pro hac vice
Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| DISABILITY LAW CENTER, <br><br> Plaintiff, <br><br> v. <br><br> STATE OF UTAH and SPENCER COX, GOVERNOR OF THE STATE OF UTAH, *in his official capacity* <br><br> Defendants. | **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PURSUANT TO FED. R. CIV. PRO. 12(b)(1)** <br><br> Case No. 2:25-cv-01154-HCN-DBP <br><br> Judge Howard C. Nielson, Jr. |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................ii

INTRODUCTION ........................................................................................................... 1

PROCEDURAL BACKGROUND.................................................................................... 1

ARGUMENT ................................................................................................................... 3

    I.    DLC Has Standing ................................................................................................ 3

        A.   DLC Has Injury-in-Fact Based on Harm to Core Business Activities........................... 3

        B.   DLC Has Associational Standing....................................................................... 6

        C.   DLC's Organizational and Associational Injuries are Directly Caused by the Implementation of S.B. 199 ...................................................................................... 12

        D.   DLC's Injuries Are Traceable to Defendants ................................................. 13

        E.   DLC's Injuries are Redressable Through Injunctive and Declaratory Relief ............... 14

    II.   Defendants Do Not Have Sovereign Immunity ................................................. 17

        A.   Congress Abrogated the State's Sovereign Immunity with Respect to Plaintiff's ADA Claim............................................................................................................. 17

        B.   *Ex Parte Young* Precludes Governor Cox from Claiming Sovereign Immunity .......... 21

CONCLUSION................................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

*Access 4 All v. Commons at Sugarhouse, LLC,* 2:16-cv-01075-PMW, 2016 WL 6779430 (D. Utah Nov. 15, 2016) ........................................................................................................11

*Advoc. Ctr. for Elderly & Disabled v. La. Dep't of Health & Hosps.*, 731 F. Supp. 2d 583 (E.D. La. 2010) ...................................................................................................................... 9

*ANR Pipeline Co. v. Lafaver*, 150 F.3d 1178 (10th Cir. 1998) ...................................................... 15

*Bldg. & Constr. Trades Council v. Downtown Dev., Inc.*, 448 F.3d 138 (2d Cir. 2006) ...............11

*Chamber of Com. of the United States v. Edmondson,* 594 F.3d 742 (10th Cir. 2010) ........... 22, 25

*Charalampous through Charalampous v. Lee*, No. CIV-23-499-R, 2024 WL 457170 (W.D. Okla. Feb. 6, 2024) ........................................................................................................... 23

*Colo. Mont. Wyo. State Area Conf. of NAACP v. United States Election Integrity Plan*, No. 22-CV-00581-PAB, 2022 WL 1266612 (D. Colo. Apr. 28, 2022) .................................... 6

*Conn. Off. of Prot. & Advoc. for Persons with Disabilities v. Connecticut*, 706 F. Supp. 2d 266 (D. Conn. 2010) .................................................................................................................11

*Consumer Data Indus. Ass'n v. King*, 678 F.3d 898 (10th Cir. 2012) .......................................... 16

*Deep S. Ctr. for Env't Just. v. United States EPA*, 138 F.4th 310 (5th Cir. 2025) .......................... 3

*Diamond House of SE Idaho, LLC v. City of Ammon*, 381 F. Supp. 3d 1262 (D. Idaho 2019) .... 13

*DiCocco v. Garland*, 52 F.4th 588 (4th Cir. 2022) ....................................................................... 13

*Disability Law Ctr. v. Cox*, No. 2:25-cv-00307-RJS (D. Utah July 22, 2025) ............................... 1

*Disability Rts. N.C. v. N.C. Dep't of Health and Hum. Servs.*, No. 1:24CV335, 2025 WL 1665327 (M.D. N.C. June 12, 2025) ............................................................................ 9

*Disability Rts. Pa. v. Pa. Dep't of Hum. Servs.*, No. 1:19-CV-737, 2020 WL 1491186 (M.D. Pa. Mar. 27, 2020) .......................................................................................................... 9

*Doe v. Stincer*, 175 F.3d 879 (11th Cir. 1999) ............................................................................... 8

*Dunn v. Dunn*, 219 F. Supp. 3d 1163 (M.D. Ala. 2016) ...............................................................11

*Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91 (4th Cir. 2011) ...................................... 16

*Fair Hous. Ctr. of Metro. Detroit v. Singh Senior Living, LLC*, 124 F.4th 990 (6th Cir. 2025) ...... 3

*Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153 (11th Cir. 2008) ................................ 6

*Food & Drug Admin. v. All. For Hippocratic Med.*, 602 U.S. 367 (2024) ................................. 3, 5

*Franco-Gonzales v. Holder*, 767 F. Supp. 2d 1034 (C.D. Cal. 2010) .......................................... 10

*Frank v. Lee,* 144 S. Ct. 1349 (2024) ........................................................................................... 15

*Frank v. Lee*, 84 F.4th 1119 (10th Cir. 2023) ................................................................. 15, 21, 22

*Free Speech Coal., Inc. v. Anderson*, 119 F.4th 732 (10th Cir. 2024) .............................. 23, 24, 25

*Gratz v. Bollinger*, 539 U.S. 244 (2003) ...................................................................................... 12

*Gutierrez v. Saenz*, 606 U.S. 305 (2025) ...................................................................................... 16

*Guttman v. Khalsa*, 446 F.3d 1027 (10th Cir. 2006) ........................................................ 15

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ..................................................... 3

*Hill v. Kemp*, 478 F.3d 1236 (10th Cir. 2007) .................................................................. 15

*Humane Soc'y of the U.S. v. Hodel*, 840 F.2d 45 (D.C. Cir. 1988) ................................... 11

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977) ............................. 7, 12

*In re Guardianship of Matthews*, 232 P.3d 1140 (Wash. Ct. App. 2010) ........................ 23

*Ind. Prot. & Advoc. Servs. Comm'n v. Comm'r, Ind. Dep't of Corr.*, 642 F.Supp.2d 872 (S.D. Ind. 2009) .............................................................................................................. 11

*Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082 (10th Cir. 2006) ...................... 12

*Jacobs v. Salt Lake City Sch. Dist.*, No. 2:21-cv-00706-JNP-CMR, 2023 WL 2742719, at *5 (D. Utah Mar. 31, 2023) .......................................................................................... 7

*Jensen v. United First Fin.*, No. 2:09-cv-00543DAK,  2009 WL 506683 (D. Utah Dec. 16, 2009) ................................................................................................................................ 9

*King v. King*, 174 P.3d 659 (Wash. 2007) ....................................................................... 19

*Kitchen v. Herbert*, 755 F.3d 1193 (10th Cir. 2014) .................................... 13, 16, 21, 23

*Laflamme v. New Horizons, Inc.*, 605 F. Supp. 2d 378 (D. Conn. 2009) ................... 9, 12

*Larson v. Valente*, 456 U.S. 228 (1982) .......................................................................... 16

*Lewis v. N.M. Dep't of Health*, No. CIV 99-0021 MV/JHG, 2002 WL 35649595 (D. N.M Nov. 5, 2002) ................................................................................................................... 8

*Luke v. Texas*, 46 F.4th 301 (5th Cir. 2022) .............................................................. 10, 12

*M.G. ex rel Garcia v. Armijo*, 1:22-cv-00325-MIS-DLM, 2024 WL 4063551 (D. N.M. Sept. 5, 2024) ...................................................................................................................... 11

*M.G. ex rel. Garcia v. Armijo*, No. 1:22-cv-00325-MIS-DLM, 2023 WL 8602960 (D. N.M. Dec. 12, 2023) ............................................................................................................... 9

*Mo. Prot. & Advoc. Servs., Inc. v. Carnahan*, 499 F.3d 803 (8th Cir. 2007) ................... 8

*Mosier v. Kentucky*, 675 F. Supp. 2d 693 (E.D. Ky. 2009) ............................................. 18

*N. New Mexicans Protecting Land Water & Rts. v. United States*, 161 F. Supp. 3d 1020 (D. N.M. 2016) ........................................................................................................................ 9

*N. New Mexicans Protecting Land Water & Rts. v. United States,* 704 F.App'x 723 (10th Cir. 2017) ................................................................................................................................ 9

*Nova Health Sys. v. Gandy*, 416 F.3d 1149 (10th Cir. 2005) .......................................... 16

*OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017) ................................. 13, 15

*Or. Advoc. Ctr. v. Mink*, 322 F.3d 1101 (9th Cir. 2003) ............................................... 7, 8

*Papasan v. Allain*, 478 U.S. 265 (1986) ..................................................................... 21, 22

*Peck v. McCann*, 43 F.4th 1116 (10th Cir. 2022) ........................................................... 13

*Petrella v. Brownback*, 697 F.3d 1285 (10th Cir. 2012) ............................... 9, 12, 21, 22

*Prakel v. Indiana*, 100 F. Supp. 3d 661 (S.D. Ind. 2015) ............................................... 18

*Quick v. S.F. Superior Ct.*, 65 F. Supp. 3d 907 (N.D. Cal. 2014) ................................... 18

*Redd v. Guerrero*, 84 F.4th 874 (9th Cir. 2023) .................................................................. 16

*Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390 (4th Cir. 2024)................. 3

*Risinger v. Concannon*, 117 F. Supp. 2d 61 (D. Me. 2000) ............................................... 9

*Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96 (10th Cir. 2024) ......................................... 10

*Schwartz v. State Farm Mut. Auto. Ins. Co.*, No. 1:18-cv-00328-WJ-SCY, 2018 WL 4148434 (D. N.M. Aug. 30, 2018) .................................................................................... 14

*Speech First v. Shrum*, 92 F.4th 947 (10th Cir. 2024)................................................. 9, 10

*Tenn. Prot. & Advocacy Inc. v. Bd. of Educ. of Putnam Cnty.*, 24 F. Supp. 2d 808 (M.D. Tenn. 1998) ............................................................................................... 8

*Tennessee v. Lane*, 541 U.S. 509 (2004) ....................................................... passim

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) ......................................................... 6

*United States v. Georgia*, 546 U.S. 151 (2006)........................................................ 18, 20

*Utah v. Evans*, 536 U.S. 452 (2002) ....................................................................... 16

## Statutes

42 U.S.C. § 12131........................................................................................ 23

42 U.S.C. § 12132.................................................................................... 19, 24

42 U.S.C. § 15043.........................................................................................11

42 U.S.C. § 15044.........................................................................................11

42 U.S.C. § 1983.......................................................................................... 19

Utah Code § 65-5-610................................................................................... 28

Utah Code § 67-1-1...................................................................................... 26

Utah Code § 75-5-604................................................................................... 28

Utah Code § 75-5-606................................................................................... 28

**INTRODUCTION**

Disability Law Center's ("Plaintiff" or "DLC") Complaint, ECF 1, alleges that Utah Senate Bill 199 ("S.B. 199") facially discriminates against people with disabilities by funneling them into a separate guardianship system that denies them equal access to guardianship proceedings, while curtailing their ability to exercise autonomy over their lives and bodies, in violation of Title II of the Americans with Disabilities Act ("ADA"). Defendants State of Utah (the "State") and Governor Spencer Cox's (collectively "Defendants") Motion to Dismiss under Rule 12(b)(1), ECF 35, is without merit. This Court has jurisdiction because DLC has alleged injury-in-fact to its core operation and constituents, these injuries are caused by and traceable to S.B. 199, are redressable through injunctive and declaratory relief, and Defendants do not have sovereign immunity. Accordingly, Defendants' Motion to Dismiss should be denied.

**PROCEDURAL BACKGROUND**

In April 2025, Plaintiff DLC filed a pre-enforcement complaint against several defendants, including the State and Governor Cox, asserting that S.B. 199 violated the ADA, Section 504 of the Rehabilitation Act, and the constitution. *Disability Law Ctr. v. Cox*, No. 2:25-cv-00307-RJS (D. Utah July 22, 2025) (hereinafter "DLC 25-307"), ECF 1. Thereafter, defendants filed motions to dismiss under Rules 12(b)(1) and 12(b)(6). *Id.*, ECF 28, 34–35.

Although defendants' motion to dismiss under Rule 12(b)(1) was granted on narrow grounds, Judge Shelby acknowledged that DLC's standing claims have merit. Specifically, after noting that DLC did not identify a constituent for purposes of associational standing, *id.*, ECF 55 at 18–21, Judge Shelby stated that DLC likely established injury-in-fact to its organization because it provided "concrete details" that "reasonably establish[] S.B. 199 will hamper [DLC's]

1

ability to carry out its core function, which are defined by statute: to provide information and referrals to programs and services addressing the needs of people with developmental disabilities and to investigate abuse and neglect allegations," *id.* at 22.

Nevertheless, Judge Shelby declined to explicitly find that DLC sufficiently asserted standing because DLC did not appropriately respond to defendants' arguments around causation and redressability. *Id.* at 23. Specifically, Judge Shelby held that Governor Cox was not a proper defendant to the constitutional claims under the *Ex parte Young* exception to sovereign immunity and therefore Plaintiff did not establish causation and redressability as to him. *Id.* at 23–26.

Regarding the ADA claims, Judge Shelby "acknowledge[d] Congress may have abrogated the State of Utah's sovereign immunity under the [ADA] with respect to DLC's claimed injuries*." Id*. at 27–28. But because "DLC asked the court to consider its arguments concerning causation and redressability with reference to its *Ex parte Young* analysis—which applies only to Governor Cox—the court ultimately cannot assess these claims because DLC failed to meet its burden demonstrating it has standing in the first instance." *Id.* at 28.

Thereafter, Plaintiff submitted a Motion for Partial Reconsideration on the basis that the dismissal order improperly analyzed standing against the State under the ADA together with standing against Governor Cox under *Ex parte Young*. DLC 25-307, ECF 58. In denying the motion, Judge Shelby clarified that he dismissed the ADA claim against the State because Plaintiff did not respond to redressability arguments as to the State of Utah. *Id.*, ECF 63 at 4–5.

In re-filing this suit, Plaintiff addressed the jurisdictional concerns identified by Judge Shelby. ECF 1. DLC has identified four constituents who, as anticipated, have already been placed into S.B. 199 guardianships and lost the right to dictate their daily life, such as where they

live and whether to receive medical care, and without receiving the procedural protections they need to meaningfully participate in guardianship proceedings. DLC has been forced to divert its limited resources to preventing these injuries to its constituents and away from its core statutory mandates: monitoring and participating in standard guardianship proceedings, investigating abuse and neglect of disabled people, preventing discrimination against disabled people, and representing disabled people in guardianship matters. And, as detailed below, DLC has shown these injuries are caused by and traceable to S.B. 199 and *both* the State and Governor Cox, and that they can be redressed through injunctive or declaratory relief against either party.

## ARGUMENT

### I. DLC Has Standing

#### A. DLC Has Injury-in-Fact Based on Harm to Core Business Activities

S.B. 199 directly injures DLC's core business activities, which establishes injury-in-fact. Organizations have standing "to sue on their own behalf for injuries they have sustained." *Food & Drug Admin. v. All. For Hippocratic Med.*, 602 U.S. 367, 393–94 (2024) (hereinafter "*AHM*"). In *AHM*, the Supreme Court confirmed that organizations suffer injury-in-fact when defendants' actions impact their "core business activities." *Id.* at 395 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)). Circuit courts across the country have adopted this approach. *See, e.g.*, *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 396 (4th Cir. 2024) (diversion of resources must be in response to a "core mission"); *Deep S. Ctr. for Env't Just. v. United States EPA*, 138 F.4th 310, 319 (5th Cir. 2025) (EPA's actions did not impede organization's "core business activities"); *Fair Hous. Ctr. of Metro. Detroit v. Singh Senior Living, LLC*, 124 F.4th 990, 993 (6th Cir. 2025) (organization has standing if defendant interfered

with "core business activities" of counseling and referral services).

Here, Plaintiff alleges that S.B. 199 impacts three of its statutorily mandated, core business activities. First, S.B. 199 restructures guardianship proceedings in ways that diminish respondents' procedural protections, reduce meaningful court oversight, and shutter public access to guardianship hearings, impairing DLC's longstanding ability to monitor cases through ordinary participation and representation. *See* ECF 1 ¶ 94. As a result, DLC has had to devote additional staff time and resources to tracking probate calendars, attending hearings, and monitoring proceedings to obtain information about cases affecting its constituents. *Id.* ¶¶ 97–107. And by eliminating appointed counsel in many proceedings, S.B. 199 has resulted in appointment of guardians without consideration of respondents' interests, further underscoring the need for DLC to monitor proceedings and protect its constituents. *Id.* ¶¶ 63 & n.16, 103–05.

Second, S.B. 199 diminishes DLC's ability to fulfill its statutory duty to investigate abuse and neglect of people with intellectual disabilities and represent them in discrimination matters. *See id.* ¶¶ 88–90, 108–11. Before S.B. 199, DLC often obtained information about abuse, neglect, and discrimination when representing respondents in guardianship proceedings and by receiving reports from respondents' friends and family. *Id.* ¶¶ 94–96, 108. But S.B. 199 impairs access to these contact points by preventing DLC from participating in guardianship proceedings and allowing guardians to isolate disabled people from friends and family who would report neglect, abuse, and discrimination to DLC. *Id.* ¶¶ 108–11. As a result, DLC must devote additional resources to uncovering and investigating abuse or neglect. *Id.* ¶¶ 97–111.

Third, by eliminating the right to counsel and court visitors in many guardianship proceedings, S.B. 199 has forced DLC to expend more resources to represent more individuals

involved in guardianship proceedings. *Id.* ¶ 112. DLC must expend additional time and resources to review cases, counsel constituents and families, and attempt to intervene earlier and more frequently to prevent unjustified guardianships. *Id.* ¶ 113. These efforts interfere with DLC's ability to allocate its limited resources across its full range of statutory responsibilities.

Defendants raise several arguments that misstate the applicable law, mischaracterize DLC's allegations, and do not address DLC's representation obligation.

Defendants confuse the standard for injury-in-fact with the standard for an ADA violation, arguing that DLC "doesn't allege harm of constitutional or statutory rights violation." ECF 35 at 14. But to have standing, DLC need only allege that Defendants' actions impact their "core business activities," *AHM*, 602 U.S. at 395, not that Defendants violated the law. And, as detailed below, DLC has alleged harms arising from Defendants' violations of the ADA.

With regard to monitoring, Defendants argue that DLC has alleged only a "possible need to expend more operational budget." ECF 35 at 15. But Defendants misstate the Complaint in claiming that DLC has alleged only future expenditures. DLC has alleged (and supported with declarations) that it has already had to divert and expend its limited resources to obtain information about cases affecting its constituents and to independently uncover and investigate abuse, neglect, and discrimination against its constituents. ECF 1 ¶¶ 97–100; 105–11.

Defendants also argue that attending and monitoring hearings is pointless because DLC could not access constituents' private documentation. ECF 35 at 15–16. That DLC cannot obtain documentation does not mean it cannot monitor proceedings to obtain relevant information or voice objections and concerns to guardianships, just as it did prior to S.B. 199. ECF 1 ¶ 94. Indeed, this resource constraint only underscores the importance of monitoring proceedings.

5

With respect to DLC's investigation obligation, Defendants' suggestion that DLC must show that a S.B. 199 guardian has isolated a disabled person and curtailed DLC's ability to receive information misunderstands the nature of diversion-of-resources injury and finds no support in case law—indeed, they cite none. ECF 35 at 13–14, 16. DLC has alleged it has already shifted resources to investigate abuse and neglect, ECF 1 ¶¶ 97–100; 106–11, and courts have repeatedly found injury where an organization only "reasonably anticipate[s]" expending resources. *See Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1165–66 (11th Cir. 2008) (standing established where plaintiffs "reasonably anticipate that they will have to divert personnel and time"); *Colo. Mont. Wyo. State Area Conf. of NAACP v. United States Election Integrity Plan*, No. 22-CV-00581-PAB, 2022 WL 1266612, at *6 (D. Colo. Apr. 28, 2022) (unpublished) (same). Moreover, requiring DLC to allow the very harm it shifts resources to prevent would undermine the purposes of organizational standing. Nevertheless, DLC has alleged that S.B. 199 has *already* prevented DLC from accessing information about abuse and neglect by impairing its ability to monitor and participate in proceedings. ECF 1 ¶¶ 97–107. Because DLC has plausibly alleged that S.B. 199 has forced it to expend resources and will continue to do so, the injury is "actual or imminent." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

To summarize, DLC's allegations establish that S.B. 199 has prevented DLC from fulfilling three separate statutory mandates and forced it to divert resources to fulfill them.

## B.    DLC Has Associational Standing

Plaintiff DLC also has associational standing. Its constituents "possess all of the indicia of membership in an organization" and "would otherwise have standing to sue in their own right;

[] the interests it seeks to protect are germane to the organization's purpose; and [] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343–44 (1977).

Pursuant to federal law, each state has a designated Protection and Advocacy organization ("P&A") that follows federal statutory mandates, including a mandate to protect and advocate for the rights of people with intellectual and developmental disabilities. 42 U.S.C. § 15043(a). DLC is the P&A for the State of Utah. ECF 1 ¶ 15. Courts in this district and across the country routinely find that P&As, including DLC, have associational standing under *Hunt*. *See, e.g.*, *Jacobs v. Salt Lake City Sch. Dist.*, No. 2:21-cv-00706-JNP-CMR, 2023 WL 2742719, at *5 (D. Utah Mar. 31, 2023) (unpublished) (holding DLC has associational standing because at least one constituent has standing and lawsuit is germane to mission of advocating for disabled people).

### 1. DLC's Constituents Possess Key Indicia of Membership in DLC

DLC can represent its constituents even though they are not considered traditional "members." An organization may assert associational standing even without "traditional members" if its participants possess "the indicia of membership in an organization." *Hunt*, 432 U.S. at 344. Key indicia include participation by constituents in the organization's governing board or advisory bodies and constituents' stake in the outcome of the litigation, even if this stake is not financial. *Or. Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1111–12 (9th Cir. 2003).

DLC has alleged that its constituents have such indicia of membership because Utahns with disabilities are essential participants in DLC's functioning and have a stake in the outcome of the litigation. Both DLC's elected governing board and its advisory committee include Utahns with disabilities and their family members. ECF 1 ¶¶ 21–23; 42 U.S.C. § 15044(a)(1). Further,

7

DLC's advisory council solicits input from people with disabilities to make recommendations about DLC's priorities. ECF 1 ¶¶ 21–23.

Defendants cite cases in which an organization's constituents did not participate in the organization. *See* ECF 35 at 9 (citing *Ass'n for Retarded Citizens of Dallas v. Dallas Cnty. Mental Health & Mental Retardation Ctr.*, 19 F.3d 241, 244 (5th Cir. 1994) (hereinafter "*ARC*") (finding no standing where "most of its 'clients'—handicapped and disabled people—are unable to participate in and guide the organization's efforts") and *Mo. Prot. & Advoc. Servs., Inc. v. Carnahan*, 499 F.3d 803, 819 (8th Cir. 2007) (citing *ARC* to reach similar conclusion)).[1]

In contrast, DLC has alleged indicia of membership, and this Court should follow the lead of courts across the country, including those in this Circuit, that have declined to follow *ARC* and *Carnahan* where P&As allege disabled constituents' involvement in their operations. *See Doe v. Stincer*, 175 F.3d 879, 886 (11th Cir. 1999) (rejecting *ARC*'s reasoning and finding that P&A constituents had indicia of membership required by *Hunt* because P&A governing statutes required their participation in the organization's governance); *Or. Advoc. Ctr.*, 322 F.3d at 1111–12 (given involvement of people with disabilities in P&A organization, it would "exalt form over substance" to conclude the organization did not have indicia of membership required by *Hunt*); *Lewis v. N.M. Dep't of Health*, No. CIV 99-0021 MV/JHG, 2002 WL 35649595, at *6 (D. N.M Nov. 5, 2002) (unpublished) (rejecting *ARC* and following *Stincer* to hold that P&A had standing based on statutes requiring disabled people's participation in the organization); *M.G. ex*

---

[1] Defendants also cite *Tenn. Prot. & Advocacy Inc. v. Bd. of Educ. of Putnam Cnty.*, 24 F. Supp. 2d 808, 816 (M.D. Tenn. 1998). But that court *affirmed* that a P&A has associational standing to assert the rights of people with disabilities and denied standing only because the P&A had not identified a particular individual with standing.

*rel. Garcia v. Armijo*, No. 1:22-cv-00325-MIS-DLM, 2023 WL 8602960, at *21 (D. N.M. Dec. 12, 2023) (unpublished) (P&A had standing to sue because it complied with the statutory requirements for participation of disabled people in the organization).[2]

### 2. DLC Has Identified Constituents Who Face Ongoing Injury

DLC has identified four individual constituents with standing to sue in their own right, ECF 1 ¶ 63 & n.16, defeating Defendants' argument to the contrary. ECF 35 at 10–11. To establish associational standing, an organization must "show that at least one specifically-identified member has suffered an injury-in-fact." *N. New Mexicans Protecting Land Water & Rts. v. United States*, 161 F. Supp. 3d 1020, 1041 (D. N.M. 2016), *aff'd*, 704 F.App'x 723 (10th Cir. 2017). However, "to identify or to name a person does not require use of the legal name." *Speech First v. Shrum*, 92 F.4th 947, 952 (10th Cir. 2024).

A disabled person who is subject to a facially discriminatory policy or denied equal access to program has suffered injury-in-fact. *Petrella v. Brownback*, 697 F.3d 1285, 1294 (10th Cir. 2012) ("It is this alleged unequal treatment that constitutes the injury."); *Jensen v. United First Fin.*, No. 2:09-cv-00543DAK, 2009 WL 506683, at *3 (D. Utah Dec. 16, 2009) (unpublished) ("existence of and adherence to discriminatory policies" established injury under

---

[2] *See also Advoc. Ctr. for Elderly & Disabled v. La. Dep't of Health & Hosps.*, 731 F. Supp. 2d 583, 595 (E.D. La. 2010) (declining to follow *ARC* where P&A's authorizing statutes required it to give people with disabilities a central role in its management); *Laflamme v. New Horizons, Inc.*, 605 F. Supp. 2d 378, 397 (D. Conn. 2009) (finding *Carnahan* unpersuasive and distinguishing *ARC*); *Risinger v. Concannon*, 117 F. Supp. 2d 61, 71 (D. Me. 2000) (describing *ARC*'s analysis as "cursory" and following *Stincer* in finding associational standing for P&A); *Disability Rts. Pa. v. Pa. Dep't of Hum. Servs.*, No. 1:19-CV-737, 2020 WL 1491186, at *7 (M.D. Pa. Mar. 27, 2020) (unpublished) (rejecting *ARC* and *Carnahan* and finding that P&A constituents were able and required to participate in the organization); *Disability Rts. N.C. v. N.C. Dep't of Health and Hum. Servs.*, No. 1:24CV335, 2025 WL 1665327, at *8 (M.D. N.C. June 12, 2025) (unpublished) (rejecting state argument based on *ARC* and *Carnahan*).

the ADA); *Luke v. Texas*, 46 F.4th 301, 306 (5th Cir. 2022) ("Lack of meaningful access is *itself* the harm under Title II [of the ADA]."). A future injury is imminent if there is a substantial risk the harm will occur. *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 109 (10th Cir. 2024).

Here, S.B. 199 facially classifies individuals as having "severe intellectual disabilities" and on that basis funnels them into a separate guardianship process that denies them an equal opportunity to participate. Whereas individuals in standard guardianship proceedings retain the accommodations they need to meaningfully participate in judicial proceedings, including the right to counsel, jury trial, to object to guardianship, and in-person hearings, S.B. 199 respondents lose these protections. ECF 1 ¶¶ 46–60; *see, e.g.*, *Franco-Gonzales v. Holder*, 767 F. Supp. 2d 1034, 1053–55 (C.D. Cal. 2010). S.B. 199 also reverses the presumption of limited guardianships by instructing courts to favor a new, more restrictive form of guardianship, thereby increasing the likelihood that respondents lose their fundamental rights. ECF 1 ¶¶ 52–54. As a result, individuals classified as having "severe intellectual disabilities" have a diminished opportunity to participate in proceedings and retain fundamental liberties.

DLC has identified four constituents already subjected to this discriminatory system who have been placed in S.B. 199 guardianships without appointed counsel or a court visitor, the opportunity to object, a jury trial, or a presumption of limited guardianship. *Id.* ¶ 63 & n.16. DLC has also alleged additional S.B. 199 guardianship proceedings have been filed in the state, demonstrating that DLC's constituents face ongoing injury. *See id.* ¶¶ 61–64, 89–92, 100–05.

Contrary to Defendants' contention, ECF 35 at 11, the Tenth Circuit has held that an organization need not identify impacted constituents by name to establish associational standing. *See Shrum*, 92 F.4th at 950–51 (10th Cir. 2024). A P&A suing on behalf of its constituents "need

only show the <u>high likelihood</u> of the existence of a member who will be harmed by the challenged policy," *Dunn v. Dunn*, 219 F. Supp. 3d 1163, 1170 (M.D. Ala. 2016), and need not name a constituent, so long as it can show how a particular constituent was harmed by the challenged conduct, *Conn. Off. of Prot. & Advoc. for Persons with Disabilities v. Connecticut*, 706 F. Supp. 2d 266, 284 (D. Conn. 2010); *Stincer*, 175 F.3d at 884–85.

The case cited by Defendants, *Access 4 All v. Commons at Sugarhouse, LLC,* 2:16-cv-01075-PMW, 2016 WL 6779430, at *11 (D. Utah Nov. 15, 2016) (unpublished), does not support their position. ECF 35 at 12. In granting Rule 11 sanctions against the attorney for the plaintiff organization, the court stated in dicta that counsel failed to conduct a reasonable inquiry into its allegations by not identifying a constituent with standing. *Access 4 All,* 2016 WL 6779430, at *11. The court did not hold that organizations must identify such constituents by name. *Id*.

### 3. The Lawsuit is Germane to DLC's Purpose

DLC has satisfied the germaneness prong because the issues in this case are at the core of its mission. Courts interpret the concept of germaneness broadly, requiring only that the lawsuit be relevant to the organization's purpose, not that it be central or essential. *See Humane Soc'y of the U.S. v. Hodel*, 840 F.2d 45, 56 (D.C. Cir. 1988); *Bldg. & Constr. Trades Council v. Downtown Dev., Inc.*, 448 F.3d 138, 149 (2d Cir. 2006). As a district court in this Circuit recently emphasized, a lawsuit to ensure the rights of state residents with developmental disabilities is "not merely germane to the [P&A plaintiff's] purpose, they are its reason for existence." *M.G. ex rel Garcia v. Armijo*, 1:22-cv-00325-MIS-DLM, 2024 WL 4063551, at *6 (D. N.M. Sept. 5, 2024) (quoting *Ind. Prot. & Advoc. Servs. Comm'n v. Comm'r, Ind. Dep't of Corr.*, 642 F.Supp.2d 872, 879 (S.D. Ind. 2009)).

11

DLC meets this standard because its statutorily mandated purpose is to advance and enforce the legal rights, choices, and opportunities of Utahns with disabilities, including by preserving their autonomy and self-determination. ECF 1 ¶¶ 13–15, 18–19. To that end, DLC brings legal claims that directly challenge S.B. 199's impact on the rights and choices of people alleged to have "severe intellectual disabilities"—an issue central to DLC's mission and purpose. The relief sought thus serves to vindicate the interests the organization seeks to protect.

Defendants misstate the relevant inquiry in arguing that, because DLC does not represent petitioners *seeking* guardianships, this lawsuit is not germane to DLC. ECF 35 at 9–10. But the test for associational standing is whether the "interest[] [plaintiff] *seeks to protect* are germane to the organization's purpose." *Hunt*, 432 U.S. at 343 (emphasis added). Defendants' preference that DLC pursue a different purpose cannot sever the obvious connection between DLC's mission and this lawsuit. *C.f. Laflamme*, 605 F. Supp. 2d at 397 (rejecting defendants' attempts to "discredit [P &A plaintiff] as a worthy representative" by arguing that the lawsuit would benefit some of the P&A's constituents but not others).

### C. DLC's Organizational and Associational Injuries are Directly Caused by the Implementation of S.B. 199

S.B. 199 has directly caused DLC's injuries because it alters the legal rights and obligations of DLC's constituents by depriving them of equal access to and protections of the standard guardianship system. *See Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1090–94 (10th Cir. 2006) (en banc); *Petrella*, 697 F.3d at 1294 ("It is this alleged unequal treatment that constitutes the injury."); *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003) ("The injury in fact . . . is the denial of equal treatment resulting from the imposition of the barrier.") (cleaned up); *c.f. Luke*, 46 F.4th at 306 (5th Cir. 2022) ("Lack of meaningful access is *itself* the harm under Title

II."). On its face, S.B. 199 classifies some of DLC's constituents as having a "severe intellectual disability" and, on that basis, illegally strips them of key procedural protections available in standard guardianships. ECF 1 ¶¶ 35–60. Moreover, as discussed above, S.B. 199 has also injured DLC by forcing it to divert resources away from its core statutory duties.

### D. DLC's Injuries Are Traceable to Defendants

Plaintiff's injuries are traceable to the State and to Defendant Governor Cox.

Where, as here, the state law is the source of the Plaintiff's injury, the injury is traceable to the state itself. *Peck v. McCann*, 43 F.4th 1116, 1129 (10th Cir. 2022); *OCA-Greater Houston v. Texas*, 867 F.3d 604, 613 (5th Cir. 2017). For example, where a statute discriminates on its face or contravenes anti-discrimination laws, the plaintiff's resulting injuries are directly traceable to the statute and thereby to the State. *See DiCocco v. Garland*, 52 F.4th 588, 591 (4th Cir. 2022); *Diamond House of SE Idaho, LLC v. City of Ammon*, 381 F. Supp. 3d 1262, 1271–72 (D. Idaho 2019). As described above, absent the State's enactment of S.B. 199, DLC would not be forced to divert resources, and its constituents would not be subject to a discriminatory classification or weakened protections in guardianship proceedings. These injuries are thus traceable to the State.

Plaintiff's injuries are also traceable to Governor Cox. Plaintiffs suing public officials can satisfy traceability by demonstrating that the official is a proper defendant under *Ex parte Young*. *Kitchen v. Herbert*, 755 F.3d 1193, 1201 (10th Cir. 2014). As discussed *infra* in section II.B., Governor Cox is a proper state official for suit under *Ex parte Young*.

Defendants ignore these allegations, instead refuting traceability based on a theory not advanced by Plaintiff—that judges and health care professionals "will act unethically, incompetently, and not correctly follow SB199." ECF 35 at 17. But Plaintiff alleges that its

13

injuries stem directly from S.B. 199's facial discrimination from which flow weakened procedures and unequal treatment of its constituents—not from the conduct of judges and health care professionals. ECF 1 ¶¶ 61–86. Having limited their attack on traceability in their Motion, Defendants have waived their right to bring other traceability arguments on reply. *See, e.g.*, *Schwartz v. State Farm Mut. Auto. Ins. Co.*, No. 1:18-cv-00328-WJ-SCY, 2018 WL 4148434, at *2 n.2 (D. N.M. Aug. 30, 2018) (unpublished) ("The Court will not address standing arguments raised for the first time in Defendant's reply brief [in support of its Motion to Dismiss].")

### E. DLC's Injuries are Redressable Through Injunctive and Declaratory Relief

Either injunctive or declaratory relief against the State and Governor Cox would redress the injuries of DLC and its constituents.

Injunctive relief against the State would directly prevent any state entity or actor from implementing S.B. 199, thereby averting the injuries described above. The State has already demonstrated that it can halt S.B. 199. In response to the district court's temporary stay order in the Plaintiff's previous pre-enforcement challenge, senior State officials "halted all efforts to prepare for S.B. 199 to go into effect" and "directed judges and clerks across the State of Utah to exclude S.B. 199's provisions when processing guardianship petitions." DLC 25-307, ECF 28 at 4; ECF 1 ¶ 32. This led to a full stay of the law's effect until Judge Shelby issued the dismissal order on July 22, 2025, a period of nearly three months. ECF 1 ¶ 31. This record confirms that the State has the capacity to meaningfully redress the harms identified.

In arguing that the State itself must bear a specific enforcement responsibility, Defendants conflate the redressability analysis for claims brought against individual officers under *Ex parte Young* and claims brought directly against governmental entities. Analysis under *Ex parte Young*,

14

which includes consideration of named officers' enforcement power, is limited to suits against *individual officers* and does not apply to claims against the State. *See Frank v. Lee*, 84 F.4th 1119, 1135 (10th Cir. 2023), *cert denied*, 144 S. Ct. 1349 (2024) ("[w]hether the Defendants have enforcement authority is related to whether, under *Ex parte Young*, they are proper state officials for suit."); *ANR Pipeline Co. v. Lafaver*, 150 F.3d 1178, 1188 (10th Cir. 1998) (*overruled on other grounds by, Hill v. Kemp*, 478 F.3d 1236, 1259 (10th Cir. 2007)).

Where, as here, a claim is brought against the State, and sovereign immunity has been abrogated (as Congress did in enacting the ADA, discussed below), *Ex parte Young* does not apply and redressability does not require Plaintiff to identify any specific state official. *See, e.g.*, *Tennessee v. Lane*, 541 U.S. 509, 533–34 (2004) (finding sovereign immunity abrogated under ADA in a case where no state officials were defendants); *Guttman v. Khalsa*, 446 F.3d 1027, 1032 (10th Cir. 2006) (remanding for analysis of sovereign immunity as to the State of New Mexico even where state official defendants had absolute immunity); *OCA-Greater Houston,* 867 F.3d at 613 ("The facial invalidity of a Texas election statute is, without question, fairly traceable to and redressable by the State itself."). Defendants fail to cite a single case supporting their apparent theory that an ADA claim against the State requires identifying an individual state official. Requiring DLC to identify an enforcer would undermine the ADA's express authorization of direct claims against the State and state entities.[3]

Independently, injunctive relief against Governor Cox would also redress Plaintiff's

---

[3] Had Congress intended to require ADA claims to identify an enforcing officer, it would have said so. *Compare* 42 U.S.C. § 12132 (ADA provision prohibiting discrimination in the "services, programs, or activities of a *public entity*") (emphasis added) *with* 42 U.S.C. § 1983 (authorizing suits against "[e]very person [acting] under color of any statute, ordinance . . . .").

15

injuries. Plaintiffs suing public officials can satisfy redressability by demonstrating that the official has proper enforcement authority under *Ex parte Young*. *Kitchen*, 755 F.3d at 1201. As discussed *infra* in section II.B., Governor Cox is a proper state official for suit under *Ex parte Young* because he possesses sufficient connection to S.B.199. This is evident in the prior ability of State officials to "halt[] all efforts to prepare for S.B. 199 to go into effect" and "direct[] judges and clerks across the State of Utah to exclude S.B. 199's provisions when processing guardianship petitions." *See* DLC 25-307, ECF 28 at 4; ECF 1 ¶ 32.

Declaratory relief would also redress Plaintiff's injuries. The Tenth Circuit has established that where injunctive relief would remedy a plaintiff's harm, declaratory relief will likewise suffice. *Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 906 (10th Cir. 2012). A declaratory judgment that S.B. 199 violates the ADA would carry significant legal and practical consequences. If this Court declares that S.B. 199 violates the ADA, Defendants (as well as other state actors) have indicated, through statements and actions, that S.B. 199 will not be given effect, thus redressing Plaintiff's injuries. ECF 1 ¶¶ 31–32.

Importantly, redressability under Article III does not require that the relief sought eliminate every trace of injury. *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1158 (10th Cir. 2005) (quoting *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (Redressability "need not relieve [a plaintiff's] *every* injury.")). Relief is sufficient where "the practical consequence of [a declaratory judgment] would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." *Utah v. Evans*, 536 U.S. 452, 464 (2002); *see also Gutierrez v. Saenz*, 606 U.S. 305, 318–21 (2025); *Redd v. Guerrero*, 84 F.4th 874, 884 (9th Cir. 2023); *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 100–01 (4th Cir. 2011).

Here, even declaratory relief without an accompanying injunction would substantially mitigate DLC's organizational injuries. Absent declaratory or injunctive relief, DLC must continue to devote resources to identifying, tracking, and intervening in guardianship proceedings under S.B. 199—tasks that require intensive individualized support. ECF 1 ¶¶ 97–100, 106–07, 112–13. A declaration that S.B. 199 violates the ADA could be used by DLC to challenge the propriety of any S.B. 199 guardianship proceeding that went forward despite the declaratory ruling at the outset. This would streamline DLC's work, reduce duplication of efforts, and enable DLC to preserve capacity for its other statutorily mandated programs. Thus, both injunctive and declaratory relief satisfy the redressability requirement.

## II. Defendants Do Not Have Sovereign Immunity

### A. Congress Abrogated the State's Sovereign Immunity with Respect to Plaintiff's ADA Claim

Sovereign immunity does not bar DLC's claim under Title II of the ADA because Congress validly abrogated state sovereign immunity for claims that seek to remedy disability-based denials of meaningful access to judicial proceedings. Congress "unequivocally expressed its intent" to abrogate state sovereign immunity under the ADA. *Lane*, 541 U.S. at 517. And the U.S. Supreme Court has held that this abrogation is a valid exercise of Congress's enforcement power under § 5 of the Fourteenth Amendment at least as applied to the "class of cases implicating the fundamental right of access to the courts." *Id.* at 533–34.

That is this case. Plaintiff challenges a State-created judicial process that determines whether a person will be subjected to a sweeping guardianship and stripped of core rights. *See* ECF 1 ¶¶ 34–36. DLC alleges that S.B. 199 denies people classified as having a "severe intellectual disability" equal access to, and meaningful participation in, guardianship proceedings

17

by diminishing or eliminating procedural protections and meaningful court oversight, including the presumption of in-person hearings, the right to counsel or a court visitor, the presumption of limited guardianship, and the opportunity to contest a guardianship. *See id.* ¶¶ 34–60. Because the claim challenges disability-based barriers to meaningful participation in judicial proceedings, the ADA's abrogation applies. *Lane*, 541 U.S. at 533–34.

Defendants argue that ADA abrogation is unavailable because (1) S.B. 199 does not erect "physical barriers" to the courthouses, and (2) DLC has not satisfied the *United States v. Georgia*, 546 U.S. 151, 159 (2006), framework. ECF 35 at 26–27. Both contentions are wrong.

First, *Lane* extends beyond courthouse ramps to disability-based barriers to meaningful participation in judicial services, including in-court procedures and communications. *See, e.g.*, *Mosier v. Kentucky*, 675 F. Supp. 2d 693 (E.D. Ky. 2009) (ADA abrogated state sovereign immunity with respect to claim that deaf attorney was denied sign language interpreter services needed to access court); *Quick v. S.F. Superior Ct.*, 65 F. Supp. 3d 907, 908 (N.D. Cal. 2014) (ADA abrogated state sovereign immunity for claim that deaf plaintiff was denied translation and captioning services needed to access court); *Prakel v. Indiana*, 100 F. Supp. 3d 661, 677 (S.D. Ind. 2015) (ADA abrogated state sovereign immunity for claim that deaf spectator was denied interpreter services needed to understand his mother's criminal proceedings).

Defendants attempt to narrow *Lane* to the physical inaccessibility of courthouses and contend that "meaningful access" must be read in light of physical obstacles. ECF 35 at 26–27. But *Lane* did not confine its holding to architectural barriers. Instead, it framed the relevant "class of cases" as those implicating "the fundamental right of access to the courts" and the "accessibility of judicial services." *Lane*, 541 U.S. at 531, 533–34. This analysis expressly

18

encompassed barriers beyond architecture, recognizing that the ADA's definition of a "qualified" individual contemplates not only the removal of architectural barriers, but also the removal of "communication" barriers and the "provision of auxiliary aids and services." *Id.* at 517 (quoting 42 U.S.C. § 12131(2)). The ADA's abrogation therefore applies whenever a court system denies disabled people equal access to judicial proceedings, whether the barrier is physical or not.

Defendants' only authority for limiting *Lane* to physical barriers is a nonbinding state court decision. ECF 35 at 26–27 (citing *King v. King*, 174 P.3d 659 (Wash. 2007)). That decision's narrowing gloss arose entirely outside of the context of disability law, and held only that *Lane* could not be interpreted to require appointed counsel in family law proceedings simply because appointing counsel would make the proceedings more accessible for non-disabled, but unrepresented, litigants. *King*, 174 P.3d at 665–66. The court in *King* did not contend with, and cannot overcome, *Lane*'s own articulation of the relevant class of cases and its express reference to communication barriers and auxiliary aids within the ADA framework. 541 U.S. at 516–17, 531–34. At minimum, at the pleading stage, DLC's allegations that S.B. 199 denies equal access to and participation in guardianship judicial proceedings bring this case squarely within *Lane*.

Second, *Georgia* has no bearing on whether sovereign immunity is validly abrogated here. *Georgia* did not question the sovereign immunity analysis in *Lane*. It analyzed a different question—whether Congress abrogated immunity for conduct that had already been determined to raise valid claims under the Eighth Amendment. Under *Georgia*, courts consider on a claim-by-claim basis: (1) whether the alleged conduct violates the ADA; (2) whether the same conduct violates the Fourteenth Amendment; and (3) to the extent conduct violates the ADA but not the Fourteenth Amendment, whether Congress's abrogation is nevertheless valid as congruent-and-

proportional § 5 legislation. 546 U.S. at 159. The answers to these questions are straightforward.

As to the first question, DLC alleges that S.B. 199 "enact[s] a facially discriminatory scheme" that provides "different and fewer rights" in guardianship proceedings to people classified as having a "severe intellectual disability," thereby denying them an "equal opportunity to participate in or benefit from guardianship proceedings," providing unequal benefits and rights, and substantially impairing the objectives of the guardianship system for people with disabilities. ECF 1 ¶¶ 126–27. Those allegations plausibly state an ADA claim challenging discrimination in the operation of a State judicial process. *See* 42 U.S.C. § 12132. And the second and third questions have already been answered by *Lane*, which held that Congress abrogated State immunity for cases dealing with access to the courts. *Georgia* did not disturb this holding, and *Lane* makes answering the second question (whether the alleged conduct also violated the Constitution) unnecessary.

Defendants' contention that sovereign immunity applies because DLC has not identified specific individuals who have suffered harm improperly conflates Article III justiciability with Eleventh Amendment abrogation. ECF 35 at 27. The relevant question is whether DLC plausibly alleges an ADA violation in a category of cases—access to judicial services—for which Congress validly abrogated immunity. *Lane,* 541 U.S. at 531–34; *Georgia*, 546 U.S. at 159. And in any event, DLC has identified four constituents who have suffered harm because of S.B. 199.

Finally, as discussed *supra* in section I.E., the ADA abrogates the State's sovereign immunity regardless of whether the State has enforcement authority. Defendants conflate the abrogation analysis (for claims brought directly against states) with the *Ex parte Young* analysis (for claims against individual officers). ECF 35 at 21. Where, as here, a claim is brought against

the State, abrogation does not require Plaintiff to identify an official with enforcement authority.

**B.  *Ex Parte Young* Precludes Governor Cox from Claiming Sovereign Immunity**

Defendant Governor Cox falls under the *Ex parte Young* exception to sovereign immunity because he is a state officer with power to affect enforcement of S.B. 199 through his authority to enforce state law, ensure ministerial officers comply with state and federal law, control and veto appropriations to the state judiciary, and appoint judges. The Tenth Circuit has found these powers to bear the requisite "connection with the enforcement of the challenged statute" under *Ex parte Young*, *Frank*, 84 F.4th at 1132 (citation modified), and that they may derive from multiple sources, including constitutional duties, statutory delegation, appointment authority, budgetary authority, or administrative control over enforcing agencies, *see Papasan v. Allain*, 478 U.S. 265, 282 n.14 (1986); *Kitchen*, 755 F.3d at 1201.

For example, in *Kitchen v. Herbert*, the Tenth Circuit found that the Utah governor had sufficient influence over the enforcement of the state's ban on same-sex marriage because he had a statutory duty to "supervis[e] the official conduct of all executive and ministerial officers" and "see[] that all offices are filled and the duties thereof performed," including that of the county clerk who issues marriage licenses, and to appoint the state's tax commissioners who process joint tax returns filed by same-sex couples. 755 F.3d at 1202–03.

Similarly, in *Petrella*, the Tenth Circuit held that the governor was the proper defendant because he had general responsibility to enforce state law. 697 F.3d at 1294. The challenged statute required school districts to levy a property tax to be supplemented by or to contribute to a general state equalization fund and gave districts the option to levy additional property taxes up to a capped amount. *Id.* at 1290. Critically, neither the cap nor any other provision directed the

Governor or Attorney General to do anything. *Id.* at 1293–94. Nevertheless, the Tenth Circuit held these officials had enforcement power over the statute because they had a general responsibility to enforce state law, *id.* at 1294, and it could not "seriously be disputed that the proper vehicle for challenging the constitutionality of a state statute . . . is an action against the state officials responsible for the enforcement of that statute." *Id.* at 1293–94.

Defendant Cox holds a similar "connection with the enforcement of the challenged statute." *Frank*, 84 F.4th at 1132 (citation modified). As in *Petrella*, S.B. 199 does not direct any party to do anything. Nevertheless, Governor Cox has substantial influence over implementation of S.B. 199 beyond a "mere general duty to enforce the law," ECF 35 at 22, Defendant Cox is responsible for "supervis[ing] the official conduct of all executive and ministerial officers" and "see[ing] that all offices are filled and the duties thereof performed," ECF 1 ¶ 33; Utah Code § 67-1-1(1)–(2). He also oversees state court administration via appointment powers and line-item veto power, and controls the budgetary process for state departments, including the state judiciary, underscoring his direct influence over the judiciary's activities. *See* Utah Const. art. VII, § 8. Defendant Cox can therefore influence enforcement of S.B. 199 by withholding funds to the judiciary, which mirrors *Papasan*, where the Secretary of State's budget authority over the challenged funding distributions satisfied *Ex parte Young*. 478 U.S. at 282 & n.14.

Governor Cox's powers also allow the Court to fashion relief that binds private parties attempting to file an S.B. 199 petition. This Court may issue an injunction prohibiting the Governor from continuing to assist implementation of S.B. 199 by approving appropriations to the state judiciary. *C.f. Chamber of Com. of the United States v. Edmondson,* 594 F.3d 742, 758 (10th Cir. 2010) ("An injunction would prevent [the Attorney General] from . . . refusing to

22

prepare a contract because it violates the terms of Section 7(B)."); *Kitchen*, 755 F.3d at 1204

("[A] state official is a proper defendant if . . . they clearly have assisted or currently assist in

giving effect to the law.").

Defendants argue that S.B. 199 strips Governor Cox of enforcement authority by placing

it with private parties and that that he cannot derive that authority from any other sources. ECF

35 at 22–24. This argument fails for two reasons.

First, Defendants do not cite any provision of S.B. 199 vesting enforcement power in

private petitioners. They nevertheless argue that, like a civil right of action, which vests

enforcement authority in plaintiffs, S.B. 199 vest enforcement authority in private parties

petitioning for guardianship. ECF 35 at 23–24 (citing *Free Speech Coal., Inc. v. Anderson*, 119

F.4th 732, 739 (10th Cir. 2024)).

But unlike civil statutes, which give plaintiffs significant power over proceedings and

require a close connection to the matter at issue, S.B. 199 petitioners are not subject to standing

requirements and have little control over proceedings, once underway. *See Charalampous*

*through Charalampous v. Lee*, No. CIV-23-499-R, 2024 WL 457170, at *10 (W.D. Okla. Feb. 6,

2024) (unpublished) ("A guardianship proceeding, however, is not a proceeding in which a

personal stake was required" because the petitioner "only had to profess an interest in another

person's welfare"). Whereas civil plaintiffs drive proceedings through motions, discovery, trials,

appeals, and enforcement of court orders, S.B. 199 petitioners simply trigger a chain of events

over which they cede control. *C.f. In re Guardianship of Matthews*, 232 P.3d 1140, 1144 (Wash.

Ct. App. 2010) ("The guardianship petitioner's role is essentially to alert the trial court of the

potential need and reasons for a guardianship." After that, "the petitioner's role in the process

essentially ends."). After petitioners file a petition, S.B. 199 delegates fact-finding functions to courts and respondents. The court determines whether respondents meet criteria for guardianship without a jury and appoints a physician or psychologist to examine respondents. Utah Code §§ 75-5-604(3)(a), (5); 75-5-606. S.B. 199 petitioners do not present evidence or cross-examine witnesses—only respondents or their counsel may do so. *Id.* § 75-5-604(4). And, unlike civil cases, where plaintiffs can request a range of remedies, S.B. 199 requires the court to appoint a guardian in a strict order of priority, regardless of petitioners' preferences. *Id.* § 65-5-610(1). Petitioners thus lack the required control over S.B. 199 proceedings to enforce the law.

Second, none of the cases Defendants cite support the contention that private enforcement strips Governor Cox of enforcement power or that he cannot derive that power from other sources. For example, *Whole Women's Health v. Jackson* turned only on the plaintiffs' inability to identify "any enforcement authority the attorney general possesse[d] in connection with [the challenged statute] that a federal court might enjoin him from exercising"—not on the statute's grant of private enforcement. 595 U.S. 30, 43 (2021). Because plaintiffs failed to identify any enforcement authority, the Court could not fashion injunctive relief that could bind private persons who might bring suits under the challenged law. *Id*. at 44.

The Tenth Circuit reached the same conclusion in *Free Speech Coal., Inc.*, noting that *Whole Women's Health* "did not turn on the fact that the challenged statute explicitly divested enforcement authority from state officials—the Court did not even mention as much." 119 F.4th at 740. With that understanding, the *Free Speech* court held that the Attorney General was not a proper defendant because he held only a "general responsibility for enforcing" the challenged state law. *Id.* But importantly, *Free Speech* also cited with approval *Petrella*—noting that the

24

statute there "did not include any particular enforcement provisions, meaning that the ability to enforce it was necessarily encompassed by the attorney general's overall enforcement authority." *Id.* Like the statute in *Petrella*, S.B. 199 does not contain enforcement provisions—meaning that it is "necessarily encompassed" in the Governor's overall authority. *Id.* at 740–41.[4]

Defendants also misrepresent *Edmondson* as turning on the Attorney General's prosecutorial authority under two challenged provisions. 594 F.3d at 760; ECF 35 at 23–24. The first required businesses to verify employees' work authorization and the second prohibited discrimination against employees with lawful authorization. Like S.B. 199, neither provision conferred prosecutorial authority. *Edmondson,* 594 F.3d at 757. Although the Attorney General could bring civil actions against businesses that violated either provision, the court held he bore enforcement power over only the first because he drafted contracts for state officials upon request and could refuse to prepare a contract that violates that provision. *Id.* at 758–60.

Accordingly, Governor Cox's overall power to enforce state law, ensure ministerial officers comply with state and federal law, veto appropriations to the state judiciary, and appoint judges provide a sufficient connection to the enforcement of S.B. 199. As discussed above, the Tenth Circuit has found these powers to bear that requisite connection to the challenged law.

## **CONCLUSION**

For the aforementioned reasons, this Court should deny State Defendants' Motion to Dismiss in its entirety.

---

[4] Similarly, *Hendrickson v. AFSCME Council 18* held that the governor was not a proper defendant because he held only a general responsibility for enforcing state law, not because the statue conferred power in another party. 992 F.3d 950, 962 (10th Cir. 2021).

Dated: February 20, 2026

Respectfully submitted,

/s/ Malhar Shah

Malhar Shah*
Zoë Brennan-Krohn*
American Civil Liberties Union Foundation
425 California Street, Suite 700
San Francisco, CA 94104
Tel: (415) 343-0769
zbrennan-krohn@aclu.org
mshah@aclu.org

Brian Dimmick*
Aditi Fruitwala*
Jacob Abudaram*
American Civil Liberties Union Foundation
915 15th Street NW, 6th Floor
Washington, D.C. 20005
Tel: (202) 731-2395
bdimmick@aclu.org
afruitwala@aclu.org
jabudaram@aclu.org

Laura Henrie (Bar No.12449)
Nate Crippes (Bar No.14622)
Disability Law Center
960 South Main Street
Salt Lake City, Utah 84101
Tel: (801) 363-1347
lhenrie@disabilitylawcenter.org
ncrippes@disabilitylawcenter.org

*Admitted pro hac vice

Attorneys for Plaintiff

Thomas Ford (Bar No. 19795)
Jason M. Groth (Bar No. 16683)
ACLU of Utah
311 South State Street, Suite 310
Salt Lake City, UT 84111
Tel: (801) 5221-9862
jgroth@acluutah.org
tford@acluutah.org

John A. Freedman*
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ace., N.W.
Washinton, DC 20001
john.freedman@arnoldporter.com

Kristine Itliong*
Arnold & Porter Kaye Scholer LLP
250 W 55th St.
New York, NY 10019
Tel: (212) 836-7037
kristine.itliong@arnoldporter.com

26