Mark C. Gillespie (19265)
*Assistant Solicitor General*

David N. Wolf (6688)
Keith W. Barlow (15532)
Jason Dupree (17509)
*Assistant Utah Attorneys General*

Office of the Utah Attorney General
P.O. Box 140858
Salt Lake City, Utah 84114-0858
Telephone: (801) 366-0533
Email: markgillespie@agutah.gov
        dnwolf@agutah.gov
        kbarlow@agutah.gov
        jndupree@agutah.gov

*Counsel for Defendants*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| DISABILITY LAW CENTER, | **DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(1)** |
| *Plaintiff*, | |
| v. | |
| | Case No. 2:25-cv-01154-HCN-DBP |
| STATE OF UTAH and SPENCER COX, GOVERNOR OF THE STATE OF UTAH, *in his official capacity*, | Judge Howard C. Nielson, Jr. |
| *Defendants*. | Magistrate Judge Dustin B. Pead |

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 1

I.   DLC LACKS STANDING BECAUSE IT HAS SUFFERED NO INJURY IN FACT. .................................................................................................................... 1

   A.  DLC Cannot Assert Associational Standing in Lieu of Its Constituents. ............... 1

   B.  DLC Has Not Suffered an Organizational Injury. .................................................... 4

II.  DLC LACKS STANDING BECAUSE IT CANNOT SHOW CAUSATION OR REDRESSABILITY. .............................................................................................. 5

III. SOVEREIGN IMMUNITY BARS DLC'S CLAIMS AGAINST THE STATE AND GOVERNOR COX. ...................................................................................... 6

   A.  Because Governor Cox Does Not Enforce SB199, the *Ex Parte Young* Exception Does Not Apply. ..................................................................................... 7

   B.  Congress Did Not Abrogate the State's Sovereign Immunity. .............................. 9

CONCLUSION .................................................................................................................. 10

# TABLE OF AUTHORITIES

Page(s)

Cases

*Am. Chem. Council v. Dep't of Transp.*,
    468 F.3d 810 (D.C. Cir. 2006)................................................................................... 3, 4

*Bishop v. Oklahoma*,
    333 F. App'x 361 (10th Cir. 2009)............................................................................. 8

*Chamber of Com. of U.S. v. Edmondson*,
    594 F.3d 742 (10th Cir. 2010) ................................................................................... 8

*Disability L. Ctr. v. Cox*,
    No. 2:25-cv-00307, 2025 WL 2050235 (D. Utah July 22, 2025)...................... 1, 4, 6

*Disability L. Ctr. v. Cox*,
    No. 2:25-cv-00307, 2025 WL 3187347 (D. Utah Nov. 14, 2025) .............................. 6

*Doe v. Stincer*,
    175 F.3d 879 (11th Cir. 1999) ................................................................................... 3

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ............................................................................................... 4, 5

*Free Speech Coal., Inc. v. Anderson*,
    119 F.4th 732 (10th Cir. 2024).............................................................................. 7, 8

*Guttman v. Khalsa*,
    669 F.3d 1101 (10th Cir. 2012) ............................................................................... 10

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ................................................................................................... 4

*Hunt v. Washington State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ............................................................................................... 1, 2

*King v. King*,
    174 P.3d 659 (Wash. 2007) ....................................................................................... 9

*Kitchen v. Herbert*,
    755 F.3d 1193 (10th Cir. 2014) ................................................................................. 8

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest,*
   624 F.3d 1083 (9th Cir. 2010) ......................................................................... 4

*Mosier v. Kentucky,*
   675 F. Supp. 2d 693 (E.D. Ky. 2009) ............................................................. 9

*Mountain States Legal Found. on Behalf of Ellis v. Dole,*
   655 F. Supp. 1424 (D. Utah 1987) ................................................................. 3

*N. New Mexicans Protecting Land Water & Rts. v. United States,*
   161 F. Supp. 3d 1020 (D.N.M. 2016) .......................................................... 3, 4

*Petrella v. Brownback,*
   697 F.3d 1285 (10th Cir. 2012) ..................................................................... 5

*Prakel v. Indiana,*
   100 F. Supp. 3d 661 (S.D. Ind. 2015) ........................................................... 9

*Sossamon v. Texas,*
   563 U.S. 277 (2011) ....................................................................................... 7

*Spokeo, Inc. v. Robins,*
   578 U.S. 330 (2016) .................................................................................... 1, 5

*Summers v. Earth Island Inst.,*
   555 U.S. 488 (2009) ....................................................................................... 1

*Tennessee v. Lane,*
   541 U.S. 509 (2004) ....................................................................................... 9

*United Gas Pub. Serv. Co. v. Texas,*
   303 U.S. 123 (1938) ..................................................................................... 10

*United States v. Georgia,*
   546 U.S. 151 (2006) ..................................................................................... 10

*Whole Woman's Health v. Jackson,*
   595 U.S. 30 (2021) ..................................................................................... 7, 8

Statutes

Utah Code § 75-5-604(1) .................................................................................... 7

Utah Code § 75-5-613(1) .................................................................................... 7

Utah Code § 75-5-601(6) ................................................................................................. 8

Other Authorities

Senate Bill 199 ...........................................................................................Passim

## INTRODUCTION

For nearly a year, Plaintiff Disability Law Center (DLC) has attempted to challenge SB199—and for nearly a year, it has "failed to meet its burden demonstrating it has standing in the first instance." *Disability L. Ctr. v. Cox*, No. 2:25-cv-00307, 2025 WL 2050235, at \*13 (D. Utah July 22, 2025). DLC's latest round of arguments does nothing to buck that trend. The complaint still fails to allege injury in fact, either as a proxy for qualifying association members (of which DLC has none) or on DLC's own behalf. It fails to show that DLC's alleged injuries, to the extent they even exist, were caused by Defendants or could be redressed by an injunction against them. And it fails to dispel the protection of Eleventh Amendment sovereign immunity, which shields Defendants from lawsuits even by plaintiffs that *can* show proper standing. For the third (and presumably final) time, DLC's misbegotten suit against Defendants should be rejected.

## ARGUMENT

### I.    DLC LACKS STANDING BECAUSE IT HAS SUFFERED NO INJURY IN FACT.

Injury in fact is the bedrock of any Article III suit, "the '[f]irst and foremost' of standing's three elements." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (internal citation omitted). DLC asserts both that it has suffered such an injury itself and that it may sue on behalf of "constituents" that have suffered such injuries. *See* ECF No. 41 ("DLC Br.") at 3–12. Neither theory holds up under scrutiny.

#### A.    DLC Cannot Assert Associational Standing in Lieu of Its Constituents.

DLC fails to show that "its members would otherwise have standing to sue in their own right," *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); it fails to show that "the interests it seeks to protect are germane to [DLC's] purpose," *id.*; and it does not specifically "identify members who have suffered the requisite harm," *Summers v. Earth Island*

1

*Inst.*, 555 U.S. 488, 499 (2009). Although DLC concedes that it must clear each of these hurdles to establish associational standing, DLC Br. 6–9, its complaint falls short on all three.

*First*, DLC does not show that its members have standing to sue in their own right. More to the point, as a protection and advocacy (P&A) group, DLC's "constituents" are "not considered traditional 'members'" at all. DLC Br. 7. DLC's constituents do not "possess all of the indicia of membership in an organization"—for instance, it is not true that they "alone elect the members of the [DLC]; they alone may serve on the [DLC]; [or] they alone finance its activities, including the costs of this lawsuit, through assessments levied upon them." *Hunt*, 432 U.S. at 344–45. DLC contends that its constituents are "participants in DLC's functioning," that they are included (alongside others) on its board and advisory committee, and that DLC "solicits input" from them "to make recommendations about DLC's priorities." DLC Br. 7–8. But that attenuated connection is a far cry from the kind of active, participatory role required of association nonmembers to establish associational standing in cases such as *Hunt*. DLC does not allege that Utahns with severe intellectual disabilities control, guide, fund, or direct its operations in any meaningful way. And DLC makes no effort to show that its mission or leadership represents Utahns with severe intellectual disabilities—the population of relevant "constituents" in this case—rather than *all* "Utahns with disabilities" of any kind. DLC Br. 7; *see, e.g.*, ECF No. 1 ("Compl.") ¶ 21. Thus, notwithstanding the split of authorities on whether a P&A group may sue in some circumstances on behalf of its constituents, *compare* Opening Br. 9 (Fifth and Eighth Circuits say no) *with* DLC Br. 8 (Ninth and Eleventh Circuits say yes), DLC cannot do so here.

*Second*, this lawsuit is not germane to DLC's interests. DLC asserts that it has an interest "to advance and enforce the legal rights, choices, and opportunities of Utahns with disabilities." DLC Br. 12. But in advancing that stated goal, it has taken a consistent stance *against*

guardianships—a legal tool on which many Utahns with severe intellectual disabilities rely. *E.g.*, Compl. ¶ 24 ("DLC provides direct representation in guardianship proceedings to individuals who do not believe a guardianship is necessary and/or individuals who wish to modify a guardianship to be less restrictive."). Though it offers no substantive argument, DLC appears to imply that its stringent opposition to guardianships is, by definition, in the interest of the disabled Utahns whose interests it purports to represent. DLC Br. 11–12. That is no answer. A mere "broad statement of purpose" cannot "violat[e] the spirit of the rule" and create germaneness if an organization cannot show that it "assist[s] a discrete group with a specific interest." *Mountain States Legal Found. on Behalf of Ellis v. Dole*, 655 F. Supp. 1424, 1428–29 (D. Utah 1987). And taking DLC at its word, DLC's interests do not overlap with those of severely intellectually disabled Utahns who benefit from guardianships.

*Third* and most tellingly, DLC fails to show how any particular constituent has been (or will be) harmed by SB199. As DLC's own cited authorities attest, the identity of "at least one specifically-identified member . . . suffering an injury in fact must be firmly established," *N. New Mexicans Protecting Land Water & Rts. v. United States*, 161 F. Supp. 3d 1020, 1041 (D.N.M. 2016) (quoting *Am. Chem. Council v. Dep't of Transp.*, 468 F.3d 810, 820 (D.C. Cir. 2006)) (cited at DLC Br. 9), and failure to make that showing is fatal, *Doe v. Stincer*, 175 F.3d 879, 886–88 (11th Cir. 1999) (cited at DLC Br. 8). Yet DLC identifies no specific individuals who have suffered an injury, instead opting to vaguely gesture at "[s]ome of DLC's constituents" who are "subjected to S.B. 199 proceedings." Compl. ¶ 63. Although it points to four court filings representing guardianship petitions, *id.* n.16, DLC offers no "allegations in its Complaint tying S.B. 199 to particular members, nor does it provide any extrinsic evidence that, even if the court were to consider it, would establish an injury-in-fact on behalf of a particular constituent"—as the district

3

court noted in rejecting DLC's previous challenge to the statute. *Disability L. Ctr.*, 2025 WL 2050235, at *9 n.103; *cf. N. New Mexicans*, 161 F. Supp. 3d at 1041 (specific members of plaintiff organization provided sworn affidavits describing injury). And DLC's bland assurances that it is "not aware of any S.B. 199 guardianship respondent" who has *not* suffered injury do not fill the gap. Compl. ¶ 63. Because "the Court is still left to wonder who, if anybody, has suffered an injury-in-fact," DLC fails to establish associational standing. *Am. Chem. Council*, 468 F.3d at 820.

### B.    DLC Has Not Suffered an Organizational Injury.

The complaint also fails to show that DLC itself has suffered an injury sufficient to support standing. Rather than point to any concrete harm, DLC suggests that SB199 will "impact[t]" three of its "core business activities": monitoring cases; investigating abuse, neglect, and discrimination; and representing individuals in guardianship proceedings. DLC Br. 4–5.

The "causal link" between SB199 and these alleged injuries is "too speculative" to support standing. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 390 (2024). Each injury alleged by DLC boils down to the same generic allegation: because SB199 changed the procedural status quo surrounding guardianships, DLC must now "prepare to expend more resources" to adapt to the changing legal landscape. Compl. ¶ 112; *see also, e.g., id.* ¶¶ 106, 110; DLC Br. 4–5. But DLC's choice to expend those resources is presented as just that—a choice. Like any organization affected by new legislation, DLC "cannot manufacture [an] injury" by "simply choosing to spend money fixing a problem that otherwise would not affect the organization at all." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010). Rather, it must "show that *it would have suffered some other injury* if it had not diverted resources to counteracting the problem." *Id.* (emphasis added). The facts alleged in the complaint make much of DLC's shifting strategies and "annual goals," Compl. ¶ 106, but they fail to show the "concrete and demonstrable injury to the organization's activities" required for standing. *Havens Realty*

4

*Corp. v. Coleman*, 455 U.S. 363, 379 (1982). For the same reason that doctors cannot "challenge general safety regulations as unlawfully lax," *All. for Hippocratic Med.*, 602 U.S. at 391, DLC cannot challenge SB199 merely for causing changes in its operations.

## II.   DLC LACKS STANDING BECAUSE IT CANNOT SHOW CAUSATION OR REDRESSABILITY.

Failure to show injury aside, this suit also lacks a justiciable case or controversy because DLC cannot carry its burden to show the remaining prongs required for Article III standing: that any injury is both fairly traceable to Defendants' challenged conduct and "likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338.

To start, neither the State nor Governor Cox caused DLC's alleged injuries. In its cursory briefing to the contrary, DLC argues that "S.B. 199 has directly caused DLC's injuries." DLC Br. 12. But as previously explained, most if not all of DLC's alleged injuries are too attenuated or speculative to be fairly traceable to the enactment of SB199—if they ever materialize at all. What's more, DLC's conclusory argument says nothing about whether its alleged injuries are fairly traceable *to Defendants* rather than to the operation of SB199 more generally. They are not, for the simple reason that—as DLC's cited authority states—"the proper vehicle for challenging the constitutionality of a state statute, where only prospective, non-monetary relief is sought, is an action against *the state officials responsible for the enforcement* of that statute." *Petrella v. Brownback*, 697 F.3d 1285, 1294 (10th Cir. 2012) (emphasis added). As explained in Defendants' opening brief (and further reiterated below), "enforcement" of SB199 takes place when private parties initiate judicial proceedings; neither the State nor the Governor play any role in the process. Defendants are not responsible for enforcement of SB199, and so DLC cannot show traceability.

For similar reasons, neither Defendant can redress DLC's alleged injuries. Because private individuals—not the State, its Governor, or any other governmental entity—are solely responsible

for enforcement of SB199 through the judicial process, an injunction against Defendants would not end the statute's operation.[1] Because of that, no relief is possible; by DLC's own admission, declaratory relief is sufficient for redressability only "where injunctive relief would remedy a plaintiff's harm" as well. DLC Br. 16. And although DLC contends that a plaintiff "can satisfy redressability by demonstrating that the official has proper enforcement authority under *Ex parte Young*," DLC Br. 16, DLC cannot demonstrate that here—as shown below, and as one court in this District has already held. *Disability L. Ctr.*, 2025 WL 2050235, at *11–13. Here, as previously, DLC "failed to adequately counter Defendants' theory of the case with respect to which parties are ultimately causing DLC's alleged injuries through S.B. 199 and in what ways the court can redress those injuries as to those parties." *Disability L. Ctr. v. Cox*, No. 2:25-cv-00307, 2025 WL 3187347, at *4 (D. Utah Nov. 14, 2025).

### III.   SOVEREIGN IMMUNITY BARS DLC'S CLAIMS AGAINST THE STATE AND GOVERNOR COX.

Even if DLC could establish standing to challenge SB199, its suit against Utah and its Governor is barred by sovereign immunity. DLC does not dispute that sovereign immunity would bar the injunctive and declaratory relief DLC seeks. Nor does it dispute that the State has not consented to suit. Instead, it argues that *Ex parte Young* abolishes Governor Cox's immunity and that Congress has abrogated the State's immunity. DLC Br. 17–25. But neither of these narrow

---

[1] DLC also insists that "the State has the capacity to meaningfully redress the harms identified" because the parties previously stipulated to a provisional stay of SB199 *prior* to its enactment. DLC Br. 14; Compl. ¶ 31.  But any willingness to temporarily "maintain the status quo . . . as if S.B. 199 had not been passed" by delaying the effective enactment date of SB199 as a courtesy does not mean, as DLC seems to infer, that Defendants possess the authority to command either private Utahns or independent judges to ignore a duly enacted law after it has taken effect. *Disability L. Ctr. v. Cox*, No. 2:25-cv-00307, Dkt. 24 (D. Utah Apr. 24, 2025) (status conference minute entry).

exceptions overrides the "important constitutional limitation on the power of the federal courts" that sovereign immunity constitutes here. *Sossamon v. Texas*, 563 U.S. 277, 284 (2011).

**A.     Because Governor Cox Does Not Enforce SB199, the *Ex Parte Young* Exception Does Not Apply.**

DLC invokes *Ex parte Young* on the theory that Governor Cox "is a state officer with power to affect enforcement of S.B. 199." DLC Br. 21. But the nebulous "power to affect enforcement" is not enough to trigger the "narrow exception" to sovereign immunity recognized in *Ex parte Young*. *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021). To the contrary, that exception "permits equitable relief against only those officials who possess *authority to enforce*," not merely affect the operation of, "a challenged state law." *Id.* at 46 (emphasis added). And here, DLC does "not direct this Court to any enforcement authority [Governor Cox] possesses in connection with S. B. [199] that a federal court might enjoin him from exercising." *Id.* at 43.

That is unsurprising, for SB199 "places enforcement authority with private individuals." *Free Speech Coal., Inc. v. Anderson*, 119 F.4th 732, 739 (10th Cir. 2024). Nowhere does it empower the Governor to enforce its terms; indeed, nowhere does it grant *any* State entity "power to direct the actions of private actors or prevent them from seeking enforcement" of SB199. *Id.* The entire operation of the statute arises from the acts of private individuals: a petition for guardianship may only be sought by a "person interested in an adult's welfare," Utah Code § 75-5-604(1), and only an "individual with a severe intellectual disability, or any person interested in the individual's welfare, may petition" for removal of a guardian, Utah Code § 75-5-613(1).

DLC resists this conclusion. It argues that "[p]etitioners . . . lack the required control over S.B. 199 proceedings to enforce the law" because after a petition is sought, "S.B. 199 delegates fact-finding functions to courts and respondents." DLC Br. 24. But even ignoring the fact that DLC identifies no role for the Governor in this enforcement regime, that reasoning fails. Respondents

are private individuals too—the very individuals whose rights DLC claims to represent, no less. *See* Utah Code § 75-5-601(6) ("'Respondent' means the adult who is alleged to be an individual with a severe intellectual disability."). And as the Supreme Court explained in *Whole Women's Health*, officers of state courts "do not enforce state laws as executive officials might," and are thus not subject to the exception in *Ex parte Young*. 595 U.S. at 39.

DLC also attempts to describe Governor Cox's nonexistent enforcement ability by identifying generic State administration processes in which he plays a role: supervising the conduct of State officers, appointing State officials, and controlling the budget. DLC Br. 22. But these high-level responsibilities are quintessential "general dut[ies] to enforce the law" that cannot support an *Ex parte Young* injunction. *Free Speech Coal.*, 119 F.4th at 739. That is confirmed by DLC's proposed remedy: an injunction prohibiting the Governor from "approving appropriations to the state judiciary" wholesale. DLC Br. 22. Unlike the injunctions in cases cited by DLC, *see* DLC Br. 22–23, DLC seeks not an order enjoining a "particular duty to enforce" the statute, but rather a sweeping moratorium on funding an entire branch of government. *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 760 (10th Cir. 2010); *see id.* at 758 (the requested "injunction would prevent [defendant] from filing lawsuits or defending against suits on the basis of" the challenged provision); *Kitchen v. Herbert*, 755 F.3d 1193, 1202 (10th Cir. 2014) (injunction against governor and attorney general appropriate when enforcement of marriage law was done by "county clerks" under their direct supervisory control); *cf. Bishop v. Oklahoma*, 333 F. App'x 361, 365 (10th Cir. 2009) (similar injunction against executive officials denied where "recognition of marriages [wa]s within the administration of the judiciary"). The Governor does not enforce SB199, and he cannot be sued under *Ex parte Young*.

8

B.      **Congress Did Not Abrogate the State's Sovereign Immunity.**

DLC's argument that Congress has stripped the State of its sovereign immunity as to DLC's Title II claim fares no better. While Congress does have the ability to abrogate State sovereign immunity, that "power is not, however, unlimited." *Tennessee v. Lane*, 541 U.S. 509, 520 (2004). And in the case of Title II claims, Congress's abrogation of immunity has been held constitutional only "as it applies to the class of cases implicating the accessibility of judicial services." *Id.* at 531. Undeterred by the facts of *Lane*, which involved defendants who were denied physical "access to, and the services of, the state court system by reason of their disabilities," *id.* at 513, DLC now seeks to expand "accessibility of judicial services" into the realm of "judicial process." DLC Br. 17.

Neither precedent nor principle supports that sweeping conclusion. DLC's cited authorities involve not challenges to judicial process, but rather plaintiffs who were actually unable to access judicial proceedings and services. In every case, the court permitted suit under *Lane* to ensure availability of translation or interpretation services, without which the plaintiff could not "access the content of" judicial proceedings. *Prakel v. Indiana*, 100 F. Supp. 3d 661, 673 (S.D. Ind. 2015). And none of those cases disputed that *Lane*'s "holding was narrowly crafted and limited to cases implicating the accessibility of judicial services." *Mosier v. Kentucky*, 675 F. Supp. 2d 693, 699 (E.D. Ky. 2009). Above all, they did not purport to leverage "accessibility of judicial services" into a standard that abrogates immunity whenever a plaintiff seeks changes to judicial procedures—for instance, by seeking to increase involvement of publicly funded counsel. *See King v. King*, 174 P.3d 659, 664–66 (Wash. 2007). Increased access to cost-free legal counsel would undoubtedly create more "accessibility" in the broadest sense of the term. So too would longer deadlines or more frequent hearings. But DLC points to no court—and Defendants are aware of none—that stretched *Lane* to hold that Congress abrogated sovereign immunity for lawsuits

9

demanding such procedural innovations. And that is no surprise, because a contrary holding would threaten the bedrock principle that a State is "entitled to determine the procedure of its courts, so long as it provides the requisite due process." *United Gas Pub. Serv. Co. v. Texas*, 303 U.S. 123, 140 (1938).

DLC also misinterprets the Supreme Court's test laid out in *United States v. Georgia*, 546 U.S. 151 (2006), insisting that *Georgia* "has no bearing on whether sovereign immunity is validly abrogated here." DLC Br. 19. Not so. DLC seeks to expand Congress's abrogation of immunity to Title II claims beyond the physical accessibility context of *Lane* and into challenges to judicial procedures. And *Georgia* provides the roadmap followed by both the Supreme Court and the Tenth Circuit in analyzing "the ADA's relationship to the Eleventh Amendment" in new contexts, where it is unclear whether "Title II is a valid exercise of [Congress's Fourteenth Amendment] § 5 authority" to abrogate State immunity. *Guttman v. Khalsa*, 669 F.3d 1101, 1112–13 (10th Cir. 2012); *see id.* at 1113–25 (applying *Georgia*'s test and finding no abrogation). Here, as explained above and in Defendants' initial brief, "DLC has not alleged facts showing a Title II violation, as required by all prongs of the test" in *Georgia*. Dkt. 35 at 27. DLC's attempt to short-circuit the State's sovereign immunity therefore fails.

## CONCLUSION

The Court should grant Defendants' motion to dismiss.

DATED: March 6, 2026

                                             */s/ Mark C. Gillespie*
                                             Mark C. Gillespie
                                             *Assistant Solicitor General*

                                             David Wolf
                                             Keith W. Barlow
                                             Jason Dupree
                                             *Assistant Utah Attorneys General*
                                             ***Office of the Utah Attorney General***

                                             *Counsel for Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 6, 2026, I electronically filed the foregoing,

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S**

**COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(1)** by using the Court's electronic

filing system which will send a notice of electronic filing to the following:

Aditi Fruitwala
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15TH ST NW 6TH FL
WASHINGTON, DC 20005
212-549-2100
Email: afruitwala@aclu.org

Brian Lawrence Dimmick
AMERICAN CIVIL LIBERTIES UNION
915 15TH ST NW
WASHINGTON, DC 20005
202-731-2395
Email: bdimmick@aclu.org

Jacob Abudaram
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15TH ST. NW
WASHINGTON, DC 2005
(202) 548-6601

John A. Freedman
ARNOLD & PORTER KAYE SCHOLER
LLP
601 MASSACHUSETTS AVE NW
WASHINGTON, DC 20001
202-942-5316
Email: john.freedman@arnoldporter.com

Kristine Rose Itliong
ARNOLD & PORTER KAYE SCHOLER
LLP
250 W 55TH ST
NEW YORK, NY 10019
212-836-7037

Email: kristine.itliong@arnoldporter.com

Malhar Parimal Shah
ACLU
425 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CA 94104
562-879-4889
Email: mshah@aclu.org

Zoe Brennan-Krohn
ACLU
39 DRUMM ST
SAN FRANCISCO, CA 94111
415-343-0769
Email: zbrennan-krohn@aclu.org

Laura K. Henrie
DISABILITY LAW CENTER
960 S MAIN ST
SALT LAKE CITY, UT 84101
801-363-1347
Email: lhenrie@disabilitylawcenter.org

Nathaniel J. Crippes
DISABILITY LAW CENTER
960 S MAIN ST
SALT LAKE CITY, UT 84101
801-363-1347
Email: ncrippes@disabilitylawcenter.org

Thomas Ford , Jr
ACLU
311 S STATE ST STE 310
SALT LAKE CITY, UT 84111
801-521-9862
Email: tford@acluutah.org

Jason Michael Groth
311 S STATE ST STE 310
SALT LAKE CITY, UT 84111
563-419-4261
Fax: 801-532-2850
Email: jgroth@acluutah.org

*/s/ Asia Reid*
ASIA REID
Paralegal